CARELLA, BYRNE, CECCHI, OLSTEIN,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
LINDSEY H. TAYLOR
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

Co-Liaison Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AHMAD ODEH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:18-cv-17645-MCA-ESK **(Consolidated)** |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| IMMUNOMEDICS, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION AND OVERVIEW

1.    Lead Plaintiffs Construction Industry and Laborers Joint Pension Trust and Boris Saljanin (together,"Plaintiffs") hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Immunomedics, Inc. ("Immunomedics" or the "Company") between February 9, 2018 and January 17, 2019, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class, as defined below, are Defendants, present or former executive officers of Immunomedics and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)). Plaintiffs seek to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.    Plaintiffs allege the following based on personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel, Robbins Geller Rudman & Dowd LLP and Block & Leviton LLP.  This investigation included, but was not limited to, a review and analysis of: (i) Immunomedics' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Immunomedics' public conference calls; (iii) Immunomedics' press releases; (iv) independent media reports regarding

4810-6879-4098.v1

Immunomedics; (v) economic analyses of Immunomedics' stock price movement and pricing and volume data; (vi) consultation with relevant experts; (vii) relevant regulatory communications, including those between the U.S. Food and Drug Administration ("FDA") and Immunomedics; and (viii) other publicly-available material and data identified herein.

3.      Counsel's investigation of the facts underlying this action continues, and counsel further believes that relevant facts are known only by Defendants (and their agents) or are exclusively within their custody or control.  Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.      Immunomedics is a clinical-stage biopharmaceutical company that purports to develop monoclonal antibody-based products for the targeted treatment of cancer.  Since its formation in 1982, the Company has not obtained FDA approval for any drug that it has developed.  Prior to and throughout the Class Period, the Company's primary focus was to commercialize sacituzumab govitecan (referred to herein as "IMMU-132") as a third-line therapy for patients with metastatic triple-negative breast cancer ("mTNBC").

5.      In February 2016, the FDA granted IMMU-132 "Breakthrough Therapy Designation" (which provides for expedited FDA review).  However, investors started to criticize the Company for failing to aggressively capitalize on

- 2 -

this opportunity.    For instance, in November 2016, the Company's largest
shareholder, venBio Select Advisor LLC ("venBio"), complained in proxy materials
that Immunomedics had failed to find a partner to assist the Company in obtaining
FDA approval of IMMU-132, had been experiencing ongoing delays in ramping up
IMMU-132 manufacturing, and otherwise lacked the world-class manufacturing
facilities necessary to drive IMMU-132 to potential FDA approval.

6.    In response to venBio's and other investors' concerns, in February
2017, Immunomedics announced that it had entered into a $2 billion licensing
agreement with Seattle Genetics, Inc. ("Seattle Genetics").    Under the terms of the
licensing agreement, Seattle Genetics would be responsible for conducting a Phase
3 clinical trial for IMMU-132 in patients with mTNBC and submitting the biologic
license application ("BLA") to the FDA for review.    Seattle Genetics would also be
solely responsible for manufacturing and commercializing IMMU-132.    venBio
immediately objected to the licensing agreement, claiming that Immunomedics
management was giving away the Company's "crown jewel" and asserting that the
licensing transaction was really a sale of Immunomedics to Seattle Genetics on the
cheap.    After a heated proxy battle – and public lawsuit – venBio representatives
succeeded in gaining four seats on the Immunomedics Board of Directors and
ousting the Company's top executives, including its Chief Executive Officer
("CEO") and the Company's founder.

4810-6879-4098.v1

7.    By late spring 2017, the newly constituted Board of Directors (which included defendants Dr. Behzad Aghazadeh, Scott Canute, Peter Barton Hutt, and Khalid Islam) informed investors that they – unlike Immunomedics' prior management – possessed the requisite expertise to establish the necessary manufacturing infrastructure for IMMU-132 for the specific purpose of obtaining FDA approval and launching the drug in the United States during 2018.

8.    Between November 2017 and February 2018, Immunomedics announced the hiring of defendants Michael Pehl (as CEO) and Morris Rosenberg (as Chief Technology Officer) to further bolster the perceived expertise of the new management team and assure investors that Immunomedics would remain on track in delivering IMMU-132 to the market by the end of 2018.

9.    On January 31, 2018, however, Defendants discovered that their Morris Plains, New Jersey manufacturing plant, where IMMU-132 would be commercially manufactured if approved by the FDA, suffered from a serious data integrity breach (hereinafter the "Data Integrity Breach").  The Data Integrity Breach was described by Immunomedics internally as involving Company personnel deliberately manipulating bioburden samples, deliberately misrepresenting test procedures in batch records and intentionally backdating batch records (including the dates of the analytical results).  The Data Integrity Breach was a critical risk to FDA approval.

- 4 -

4810-6879-4098.v1

If the Company failed to demonstrate to the FDA that it had determined the scope of the Data Integrity Breach and remediated it, the FDA would not approve the BLA.

10.    Public documents (made available after the Class Period) reveal Defendants' admissions that they were "immediately" made aware of the Data Integrity Breach upon its discovery in January 2018, and that due to its severity, it was "immediately" reported to the FDA.  While Defendants also acknowledged that they concluded the Data Integrity Breach was of the "utmost concern" to them upon its discovery in January 2018, they still deliberately withheld from the FDA (on the basis of a purported attorney-client privilege) facts underlying the scope of the Data Integrity Breach and whether it was ever remediated.

11.    After assuring investors that Immunomedics' new management team – comprised of each of the Individual Defendants (defined herein) in this case – was capable of establishing and managing a world-class manufacturing capability in support of IMMU-132, Defendants were clearly motivated to mislead investors throughout the Class Period regarding the status of the Morris Plains manufacturing facility and conceal the issues involving the Data Integrity Breach.

12.    On February 8, 2018, for example, defendant Michael Pehl deliberately and falsely "***confirm[ed] that all critical work streams, including, for example, the previously discussed manufacturing validation runs, are yielding positive results***."

- 5 -

4810-6879-4098.v1

13.     On the same day, defendant Morris Rosenberg described the Company's purported communications with the FDA concerning Immunomedics' manufacturing capabilities, saying the FDA "*[has] seen our whole manufacturing process*," but disclosed nothing about how the manufacturing process suffered from a serious Data Integrity Breach or that the FDA had been immediately notified of the Data Integrity Breach.

14.     On February 22, 2018, defendant Michael Pehl spoke with analysts and investors about manufacturing process validation at the Morris Plains facility and Immunomedics' preparation of the facility for the highly anticipated FDA pre-approval inspection.  But, again, Pehl said nothing about the Data Integrity Breach at the Morris Plains facility.

15.     In June 2018, while the truth about the Data Integrity Breach was still unknown by the market, Immunomedics sold over 1.7 million shares of stock for net proceeds of $300 million pursuant to a Form S-3ASR and prospectus.  Defendants Michael Pehl, Michael Garone, Behzad Aghazadeh, Scott Canute, Peter Barton Hutt and Khalid Islam each signed the S-3ASR.  While the SEC filing warned the Company could suffer material adverse effects to its financial condition and results of operations *if* it suffered a security breach to its information systems, it failed to disclose that Immunomedics already suffered a serious Data Integrity Breach as a result of Immunomedics employees' deliberate and fraudulent conduct.  At the time

- 6 -

these Pehl, Garone, Aghazedeh, Canute, Hutt and Islam signed the Form S-3ASR and directed the $300 million stock offering, they each had direct knowledge of the circumstances of the Data Integrity Breach.

16.     Between August 6 and August 14, 2018, the FDA conducted an inspection of the Morris Plains facility.  One key purpose of the inspection was to engage with Immunomedics concerning the status of the Data Integrity Breach.  But each time the FDA asked Defendants for written proof regarding the scope of the Data Integrity Breach and whether the Company had resolved it, Defendants refused to provide it to the agency, claiming it was protected by attorney-client privilege.

17.     On August 14, 2018, during the pre-approval inspection close-out meeting with Immunomedics senior executives, the FDA informed the Company that without written proof of the Company's verbal assertions concerning the scope of the Data Integrity Breach and Immunomedics' purported remediation of it, the agency could not make any assessment as to whether the Data Integrity Breach had been resolved.  On August 14, 2018, moreover, the FDA issued a Form 483 to Immunomedics and Michael Pehl – an official report issued at the conclusion of an inspection if the investigators identify conditions that may constitute violations of relevant statutes – that again reiterated that the agency could not assess the Data Integrity Breach due to Immunomedics' refusal to provide written proof of

4810-6879-4098.v1

resolution. But even in the Company's September 4, 2018 final response to the Form 483, Defendants again refused to provide the FDA with the required proof.

18.    On December 20, 2018, prior to the market open, equity analyst Dr. Elliot Favus, M.D. ("Favus") of Favus Institutional Research issued a report (the "Favus Report") that broadly disseminated the details of the August 14, 2018 Form 483 issued to Michael Pehl and Immunomedics. When the market opened, the Company's stock price immediately dropped from $17.64 to below $13.00 per share, causing investors millions of dollars in damages.

19.    On December 20, 2018, in an effort to obfuscate the news about the Form 483 and temper the downward stock price pressure, Defendants immediately began issuing additional false and misleading statements to investors through friendly equity analysts. For instance:

- At 10:00 a.m. EST, Guggenheim Securities LLC ("Guggenheim") analysts stated: "We spoke with management who pointed out to us that this Form-483 was already received 4 months ago, this August, and the company believes it has addressed [the] manufacturing issues cited in the form."

- At 11:00 a.m. EST, Morgan Stanley analysts stated: "We spoke with mgt. . . . [The Company] believes they have communicated with the FDA about the issues prior to the 483 and have worked to remediate all the key issues. [The Company] further indicated that if these issues, including the 483, were material they would have issued a release highlighting the issues."

- At 11:30 a.m. EST, Wells Fargo Securities, LLC ("Wells Fargo") analysts stated: "We have spoken with management this morning regarding observations and understand that they occurred as part of a

4810-6879-4098.v1

pre-approval inspection in early August . . . and that the observations are 'old news' and a remediation has long been put in place."

- At 1:00 p.m. EST, Piper Jaffray analysts stated: "We spoke with IMMU which emphasized that some observations were flagged and discussed with the FDA well ahead of the inspection and that . . . IMMU feels that it is in a very good place."

- After the markets closed, a Jefferies analyst added: "[T]he company confirmed that it received the inspection reports in August of this year, and feel that it has addressed all of the issues raised during the inspection. While mgmt did not disclose specific content, they were outwardly confident that everything was adequately addressed, and further that they are confident in a positive decision by the FDA on or before the Jan PDUFA date."

Each of these statements, attributed to Immunomedics' management by key sell-side analysts, were materially misleading.[1]  Defendants knew, but failed to disclose, that the FDA requested written proof of Data Integrity Breach resolution and Defendants refused to provide that to the agency.  Defendants' misstatements succeeded in halting the downward pressure on Immunomedics stock price, which **closed down $3.47** per share for the day.

20.    Then, on January 10, 2019, defendant Michael Pehl again deliberately deceived investors when he said the Company "**did take care of [the issues listed in the Form 483] very early**."  One week later, after the close of the market on January 17, 2019, Immunomedics disclosed receipt of a Complete Response Letter ("CRL")

---

[1]    Morgan Stanley, Jefferies and Wells Fargo were underwriters for Immunomedics' June 2018 $300 million common stock offering.

4810-6879-4098.v1

notifying the Company that the FDA had rejected approval of IMMU-132 due to unresolved manufacturing violations at the Morris Plains manufacturing facility. As a result, the Company's stock price fell to $13.31 per share, down 26% compared to the prior day's close of $18.09 per share, resulting in a market capitalization loss of approximately $1 billion.

## JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

22.    This Court has jurisdiction over this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

23.    Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

24.    In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the Nasdaq stock market.

- 10 -

4810-6879-4098.v1

## PARTIES

**Plaintiffs**

25.    Construction Industry and Laborers Joint Pension Trust ("Pension Trust"), based in Nevada, purchased Immunomedics common stock during the Class Period on the Nasdaq and was damaged thereby. *See* ECF No. 6-2, Ex. B. Pension Trust is a defined-benefit plan that manages approximately $385 million in assets for the benefit of approximately 5,100 participants (including retirees and beneficiaries).

26.    Boris Saljanin, a resident of New York, purchased Immunomedics common stock during the Class Period on the Nasdaq and was damaged thereby. *See* ECF No. 11-2, Ex. B.

**Defendants**

27.    Immunomedics is a Delaware corporation that describes itself as a clinical-stage biopharmaceutical company focusing on the development of antibody-based products for the treatment of cancer. During all relevant times, the Company stated that its "most advanced product candidate" was IMMU-132. The Company's principal offices are located at 300 The American Road, Morris Plains, NJ 07950. Since the Company was founded in 1982, it has incurred significant operating losses and, over the course of nearly 40 years, has not developed any drug that the FDA approved for marketing and sales in the United States. Immunomedics is a control

- 11 -

4810-6879-4098.v1

person of the Individual Defendants within the meaning of §20(a) of the Exchange Act.

28.    Defendant Michael Pehl ("Pehl") served as the Company's CEO between December 7, 2017 and February 25, 2019.  During that period, Pehl also served as a member of Immunomedics' Board of Directors.  The Company's March 2, 2018 Proxy Statement described Pehl as having more than 20 years of experience in hematology and oncology and having launched multiple blockbuster drugs.  Prior to being appointed CEO at Immunomedics, Pehl worked in several executive positions at Celgene Corporation ("Celgene").  Pehl was forced to resign from the Company on February 22, 2019, three weeks after the FDA sent a written communication to Immunomedics, which included a copy of the FDA's Establishment Inspection Report concerning, among other things, the Data Integrity Breach at the Morris Plains manufacturing facility.

29.    Prior to and during the Class Period, Pehl was responsible for complying with the Company's Code of Ethics for the CEO and Senior Financial Officers (adopted by Immunomedics Board of Directors in 2003) ("Senior Officer Code of Ethics").  The Senior Officer Code of Ethics required Pehl to "[c]arefully review a draft of each" "financial press release or other public communications by the Company" and "SEC report and related documents for accuracy and completeness before each such report is filed with the SEC, with particular focus on

- 12 -

disclosures issues within his or her area of responsibility." The Senior Officer Code of Ethics warned that any "violation of this Code will subject a Senior Officer to disciplinary action, up to and including a discharge from the Company and, where appropriate, may subject the Senior Officer to civil liability and criminal prosecution." Pehl was also subject to the Company's External Communications Policy ("Communications Policy"). The Communications Policy stated that Pehl, together with the Company's Chief Financial Officer ("CFO") and Head of Investor Relations, were the only persons authorized by Immunomedics to speak on its behalf to the public. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

30.   Pehl made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶93-103, 106, 108-113, 115-120, and is liable for those false statements and omissions. Pehl is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

31.   Defendant Usuma Malik ("Malik") served as the acting CFO of the Company during the Class Period. Prior to being appointed acting CFO in August

- 13 -

4810-6879-4098.v1

2018, Malik had served as the Company's Chief Business Officer since August
2017. Malik's appointment as acting CFO followed Michael Garone's August 23,
2018 resignation as CFO. Prior to working for Immunomedics, Malik served in
various executive positions at Pfizer Inc., Booz & Co. and KPMG Consulting.

32.    During the Class Period, Malik was responsible for complying with the
Company's Senior Officer Code of Ethics. The Senior Officer Code of Ethics
required Malik to "[c]arefully review a draft of each" "financial press release or other
public communications by the Company" and "SEC report and related documents
for accuracy and completeness before each such report is filed with the SEC, with
particular focus on disclosures issues within his or her area of responsibility." The
Senior Officer Code of Ethics warned that any "violation of this Code will subject a
Senior Officer to disciplinary action, up to and including a discharge from the
Company and, where appropriate, may subject the Senior Officer to civil liability
and criminal prosecution." Malik was also subject to the Communications Policy.
The Communications Policy stated that the CEO, Malik and Immunomedics' Head
of Investor Relations were the only persons authorized by Immunomedics to speak
on its behalf to investors and the public. The purpose of the Communications Policy
was to ensure clear guidelines "for . . . making disclosures of, material information
to ensure all required disclosures are made accurately, timely and on a broadly
disseminated basis as defined by SEC Regulation Fair Disclosure." The

- 14 -

4810-6879-4098.v1

Communications Policy defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

33.    Malik made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶109-113, 115-119, and is liable for those false statements and omissions.  Malik is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

34.    Defendant Michael Garone ("Garone") served as the Company's CFO from the start of the Class Period through his resignation on August 23, 2018, the same day he signed the Company's 2018 Form 10-K.  Garone continued to serve as the Company's Vice President of Finance until he resigned from that position as well on December 24, 2018, four days after the publication of the Favus Report regarding Immunomedics' Form 483.  Prior to working at the Company, Garone served in executive financial positions at several companies, including Emisphere Technologies, Inc., Australis, Ltd. and AT&T, Inc.

35.    During the Class Period, Garone was responsible for complying with the Company's Senior Officer Code of Ethics.  The Senior Officer Code of Ethics required Garone to "[c]arefully review a draft of each" "financial press release or other public communications by the Company" and "SEC report and related documents for accuracy and completeness before each such report is filed with the

- 15 -

SEC, with particular focus on disclosures issues within his or her area of responsibility." The Senior Officer Code of Ethics warned that any "violation of this Code will subject a Senior Officer to disciplinary action, up to and including a discharge from the Company and, where appropriate, may subject the Senior Officer to civil liability and criminal prosecution." Garone was also subject to the Communications Policy. The Communications Policy stated that the CEO, Garone (during the period he was CEO) and Immunomedics' Head of Investor Relations were the only persons authorized by Immunomedics to speak on its behalf to investors and the public. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy also defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

36.     Garone made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶93, 97, 100, 102-103, 106, and is liable for those false statements and omissions. Garone is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

37.     Defendant Morris Rosenberg ("Rosenberg") served as the Company's Chief Technology Officer ("CTO") throughout the Class Period. According to the

4810-6879-4098.v1

Company's February 28, 2018 press release announcing Rosenberg's January 2018 hiring, Rosenberg had "been a key consultant to Immunomedics for the past nine months, focusing on building an outstanding team and preparing for commercial launch [of IMMU-132], including a robust CMC package for BLA submission."

38.    Rosenberg was also subject to the Communications Policy. According to the Communications Policy, Rosenberg could not speak on behalf of the Company "without the prior approval of the Company Spokespersons" (*i.e.*, the current CEO, CFO and Head of Investor Relations, among others). During the Class Period, Rosenberg made several public statements on behalf of the Company, as alleged at ¶¶95-96, 115-119. In accordance with the Communications Policy, defendants Pehl, Garone and Malik had to have approved Rosenberg to speak on the Company's behalf regarding, among other things, the status of the Morris Plains manufacturing facility during the Class Period. The purpose of the Communications Policy was to ensure clear guidelines "for . . . making disclosures of, material information to ensure all required disclosures are made accurately, timely and on a broadly disseminated basis as defined by SEC Regulation Fair Disclosure." The Communications Policy defined "[n]on-public communications with regulators, including the FDA" as a specific example of "[m]aterial [n]on-[p]ublic [i]nformation."

39.    Rosenberg made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶95-96, 115-

- 17 -

4810-6879-4098.v1

119, and is liable for those false statements and omissions. Rosenberg is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

40.     Defendant Dr. Behzad Aghazadeh ("Aghazadeh") has been a member of Immunomedics' Board of Directors since March 2017. Throughout the Class Period, Aghazadeh was the Company's Executive Chairman of the Board of Directors. At all relevant times, Aghazadeh served as Managing Partner and Portfolio Manager of venBio. Between 2000 and 2006, Aghazadeh was in the healthcare practice at Booz Allen Hamilton Holding Corporation (now a unit of PricewaterhouseCoopers), and between 2006 and 2011 served as an analyst for Bernstein Value Equities and Sio Capital Management.

41.     Aghazadeh made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 115-119, and is liable for those false statements and omissions. Aghazadeh is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

42.     Defendant Scott Canute ("Canute") has been a member of Immunomedics' Board of Directors since March 2017. Throughout the Class Period, Canute served on Immunomedics' Executive Committee, Audit Committee, Compensation Committee (Chair), Governance and Nominating Committee and Research & Development Committee. Between 2004 and 2007, Canute served as

- 18 -

4810-6879-4098.v1

the President of Global Manufacturing Operations at Eli Lilly and Company and between 2010 and 2011, as President of Global Manufacturing and Corporate Operations at Sanofi Genzyme.

43.    Canute made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 115-119, and is liable for those false statements and omissions.  Canute is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

44.    Defendant Peter Barton Hutt ("Hutt") has been a member of Immunomedics' Board of Directors since March 2017.  Throughout the Class Period, Hutt served on Immunomedics' Executive Committee, Compensation Committee and Governance and Nominating Committee (Chair).  Since 1975, Hutt has served as Senior Counsel of Covington & Burling LLP.  Between 1971 and 1975, Hutt served as the FDA's Chief Counsel.

45.    Hutt made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 115-119, and is liable for those false statements and omissions.  Hutt is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

46.    Defendant Dr. Khalid Islam ("Islam") has been a member of Immunomedics' Board of Directors since March 2017.  Throughout the Class Period, Islam served on Immunomedics Executive Committee (Chair), Audit

- 19 -

Committee (Chair), Compensation Committee, Governance and Nominating Committee and Research & Development Committee (Chair). Between 2009 and 2014, Islam served as the Chairman and CEO of Gentium S.p.A. and since 2014 served as the Managing Director of Life Sciences Management GmbH.

47.    Islam made or had authority over the content and dissemination of the false and misleading statements and omission set forth herein at ¶¶102-103, 106, 115-119, and is liable for those false statements and omissions. Islam is also a control person of Immunomedics within the meaning of §20(a) of the Exchange Act.

48.    Defendants Immunomedics, Pehl, Malik, Garone, Rosenberg, Aghazadeh, Canute, Hutt and Islam are collectively referred to herein as "Defendants."

49.    Defendants Pehl, Malik, Garone, Rosenberg, Aghazadeh, Canute, Hutt and Islam are collectively referred to herein as the "Individual Defendants."

## FACTUAL BACKGROUND

### Metastatic Triple-Negative Breast Cancer – "mTNBC"

50.    mTNBC is a serious disease. It includes about 12% of all breast cancer types. mTNBC is more aggressive than other forms of breast cancer. It is more likely to spread to other areas of the body, and there is a higher chance it will come back within the first three years after treatment. It is also more likely to be fatal

4810-6879-4098.v1

within the first five years. But once a patient passes those milestones, his or her odds of beating it are about the same as someone with any other type of breast cancer.

51.    One of the distinguishing features of mTNBC is that it tests negative for three of the main things – the hormones estrogen and progesterone and a protein called HER2 – that drive other forms of cancer.

52.    Because mTNBC is different than other forms of cancer in this way, it does not respond to some of the medications that work for these other types of cancer. And patients with mTNBC have a poorer short-term prognosis than other subtypes, in part because of this lack of targeted therapies for this cancer type. *See* Giampaolo Bianchini, Justin Balko, Ingrid Mayer, Melinda Sanders & Luca Gianni, *Triple-negative breast cancer: challenges and opportunities of a heterogeneous disease*, 13 Nature Rev. Clinical Oncology, 674-690 (May 17, 2016).

53.    Therefore, new targeted treatment therapies are desperately needed to save lives.

**Sacituzumab Govitecan or IMMU-132**

54.    Throughout the Class Period, Immunomedics' primary focus was the commercialization of IMMU-132, which was predominantly intended to be marketed for the treatment of patients with mTNBC who had received at least two prior therapies for metastatic disease. IMMU-132 was also touted as a possible product candidate in the treatment of other solid tumors and cancers.

- 21 -

4810-6879-4098.v1

55.    IMMU-132 is an antibody-drug conjugate ("ADC"), which means it is made up of an antibody attached to an anticancer drug. IMMU-132 is designed to deliver a specified payload of chemotherapeutics directly to the tumor. The biologic product is believed to work by binding the antibody portion of the drug to the tumor(s), while the anticancer drug portion works to prevent the cancer cells from growing and/or spreading. ADCs have less toxicity than conventional chemotherapy, thereby reducing the total exposure of a patient to the debilitating side effects typically associated with therapeutic agents. This targeted treatment and lower toxic exposure is what makes ADCs unique.

56.    As of 2018, if approved by the FDA, IMMU-132 would be the first ADC of its kind approved for use by patients with mTNBC. Given that Immunomedics had failed to obtain FDA approval of any drug candidate in the Company's near 40-year history, market participants were keenly focused on the regulatory pathway of IMMU-132, including the FDA's BLA pre-approval inspection of the Company's Morris Plains manufacturing facility.

57.    Because of Immunomedics' history of suffering material operating losses since 1982, the Company had to obtain funding for research and development and operations from the private and public sale of equity and debt securities, in addition to relatively small amounts of revenue from licensing agreements for other drug compounds. Prior to the Class Period, Immunomedics made a strategic

4810-6879-4098.v1

decision to shift from merely developing potential new drug candidates to developing and commercializing therapeutic product candidates. As a result, Immunomedics' spending on research and development increased significantly, costing the Company $53.5 million in 2016, $51.8 million in 2017 and $99.3 million in 2018. This pattern of increased spending was a direct result of the Company's efforts to obtain FDA approval of IMMU-132 and establish a first-class manufacturing facility for the drug.

**Immunomedics' Attempt to License IMMU-132 to Seattle Genetics**

58. In February 2016, Immunomedics announced that the FDA had granted IMMU-132 Breakthrough Therapy Designation, which serves to speed up the development and FDA review of drugs that could represent an improvement over existing therapies. The FDA's Breakthrough Therapy Designation was a significant recognition that IMMU-132 had the potential to significantly improve the outcome for patients with mTNBC.

59. Investors became frustrated with Immunomedics' perceived failure to capitalize on the opportunity presented by the FDA's Breakthrough Therapy Designation. For instance, in 2016, investors believed that Immunomedics' management had failed to maintain sufficient funds to push IMMU-132 through a Phase 3 clinical program, and otherwise failed to find a competent partner to assist

4810-6879-4098.v1

in getting IMMU-132 approved by the FDA and in the hands of patients who could benefit from the drug.

60.     In November 2016, Immunomedics' largest shareholder, venBio, filed materials with the SEC that described a number of Immunomedics' perceived failures with regard to the development and commercialization of IMMU-132. As a result, venBio nominated a majority slate of dissident director candidates and triggered a heated and protracted proxy fight. Among other things, venBio expressed the following concerns:

- In June 2016, the Company announced that it had been ejected from a meeting of the American Society of Clinical Oncology ("ASCO") because management had failed to adhere to a data embargo policy, meaning that it shared the data on the IMMU-132 clinical trials before the ASCO meeting. As a result, IMMU's share price dropped over 50% after the Company lost the opportunity to further validate IMMU-132 with the medical community and missed out on significant media exposure because of management's missteps.

- The Company's failure to deliver on its promise of signing a partnership or appropriate licensing agreement to move its only viable drug candidate, IMMU-132, through clinical development despite early clinical successes and the rarely-granted Breakthrough Therapy Designation by the FDA.

61.     venBio also asserted that Immunomedics' capability to manufacture IMMU-132 in a commercial setting was a significant concern. According to the venBio, Immunomedics had experienced "[o]ngoing delays" in getting its manufacturing processes ready. venBio expressed that it was "skeptical of IMMU's communicated manufacturing strategy," and stated that "IMMU cannot manufacture

- 24 -

4810-6879-4098.v1

their product without world-class CMC (Chemistry, Manufacturing & Controls) operating flawlessly, which [Immunomedics] likely do[es] not have."

62.    In response to these complaints, on February 10, 2017, the Company announced that it had entered into a $2 billion licensing agreement for IMMU-132 with Seattle Genetics.  Under the terms of the licensing agreement, Seattle Genetics would be responsible for conducting a Phase 3 clinical trial for IMMU-132 in patients with mTNBC and submitting the BLA to the FDA for accelerated approval. Seattle Genetics would also be solely responsible for manufacturing and commercializing IMMU-132.    In exchange, Seattle Genetics would pay Immunomedics a $250 million up-front payment, with the remaining $1.75 billion being contingent on the drug achieving certain clinical, development, regulatory and sales milestones.  Immunomedics would retain the right to co-promote IMMU-132 in the United States by participating in 50% of the sales effort, subject to certain parameters set forth in the agreement.

63.    While some investors cheered the announcement of the $2 billion licensing deal, which led to an increase in the Company's stock price, venBio immediately and strenuously objected to it.  venBio thereafter filed a lawsuit against Immunomedics' former slate of directors, Seattle Genetics and Greenhill & Co., which served as adviser to Immunomedics, and Immunomedics as a nominal defendant.  venBio condemned the deal as essentially giving away Immunomedics'

- 25 -

"crown jewel" at a price that was well below market.  Essentially, venBio claimed

the deal was a sale of Immunomedics to Seattle Genetics on the cheap and, at

minimum, provided Seattle Genetics the right to acquire a large portion of

Immunomedics common stock at a deep discount.  venBio also objected to the deal

on the basis that Immunomedics' then-Chief Scientific Officer David Goldenberg

("Goldenberg") (Immunomedics' founder), who was married to then-CEO and

director Cynthia Sullivan ("Sullivan"), was eligible for various royalties and other

payments as a result of the Seattle Genetics transaction, which were not subject to

any maximum cap.  venBio further alleged that the former directors stood to be

awarded lucrative packages on the closing of the deal.  Thus, according to venBio,

the deal would have enriched Immunomedics directors and officers at the expense

of venBio and other Immunomedics shareholders.

64.    At the end of the proxy battle, venBio representatives (and defendants

in this case) Aghazadeh, Canute, Hutt, and Islam ultimately gained seats on the

Immunomedics Board of Directors.  Each of these directors touted their extensive

experience in the biotechnology industry and ability to successfully fast-track

IMMU-132 to FDA approval and get it to market.  For instance, according to venBio:

> Canute's specific expertise in the area of commercial biologics
> manufacturing (commonly referred to in the industry as Chemistry,
> Manufacturing, and Controls ("CMC")), as well as his extensive board
> experience with multiple pharmaceutical companies make him highly
> qualified to help run Immunomedics's business. In particular, Mr.
> Canute's experience and expertise in CMC will provide critical

4810-6879-4098.v1

assistance to the Company's development of IMMU-132, which cannot be manufactured successfully unless CMC operates flawlessly.

65.     On May 5, 2017, following venBio's successful campaign to place its people on Immunomedics' Board of Directors, the Company announced that Seattle Genetics had agreed to terminate the licensing agreement and settle the related litigation with venBio.   Additionally, the Company announced that Sullivan and Goldenberg were resigning from their positions at Immunomedics.   Immunomedics, under the leadership of Aghazadeh, Canute, Hutt, and Islam, announced that the new Board of Directors had conducted a review of the strategy of the Company, including a review of the projected timeline for the BLA submission for IMMU-132.   The Company also announced that the planned BLA filing date had slipped to "between late fourth quarter 2017 and first quarter 2018," and was "subject to FDA acceptance of the Company's chemistry, manufacturing and controls filing."

66.     Around the time of the termination of the Seattle Genetics licensing agreement, Immunomedics hired defendant Rosenberg as an outside consultant to get the Morris Plains manufacturing plant ready for an FDA pre-approval inspection. In November 2017, Immunomedics announced that it hired defendant Pehl due to his "proven ability to successfully navigate the approval and commercialization of ground-breaking drugs in the oncology space – which we are confident IMMU-132 and other products in our pipeline will be."   In February 2018, the Company

- 27 -

announced that Rosenberg would no longer be just a consultant, but had been hired as Immunomedics' CTO.

67.    The scuttling of the Seattle Genetics deal left Defendants with the need to deliver on their commitment that Immunomedics, alone, could timely file the IMMU-132 BLA, and get the Morris Plains manufacturing facility ready for a robust FDA pre-approval inspection and commercial production. Indeed, after: (a) nearly 40 years of repeated failures to get a single drug approved by the FDA; (b) Aghazadeh, Canute, Hutt and Islam successfully removed Immunomedics management who were purportedly responsible for those failures; and (c) the repeated assurances to investors that the Company under new management could deliver IMMU-132 to the market, Defendants knew that any failure to do so would be harshly judged by investors and the market.

**FDA Approval Process of Biologics**

**Biologics License Application – "BLA"**

68.    IMMU-132 is a biological pharmaceutical, or biologic. Biologics differ from conventional drugs in that a biologic is a large, complicated molecule that only comes from living systems or contains organic molecules, whereas non-biologic, small-molecule drugs largely come from chemicals. Often, biologics are injected while drugs are usually swallowed. Biologics are generally so large and complex that their exact structure is unknown. By contrast, conventional drugs have an

- 28 -

easily-identifiable chemical structure and can usually be analyzed to determine all their various components.

69.    Prior to the marketing and sale of any biologic, the product must go through an extensive FDA approval process.   The approval process includes completion of preclinical laboratory tests and animal studies, performance of clinical trials in humans, submission of a BLA, and FDA review and approval of the application.

70.    While a new drug application ("NDA") is used for drugs, a BLA is required for biological products. The process is so similar, in fact, that the FDA Form 356h is used for both NDA and BLA submissions.  Like an NDA submission, the BLA submission can be tens of thousands of pages long.  The BLA similarly includes detailed information on the biologic, including the data and results from both the preclinical and clinical testing and trials, as well as information concerning the biologic's chemistry, manufacturing, controls and proposed labeling.  The FDA evaluates the BLA to determine whether the biologic is safe and effective for its intended use.  Additionally, and importantly, the FDA must make a determination that the manufacturing process and facilities meet applicable regulations and requirements to ensure the continued safety, purity and potency of the product.  The regulations regarding BLAs for therapeutic biological products include 21 C.F.R. parts 600, 601, and 610.

4810-6879-4098.v1

71.    The manufacturing process for a biological product is usually different from the manufacturing process of drugs.  For biologics, "the product is the process," and biologics are often defined by their manufacturing processes.  Whereas finished drugs can be replicated with 100 percent confidence in manufacturing sites across the globe, biologics are impossible to recreate with 100 percent accuracy. And while drug manufacturers can change the manufacturing process extensively and analyze the finished product to establish that it is the same as before the manufacturing change, biologic manufacturers must ensure product consistency, quality and purity by maintaining a substantially similar manufacturing process over time.

72.    The living systems used to produce biologics can be sensitive to even very minor changes in the manufacturing process.  Small changes in the manufacturing process, equipment or facilities can significantly affect the nature of the biological product itself and the way it functions in the body, sometimes requiring additional clinical studies to demonstrate the product's safety, identity, purity and potency.  To ensure the manufacturing process remains the same over time, biologic manufacturers must tightly control the source and nature of starting materials, and consistently employ hundreds of process controls that assure predictable manufacturing outcomes. Because a tightly controlled manufacturing process for biologics is crucial, production is monitored by the FDA from the early stages to make sure the final product turns out as expected.

4810-6879-4098.v1

**FDA Form 483**

73.    As part of the review process of a BLA, the FDA conducts what is known as a "pre-approval inspection" of the applicant's manufacturing facilities to ensure that the facility complies with applicable rules and regulations in manufacturing the biologic in question. These regulations are known as current Good Manufacturing Practice ("cGMP") regulations and compliance with cGMP includes an investigation of any deviations from cGMP regulations and the correction of those deviations if any are found. Failure to comply with cGMP may result in a variety of consequences, including subjecting a company to regulatory enforcement or a delay in the potential approval and commercialization of a biopharmaceutical product.

74.    Immunomedics emphasized the importance of complying with cGMP in its annual reports on Form 10-K filed with the SEC. For example, the Company informed investors:

**Manufacturing Regulatory Considerations**

In addition to regulating and auditing human clinical trials, the FDA regulates and inspects equipment, facilities and processes used in the manufacturing of such products prior to providing approval to market a product. If, after receiving approval from the FDA, a material change is made in manufacturing equipment, location, or process related to an approved product, additional regulatory review may be required. We must also adhere to cGMP and product-specific regulations enforced by the FDA through its facilities inspection program. The FDA also conducts regular, periodic visits to re-inspect equipment, facilities, and processes following the initial approval. If, as

4810-6879-4098.v1

a result of these inspections, the FDA determines that our equipment,
facilities or processes do not comply with applicable FDA regulations
and conditions of product approval, the FDA may seek civil, criminal
or administrative sanctions and/or remedies against us, including the
suspension of our manufacturing operations.

75.    According to the FDA, a notice on FDA Form 483 may be issued if an

inspector finds conditions at a manufacturing facility to be in violation of the Federal

Food, Drug and Cosmetic Act, cGMP or any other applicable regulations.  A Form

483 logs observations seen during the course of the FDA inspection, and

observations are made when an inspector determines that a drug has been adulterated

or is being prepared, packed or held under conditions where the drug may be

adulterated or become injurious to health due to conditions or practices that are not

in compliance with regulations.

76.    At the end of the inspection, a Form 483 is issued to the company's

management if an observed violation has been made by FDA inspectors.  In

conjunction with the Form 483, each observation is read and discussed with

management at the inspection "close-out" meeting so that the company understands

the significance of each observation.  Upon receipt of the Form 483 the company

must adequately respond within 15 days with a corrective action plan that the

company must then implement.  The Form 483, the Establishment Inspection Report,

any additional evidence/documentation and the company's responses thereto are

collectively considered by the FDA in determining whether further action is needed.

- 32 -

4810-6879-4098.v1

**Establishment Inspection Report – "EIR"**

77.     Subsequent to the completion of the FDA's inspection of a company's manufacturing facilities, the FDA inspectors prepare and issue a written Establishment Inspection Report ("EIR"). The EIR includes a detailed summary of the FDA inspection team's findings, details regarding a Form 483 (if issued), descriptions of failures or refusals by the company to remediate observed violations, whether the company is approved for distribution of the product at issue, summaries of interviews conducted by the inspectors, details on the company's training program and a description of the inspectors' tour of the facility. The EIR also includes any objectionable conditions noted by the inspectors, notates supporting evidence for the FDA's conclusions, and details management's responses to the observations during the inspection.

**Complete Response Letter – "CRL"**

78.     The final step in the BLA review cycle is the issuance of either an approval letter or a CRL by the FDA. If a company receives a CRL, the FDA's review of the BLA is complete and the agency has determined that the product is not ready for approval. CRLs may also list additional data, clinical trials, preclinical studies, or remediation of manufacturing issues that may be required of the sponsor company prior to BLA approval. In addition, the FDA may request that the sponsor resubmit the BLA at a future date.

4810-6879-4098.v1

### The Immunomedics Data Integrity Breach

79.    On January 31, 2018, Immunomedics personnel internally reported a Data Integrity Breach that was discovered upon a review of analysis of bioburden data at the Morris Plains manufacturing facility.  "[A]nd in the days immediately following" January 31, 2018, Pehl and the Board of Directors were notified of the Data Integrity Breach.  Ex. A, App'x 1, at 2 of 29 (attached hereto).  It bears emphasis, moreover, that the Data Integrity Breach was so serious that Immunomedics informed the FDA of the Data Integrity Breach "immediately upon [its] discovery" on January 31, 2018.  *Id.* at 4 of 29.  Defendants immediately identified the Data Integrity Breach as "a matter deserving [their] utmost attention," and brought in outside counsel to investigate the Data Integrity Breach under the cloak of attorney-client privilege.  *Id.* at 2 of 29.

80.    Immunomedics had originally informed investors that it would be filing the IMMU-132 BLA with the FDA in March 2018.  Due to Defendants' discovery of the Data Integrity Breach on January 31, 2018, Defendants knew they needed additional time to begin the process of resolving it.  Accordingly, on February 8, 2018 after the market closed, Immunomedics told the investing public that it was pushing its BLA filing date out by two months.  In announcing the delay, however, Defendants deliberately concealed from investors any and all information regarding the Data Integrity Breach.

- 34 -

4810-6879-4098.v1

81.    To avoid investor outrage with another delay, on May 21, 2018, Immunomedics submitted the BLA to the FDA for IMMU-132. On July 18, 2018, the application was accepted and scheduled to be reviewed by the FDA within six months. Pehl claimed the submission of the BLA for IMMU-132 was a "significant milestone" for the Company and told investors "[w]e will continue to work closely with the [FDA] as we strive to bring this potential new treatment to mTNBC patients expeditiously." But, again, Pehl said nothing about the Data Integrity Breach.

82.    Between August 6 and August 14, 2018, the pre-approval inspection of Immunomedics' manufacturing facilities was conducted in Morris Plains, New Jersey. *See* Exs. B, C (attached hereto). The FDA issued a Form 483 to Pehl and Immunomedics on August 14, 2018, immediately following the completion of the inspection and after consulting with the Company about the agency's findings. Ex. B. The FDA inspectors logged 13 observations on the Form 483, the first two of which related to the Data Integrity Breach. *Id.* The FDA inspectors determined that the Data Integrity Breach should have triggered a deviation that should have been investigated by the Company's quality control unit, but no deviation was generated. *Id.* at 1. The Form 483 identified that the Data Integrity Breach included "manipulation of bioburden samples, misrepresentation of the [REDACTED] integrity test procedure in the batch record and backdating of batch records, including dates of analytical results." Ex. B at 1. Moreover, the Form 483 stated

- 35 -

4810-6879-4098.v1

that the FDA could make no assessment whether the Data Integrity Breach had been remediated because documentation necessary to make that assessment was deliberately withheld by Defendants pursuant to attorney-client privilege. *Id.*

83.    On September 4, 2018, Immunomedics issued a 29 page response to the Form 483, but did not make it publicly available. *See* Ex. A.  Immunomedics' response conceded that the Data Integrity Breach had first been raised internally on January 31, 2018, and that defendants Pehl, Aghazadeh, Canute, Hutt and Islam had been notified of the Data Integrity Breach immediately following its discovery. *Id.*, App'x 1 at 2 of 29.  Immunomedics also confirmed that its internal investigation determined that "employee misconduct [was] identified and verified" and resulted in the "separation of three managers from the Company." *Id.*  As a result of the Form 483 observations concerning the Data Integrity Breach, Immunomedics informed the FDA that it had implemented several changes, including the issuance of an Ethical Conduct and Data Integrity corporation policy, initiation of a Data Governance Program and training on data integrity and good documentation practices. *Id.* at 3 of 29.

84.    Between September 26 and 27, 2018, the FDA inspectors responsible for the agency's pre-approval inspection of the Morris Plains manufacturing facility, signed the EIR, which contained a detailed narrative of the events that occurred during the August 6-14, 2018 pre-approval inspection. *See* Ex. C.  At bottom, the

- 36 -

EIR contained the factual underpinnings of the FDA inspectors' observations listed in the August 14, 2018 Form 483 issued to Pehl. The EIR, comprised of a 59-page report plus numerous attachments and exhibits, confirmed that the Data Integrity Breach had been discovered during the review of the bioburden data in January 2018. The EIR also confirmed that the status of the Data Integrity Breach could not be ascertained because of Immunomedics' repeated invocation of the attorney-client privilege to withhold documentary proof to back up Defendants' verbal claims regarding the scope and remediation of the Data Integrity Breach. *Id.*, App'x at 41-42.

85.    With respect to the manipulation of bioburden samples, the EIR noted that "in-process samples were [REDACTED] by the manufacturing operators prior to be submitted to the QC lab for analysis" and the manipulation "was conducted to prevent potential bioburden non-conformances of the samples." *Id.* at 40. The inspectors also determined that an integrity test in the batch record was compromised and "would not have detected any failure in the integrity." *Id.* The EIR also stated that "operators recorded the operations later using the date when the operation was supposed to be recorded." The inspectors found that the backdating "included information regarding manufacturing operations and input of analytical data." *Id.*

86.    The EIR went on to describe the FDA inspectors' interactions with Immunomedics management and their repeated refusal to provide any evidence

- 37 -

4810-6879-4098.v1

concerning their verbal claims concerning the scope and purported resolution of the
Data Integrity Breach. Specifically, the EIR detailed an inspector's communications
with Rosenberg, who was identified as the "most responsible person at the facility
at the start of the inspection." *Id.* at 1. An FDA inspector noted in the EIR that he
had asked Rosenberg for additional information concerning the Data Integrity
Breach, but was only given limited information in response. *Id.* at 40. Rosenberg's
initial response was that the Data Integrity Breach had been discovered through an
analysis of historical bioburden data in January 2018, and that only two procedures
were impacted – manipulation of the bioburden samples and misrepresentation of
the integrity test procedures. *Id.* However, the inspector observed that Rosenberg
failed to disclose the issue related to the integrity test procedures discovered by
Immunomedics in January 2018 until the inspector directly asked about it. *Id.*

87.    As described in the EIR, on August 9, 2018, the FDA inspector asked
Rosenberg again about the Data Integrity Breach, and inquired if it only impacted
the two procedures Rosenberg had previously disclosed to him. *Id.* Rosenberg
finally conceded that a third procedure had been impacted, which related to the
backdating of records. *Id.* Subsequently, the FDA investigator requested
information concerning Immunomedics' investigation/deviation of the Data
Integrity Breach, and management was forced to admit that no deviation had been
initiated. Rosenberg claimed that remediation steps had been taken but refused to

4810-6879-4098.v1

honor the FDA's repeated requests for documentation supporting this verbal claim, asserting attorney-client privilege over the documents (which included interview transcripts from the investigation of the Data Integrity Breach performed by outside counsel). *Id.* at 40-41.

88.     The EIR also revealed the FDA inspector's determination that the scope of the Data Integrity Breach was much broader than what had initially been disclosed to the FDA in Immunomedics' early 2018 letter to the agency, which had only identified the manipulation of the bioburden samples. *Id.* at 41. The inspector noted that while Immunomedics had provided an update to the FDA (prior to the August 2018 inspection), the Company had again failed to disclose that any additional procedures had been impacted by the Data Integrity Breach. *Id.*

89.     On August 9, 2018, Rosenberg gave the FDA inspector a document that he represented was information given to the firm's outside counsel investigating the Data Integrity Breach. *Id.* at 42. But the FDA inspector noted that the document was dated August 7, 2018 and was nothing more than a summary of what Rosenberg had verbally claimed during the inspection. Regardless, the inspector requested to keep a copy of this document for the FDA's records, but Rosenberg refused. *Id.* Accordingly, the EIR logged the FDA inspectors' determination that "no verbal information could be verified during the inspection because the firm refused to provide" documentary proof. *Id.* at 41.

- 39 -

4810-6879-4098.v1

90.     During the inspection, the FDA inspectors attempted to assess the impact of the Data Integrity Breach through a review of the Company's historical bioburden data.  Although Rosenberg insisted throughout the inspection that the Data Integrity Breach had stopped before the process performance qualification ("PPQ") campaign, which was initiated August 1, 2017, the FDA inspector determined after testing the bioburden samples that the Data Integrity Breach "was ongoing during the PPQ campaign and possibly during the commercial campaign." *Id.* at 44 of 66.  The FDA inspector found no evidence to support Rosenberg's verbal claim. *Id.*

91.     In response to the FDA inspectors' findings, Immunomedics' management "indicated at the [August 14, 2018] inspection close-out that they understood the seriousness of the observation[s] and they would respond to the FDA." *Id.*

92.     The EIR was provided to Immunomedics and the Individual Defendants on February 6, 2019.  Within three weeks of its receipt, Pehl was forced to resign.

### DEFENDANTS' MISLEADING STATEMENTS
### AND MATERIAL OMISSIONS

93.     After the market closed on February 8, 2018, Immunomedics issued a press release and thereafter filed a Form 8-K, signed by Garone and attaching the press release, with the SEC.  The press release, reviewed and approved for

- 40 -

4810-6879-4098.v1

publication by Pehl and Garone was entitled "Immunomedics Announces Second

Quarter Fiscal 2018 Results and Provides Corporate Update."   In the press release,

Pehl stated:

> *I am pleased with the overall progress across clinical and manufacturing work streams, including successful validation runs. Our focus continues to be on compiling a BLA package that efficiently brings [IMMU-132] to market, and one that anticipates and addresses potential FDA requests going forward.  As such, we now expect to file the BLA by the end of May 2018.*

The press release further announced that Rosenberg had joined the Company as CTO

and would focus on preparing IMMU-132 for commercial launch, including

developing a robust CMC package for the BLA submission.

94.    Immediately after the Company issued its February 8, 2018 press

release, Immunomedics held a conference call with analysts and investors to discuss,

among other things, the Company's second fiscal quarter of 2018 ("2Q18") financial

results, the status of the IMMU-132 BLA and pre-approval inspection efforts at the

Morris Plains manufacturing facility.   Pehl and Rosenberg participated in the

conference call.   During Pehl's opening remarks, he stated:

> We continue to work diligently and have made significant progress towards the filing of our BLA.  Since joining the company, I have asked for a thorough review of all submission and site inspection related work streams to ensure highest quality of our filing documents and manufacturing and inspection preparedness efforts.  *I'm very pleased with the overall status and quality and can confirm that all critical work streams, including, for example, the previously discussed manufacturing validation runs, are yielding positive results.   We are tracking slightly behind our previously*

- 41 -

4810-6879-4098.v1

*communicated time schedule, as we seek to compile the most complete package possible that anticipates future FDA requests*.  We therefore now anticipate filing the BLA by the end of May 2018.

95.     Later in the February 8, 2018 conference call, Pehl and Rosenberg

engaged in the following exchange with Philip M. Nadeau ("Nadeau"), an equity

analyst for Cowen & Co.:

> [NADEAU:] I guess, first question is on the BLA timelines.  As you suggested, they're a couple difference versus prior guidance. Could you talk a little bit more about what gave rise to that?  Was it simply some of the work streams that you are working on are a little bit – going a little slower than maybe you initially anticipated?  Or is it more that in looking through the filing, Michael, you decided that there is some analyses that should be in there to anticipate potential questions from the FDA?

> [PEHL:] Yes, this is Michael.  Thanks, Phil, for the question. So let me start by saying that I'm really very pleased with the overall status and the quality of the CMC and clinical submission package.  *And that I can really confirm that all the critical submission-related work streams, including, for example, the previously discussed manufacturing validation runs, are providing positive results*.  There [are] 2 principal reasons for why we are now guiding to a submission date at the end of May, which represents a change of about 2 months. And Morris Rosenberg, who is with me in the room, will provide you with a bit more detail in a minute.  The first is that we had a very important pre-BLA CMC meeting with the agency in January, during which they requested that we do 3 additional assays.

> *We adjusted our original schedule to allow sufficient time to validate these assays and incorporate the data into our BLA submission package.  So that was reason number one.  Reason number two is that we had very aggressive initial time lines associated with the validation of the bioanalytical assays and testing for literally thousands of animal and human PK samples*.  And it has just taken us longer than originally anticipated to complete the assay validations, run the samples and incorporate the data into the BLA submission.  So

- 42 -

we're making really rapid progress and good progress on both of these fronts, and we are very confident that we will meet our new date of end of May. And I just want to hand over to Morris for providing a little bit of detail and flavor.

[ROSENBERG:] Sure. Thank you, Michael. We've made tremendous progress over the last 6 months in process validation, assay validation and so forth. And Michael mentioned that we had the pre-BLA meeting focused on CMC with the FDA. We have an excellent working relationship with the FDA. At that most recent CMC pre-BLA meeting that we had with the agency in January, they requested that we add 3 assays to our package. One assay is a routine assay that measures endotoxin and other pyrogens in an animal model, and the FDA asked us to do this assay on 3 demonstration batches. And we have already performed a very similar assay in vitro that measures the same parameters, measures endotoxin. *So this is very much sort of a check-the-box exercise. Nonetheless, we have to go through validation and incorporate the data into the BLA.*

96.     Later in the February 8, 2018 conference call, Rosenberg engaged in the following exchange with James W. Birchenough ("Birchenough"), an equity analyst for Wells Fargo:

[BIRCHENOUGH:] Congrats, Michael and Morris, on the new roles and the progress. So I wanted to follow up on Phil's questions, just around the manufacturing. You talked about making great progress in these validation assays, but could you comment on the performance? How much visibility you have from FDA in terms of release criteria? And how these assays are performing relative to the release criteria? The impetus of the question is just to understand whether there's any potential risk in these validation assays.

[ROSENBERG:] Yes, thanks for the question. *So the FDA does have a lot of visibility. So we've had a couple of face-to-face meetings with them and written communications with them. We – they have seen our proposed release assays. They have seen our whole manufacturing process, the process flow diagrams and so forth. They have seen our proposed release assays, and it was in that discussion,*

- 43 -

4810-6879-4098.v1

*actually, that they made the suggestion for the 3 additional assays. We discussed it with them and agreed with them that we should put those in place and are doing that.* And these are, as I was saying before, fairly standard assays. And we have already characterized our process by either very similar assays or exactly these assays. So it's really just an exercise in going through the tailoring to our product and then the validation and then importing the data into the appropriate sections of the BLA.

97.    On February 8, 2018, after Defendants conducted the 2Q18 earnings call, Immunomedics filed its 2Q18 Form 10-Q with the SEC. Defendants Pehl and Garone singed the 2Q18 Form 10-Q. The 2Q18 Form 10-Q contained the following risk disclosure:

> We face a number of risks relating to the maintenance of our information systems and our used of information relating to clinical trials.
>
> In managing our operations, we rely on computer systems and electronic communications, including systems relating to record keeping, financial information, sourcing, and back-up and the internet ("Information Systems"). Our Information Systems include the electronic storage of financial, operational, research, patient and other data. ***Our Information Systems may be subject to interruption or damage from a variety of causes, including power outages, computer and communications failures, system capacity constraints, catastrophic events (such as fires, tornadoes and other natural disasters), cyber risks, computer viruses and security breaches.*** If our Information Systems cease to function properly, are damaged or are subject to unauthorized access, we may suffer interruptions in our operations, be required to make significant investments to fix or replace systems and/or be subject to fines, penalties, lawsuits, or government action. The realization of any of these risks could have a material adverse effect on our business, financial condition and results of operations. Our clinical trials information and patient data (which may include personally identifiable information) is part of our Information

- 44 -

4810-6879-4098.v1

Systems and is therefore subject to all of the risks set forth above, notwithstanding our efforts to code and protect such information.

98.     On February 22, 2018, the Company participated in the RBC Capital Markets Healthcare Conference.     During the conference, Pehl engaged in the following exchange with Kennan McKay ("McKay"), an RBC Capital Markets equity analyst:

> [MACKAY:]  And just putting the prior checkpoint treatment into context, I think that exemplifies how desperate these patients really are.  Because this isn't exactly an immunologically hot tumor. This is perhaps one of the colder tumor types out there where checkpoints really don't see activity.
>
> So putting this into context, what are sort of the next steps and timelines associated with the regulatory submission?  What else does need to get done?
>
> [PEHL:]  So we communicate[d] in our earnings call that the timeline or the time point of our submission is end of May.  ***We had previously communicated a timeline that was a couple of [months] earlier, but there is some additional work ongoing in terms of assays that the FDA has been asking us to do***.  And PK work that just needs to be finished and finalized in the right quality and that has shifted the timeline a little bit.
>
> ***The other work stream that is ongoing and where we have really made great progress is process validation***.  So doing validation runs of the antibody, of the linker, of the conjugation and of the fill/finish. Most of that work is done, so the antibody work is done.
>
> The linker work is almost done and we are now doing the last work with our partner BSP in Italy, who does the conjugation fill/finish. So we are really going to come in very nicely against that timeline.
>
> The third major thing for us is preparing for a preapproval inspection.  That's what the FDA usually does.  That's totally not unusual for our Company.  Every company with a biologic gets that.

4810-6879-4098.v1

> *We hired someone as our head of quality who has eight years of experience as an FDA inspector. She turns basically every stone between New Jersey and New York, I can tell you. And she also brought in a lot of consultants with an FDA background, so we feel that we are extremely well prepared.*

> Submission is front and center for us without any doubt. But I think we are doing extremely well against the timelines and the work that needs to be done.

99.    On May 9, 2018, Immunomedics held a conference call with analysts and investors to discuss, among other things, the Company's third fiscal quarter of 2018 ("3Q18") financial results and provide a corporate update. Pehl participated in the conference call. During the call, Immunomedics and Pehl published to analysts and investors a PowerPoint presentation entitled "Corporate Overview, May 2018." The presentation outlined ongoing activities related to the Morris Plains manufacturing facility, as well as IMMU-132 supply in anticipation of commercial launch of the drug. Defendants' PowerPoint presentation informed investors that completing chemistry, manufacturing and controls preparations in advance of the FDA pre-approval inspection of the Morris Plains facility was a "***Key 2018 Business Objective[]***," "***[p]re-approval inspection activities continue***" and that manufacturing "***[p]rocess [v]alidation***" was ongoing in anticipation of the FDA's pre-approval inspection.

100.    On May 9, 2018, Immunomedics filed its 3Q18 Form 10-Q with the SEC. Defendants Pehl and Garone signed the 3Q18 Form 10-Q. The 3Q18 Form

- 46 -

4810-6879-4098.v1

10-Q contained the identical misleading risk disclosure (contained in the 2Q18 Form 10-Q) concerning the Company's information systems. *See* ¶97, *supra.*

101.   On June 4, 2018, Immunomedics issued a press release containing its presentation the prior day at the ASCO annual meeting in Chicago, Illinois.  During the Company's presentation, and with regard to additional manufacturing testing the FDA had requested Immunomedics complete before submitting the BLA, Pehl stated: "***I think we did really, really with the additional time that we gave ourselves due to feedback of FDA who wanted to have some additional assay information and was also very useful for us in order to make sure [the BLA] comes in the highest possible quality***."

102.   On June 11, 2018, Defendants filed a Form S-3ASR Registration Statement (the "Registration Statement") with the SEC for a follow-on offering of securities, including common stock.  Defendants Pehl, Garone, Aghazakeh, Canute, Hutt and Islam signed the Registration Statement pursuant to the Securities Act of 1933.  The Registration Statement incorporated by reference the risk disclosure language from the Company's 2017 Form 10-K regarding the Company's information system.  That incorporated language is identical to the risk disclosure language contained in the Company's 2Q18 Form 10-Q.  *See* ¶97, *supra.*  The Registration Statement, however, failed to disclose the Data Integrity Breach discovered by the Company in January 2018.

- 47 -

4810-6879-4098.v1

103. On June 14, 2018, Defendants filed a Form 424B5 Prospectus ("Prospectus") for the offering of at least 11.5 million shares of common stock at a price of $24.00 per share. The Prospectus contained identical risk disclosure language regarding the Company's information systems as identified in the Company's 2Q18 Form 10-Q. *See* ¶97, *supra*. Like the Registration Statement, the Prospectus failed to disclose the Data Integrity Breach.

104. On June 15, 2018, the Company issued a press release entitled "Immunomedics Announces Closing of Public Offering of Common Stock." The Company announced that total net proceeds from the 11.5 million share offering were $260 million (after deducting underwriting discounts and commissions, etc.). Subsequently, the Company disclosed in its 2018 Annual Report on Form 10-K that it had issued an additional 1.725 million shares pursuant to the underwriters' full exercise of the over-allotment option, bringing the total net proceeds for the June 2018 offering to approximately $300 million. The Company announced that it intended to use the proceeds from the June offering for, among other things, manufacturing process improvements.

105. Defendants' statements, made between February 8, 2018 and June 14, 2018, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading, because Defendants failed to disclose that as discovered on January 31, 2018, Immunomedics suffered a Data

Integrity Breach at its Morris Plains manufacturing site for IMMU-132. The scope

of the Data Integrity Breach included personnel working for Immunomedics at the

Morris Plains facility who had deliberately manipulated bioburden samples of

IMMU-132, deliberately backdated batch records, including the dates of analytical

results conducted by Immunomedics, and deliberately falsified information in the

batch records related to the manufacturing process of IMMU-132. As a result of its

severity, the FDA was alerted about the Data Integrity Breach immediately upon its

discovery in January 2018.

106.   On August 23, 2018, Immunomedics filed its 2018 Form 10-K with the

SEC. Defendants Pehl, Garone, Aghazadeh, Canute, Hutt and Islam signed the 2018

Form 10-K. The 2018 Form 10-K contained the identical misleading risk disclosure

contained in the Company's prior regulatory filings concerning the Company's

information systems. *See* ¶97, *supra*. The 2018 Form 10-K also contained risk

disclosure language concerning the Company's ***potential*** receipt of a Form 483 from

the FDA (even though Immunomedics had actually received the Form 483 nine-days

earlier on August 14, 2018):

> ***If we, or any of our collaboration partners, or our or their
> contract manufacturers, cannot successfully and efficiently
> manufacture the compounds that make up our products and product
> candidates, our ability, and the ability of our collaboration partners,
> to sell products and conduct clinical trials will be impaired.***
>
> Our ability to conduct our preclinical and clinical research and
> development programs depends, in large part, upon our ability to

4810-6879-4098.v1

manufacture our proprietary compounds in accordance with the FDA and other regulatory requirements. We have limited historical experience in manufacturing these compounds in significant quantities, and we may not be able to do so in the quantities required to commercialize these products. Any interruption in manufacturing at this site, whether by natural acts or otherwise, could significantly and adversely affect our operations, and delay our research and development programs.

We and our collaboration partners also depend on third parties to provide certain raw materials, and contract manufacturing and processing services. All manufacturers of biopharmaceutical products must comply with current [Good Manufacturing Practice regulations or cGMPs], required by the FDA and other regulatory agencies. Such regulations address, among other matters, controls in manufacturing processes, quality control and quality assurance requirements and the maintenance of proper records and documentation. The FDA and other regulatory agencies routinely inspect manufacturing facilities, including in connection with the review of a BLA. ***The FDA generally will issue a notice on Form 483 if it finds issues with respect to its inspections, to which the facility must adequately respond in order to avoid escalated regulatory concerns. If our manufacturing facility or those facilities of our collaboration partners and our respective contract manufacturers or processors do not comply with applicable cGMPs and other regulatory requirements, in addition to regulatory enforcement, we may be subject to product liability claims, we may be unable to meet clinical demand for our products, and we could suffer delays in the progress of clinical trials for products under development and of potential approval and commercialization***.

107.  On August 24, 2018, the day after Garone signed the Company's 2018 Form 10-K and 10 days after the Company received the FDA's Form 483, Immunomedics announced that Garone had resigned from his position as CFO effective August 23, 2018. The Company further announced that Malik would serve as Immunomedics' interim CFO.

- 50 -

108.  On November 7, 2018, Immunomedics held a conference call with analysts and investors to discuss, among other things, the Company's first fiscal quarter of 2019 ("1Q19") financial results and provide a corporate update.  Pehl participated in the call.  During the call, Pehl stated:

> [The] Company has made significant progress in the first fiscal quarter as we continue to focus on our regulatory, clinical, manufacturing and launch-preparatory efforts.  ***Based on recent mid-cycle discussion with the FDA, the company will continue to work closely and collaboratively with the agency to address outstanding review issues*** . . . .

109.  Pehl's comment during the November 7, 2018 conference call led multiple analysts to ask about "issues" with the FDA, to which Pehl responded that "the nature of our ongoing discussions with the agency are very confidential and sensitive" and "we are working very closely and collaboratively with the agency."

110.  Immunomedics' stock price promptly declined following the vague warning about "issues" with the FDA.  In response, Defendants made misleading statements through friendly sell-side analysts to falsely assure investors that there were no material issues with the FDA.  At approximately 2:08 p.m. on November 8, 2018, Wells Fargo analysts reported of their discussions with Immunomedics management:  "We spoke with management earlier today to clarify and gain context and understand that outstanding questions are in line with that expected in the normal course of [the] BLA review."  Approximately one hour later, Morgan Stanley analysts reported of their discussions with Immunomedics management:  "We spoke

- 51 -

with mgt. who clarified that what they were trying to communicate was that the review is 'on-going' and proceeding as a normal review would, with back and forth with the FDA."

111.    On November 7, 2018, after the earnings call, Immunomedics filed its 1Q19 Form 10-Q with the SEC.  Defendants Pehl and Malik signed the 1Q19 Form 10-Q.  The Form 10-Q contained the identical misleading risk disclosure (contained in the 2018 Form 10-K) concerning the Company's information systems. *See* ¶97, *supra*.  The 1Q19 Form 10-Q also contained the identical misleading risk disclosure (contained in the 2018 Form 10-K) concerning FDA regulation of the manufacturing process and the implications if a Form 483 was received from the FDA. *See* ¶106, *supra*.

112.    The 1Q19 Form 10-Q also added a new risk factor relating to, among other things, Immunomedics employees who "may engage" in fraudulent conduct or other illegal activity that violates FDA laws, manufacturing standards and the federal securities laws.  Specifically, the new risk factor Defendants caused Immunomedics to list in the 1Q19 Form 10-Q stated:

> ***Our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their respective sub-contractors, if any, may engage in misconduct or fail to comply with certain regulatory standards and requirements, which could expose us to liability and adversely affect our reputation.***
>
> Our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their

4810-6879-4098.v1

respective sub-contractors, if any, may engage in fraudulent conduct or other illegal activity, *which may include intentional, reckless or negligent conduct that violates, among others, (a) FDA laws and regulations, or those of comparable regulatory authorities in other countries, including those laws that require the reporting of true, complete and accurate information to the FDA, (b) manufacturing standards*, (c) healthcare fraud and abuse laws or (d) laws that require the true, complete and accurate reporting of financial information or data. For example, such persons may improperly use or misrepresent information obtained in the course of our clinical trials, create fraudulent data in our preclinical studies or clinical trials or misappropriate our drug products, which could result in regulatory sanctions being imposed on us and cause serious harm to our reputation. It is not always possible for us to identify or deter misconduct by our employees and third parties, and any precautions we may take to detect or prevent such misconduct may not be effective. *Any misconduct or failure by our employees and our independent contractors, principal investigators, consultants or commercial collaborators, as well as their respective sub-contractors, if any, to comply with the applicable laws or regulations may expose us to governmental investigations, other regulatory action or lawsuits. If any action is instituted against us as a result of the alleged misconduct of our employees or other third parties, regardless of the final outcome, our reputation may be adversely affected and our business may suffer as a result. If we are unsuccessful in defending against any such action, we may also be liable to significant fines or other sanctions, which could have a material and adverse effect on us.*

Defendants, however, failed to inform investors that the Company had already concluded that Immunomedics employees engaged in the precise conduct set forth in the risk disclosure. Specifically, as part of the Data Integrity Breach, Immunomedics employees engaged in the deliberate and fraudulent conduct of falsifying manufacturing processes and documentation relating to the operational status of the Morris Plains manufacturing facility. Defendants, moreover, failed to

- 53 -

4810-6879-4098.v1

inform investors that they had made a deliberate decision to withhold disclosure of the details of that fraudulent conduct, as well as the Company's August 14, 2018 receipt of the Form 483 and the content of the Form 483 that explicitly referenced that deceptive conduct.

113.   On November 13, 2018, the Company participated in the Credit Suisse Healthcare Conference.  During the conference, Malik stated:

> *Where we are today is we're in a good state to supply the market for the next few years based on the current [Morris Plains manufacturing] infrastructure that we have.*  But we've timed bringing up the second and third sourcing of the supply chain in order to have them up and running, so that at no point do we have a risk in the supply chain or supplying the market.  And we've also done significant amount of analysis on upside scenarios to understand if they are – if there's prescriptions that are happening in earlier line or off-label prescriptions or other indications come to market or as we expand geographically over the next could of year [sic], what are the implications on supply.  And again based on that modeling, we're continuing to scale the supply chain, accordingly.

114.   As described in further detail below, on December 20, 2018, Dr. Favus issued an equity analyst report disclosing in further detail the contents of the August 14, 2018 Form 483 and the conclusions made by FDA inspectors during the August 6 through August 14, 2018 pre-approval inspection of the Morris Plains manufacturing facility.  This revelation, which disclosed only a part of Defendants' fraudulent conduct, also raised fears that the FDA would not approve the IMMU-132 BLA.

- 54 -

115.    As a consequence, Defendants made additional misleading statements through friendly sell-side analysts to assure investors that their concerns were overblown.  For example, around 10:00 a.m. on December 20, 2018, Guggenheim analysts reported of their discussions with Immunomedics management:

> According to IMMU management, a competitor research report published this a.m. highlighted IMMU's receipt of an FDA Form-483, citing manufacturing issues regarding sacituzumab, which is currently under FDA review (1/18/2019 PDUFA). ***We spoke with management who pointed out to us that this Form-483 was already received 4 months ago, this August, and the company believes it has addressed manufacturing issues cited in the form.***

116.    Approximately one hour later, Morgan Stanley analysts reported on their discussions that morning with Immunomedics management:

> We spoke with mgt. who indicated that these issues were discovered as part of their ramp to GMP quality in late 2017/early 2018 and that mgt. began remediation of the issues well prior to the 483. ***Mgt. believes they have communicated with the FDA about the issues prior to the 483 and have worked to remediate all the key issues. Mgt. further indicated that if these issues, including the 483, were material they would have issued a release highlighting the issues.***  Finally, mgt. indicated that in general, the issues can be resolved both as pre or post approval commitments and that a follow-up inspection, while possible, is not required for approval.  Given that investors have been worried about manufacturing issues potentially impacting the approval of IMMU-132, we understand the concern in the market.  However, given what we see as resolvable issues and the fact that mgt. began remediation with FDA prior to the documentation in the 483, while these issue may pose approval risk, we still believe there is a higher probability of approval than not on the PDUFA.

117.    Then, at approximately 11:30 a.m. on December 20, 2018, Wells Fargo analysts reported of their discussions with Immunomedics management:

- 55 -

4810-6879-4098.v1

> *We have spoken with management this morning regarding observations and understand that they occurred as part of a pre-approval inspection in early August following BLA acceptance and granting of priority review status in July and that the observations are "old news" and a remediation has long been put in place.*

> We understand from IMMU management that observations from the FDA pre-approval inspection were "surfaced" by new management *18-19 months ago* and have been a focus of remediation efforts even in advance of the FDA inspection. *While IMMU, appropriately, will not characterize FDA response to remediation efforts so close to a PDUFA date the company suggested that if there are major risks to the filing it would have to disclose more specifics*.

118.   Shortly before 1:00 p.m. on December 20, Piper Jaffray also issued a

report based on statements from Immunomedics, stating:

> We spoke with IMMU which emphasized that some observations were flagged and discussed with the FDA well ahead of the inspection and that it continues to interact with the FDA on almost a daily basis. At this stage, it is "dotting the I's and crossing the T's" and IMMU feels that it is in a very good place.

119.   Finally, after the market close on December 20, a Jefferies analyst

issued a report based on statements from Immunomedics, stating:

> IMMU traded down 20+% today on negative commentary related to an FDA inspection of the manufacturing site for the hRS7 antibody component of '132.

*     *     *

> *As above, the company confirmed that it received the inspection reports in August of this year, and feel that it has addressed all of the issues raised during the inspection. While mgmt did not disclose specific content, they were outwardly confident that everything was adequately addressed, and further that they are confident in a positive decision by the FDA on or before the Jan PDUFA date*.

4810-6879-4098.v1

120.    On January 10, 2019, the Company participated in the J.P. Morgan Global Healthcare Conference.  During the Company's presentation, and in response to an unidentified securities analyst's question concerning the "issues" identified by the FDA in the August 14, 2018 Form 483, Pehl stated:  "This is a regulatory question, and I said, in the beginning that I would not comment on a regulatory question."  Despite Pehl's insistence that he would not comment on the Form 483, he nonetheless assured analysts and investors:  *"We've got the [Form] 483s in August.  We did take care of [the issues] very early*."

121.    Defendants' statements, made after August 14, 2018 and through January 17, 2019, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading, because Defendants failed to disclose:

(a)    As discovered on January 31, 2018, Immunomedics suffered a Data Integrity Breach at its Morris Plains manufacturing site for IMMU-132.  The scope of the Data Integrity Breach included personnel working for Immunomedics at the Morris Plains facility who had deliberately manipulated bioburden samples of IMMU-132, deliberately backdated batch records, including the dates of analytical results conducted by Immunomedics, and deliberately falsified information in the batch records related to the manufacturing process of IMMU-132.  As a result of its

- 57 -

severity, the FDA was alerted about the Data Integrity Breach immediately upon its discovery in January 2018;

(b)      Throughout the Class Period and particularly during the August 6-14, 2018 FDA pre-approval inspection of the Morris Plains manufacturing facility, Immunomedics failed to provide the FDA with written evidence to back up its verbal claims regarding the scope of the Data Integrity Breach, in addition to written information that would confirm Immunomedics' claims that it had purportedly resolved the Data Integrity Breach. Between August 6 and 14, 2018, during the FDA's pre-approval inspection of the Morris Plains facility, FDA inspectors repeatedly asked the Company to produce the results of the outside law firm's investigation into the scope and purported resolution of the Data Integrity Breach, but Defendants refused to provide it to the FDA on the basis that it was protected by the attorney-client privilege. Accordingly, by the close of the August 14, 2018 pre-approval inspection, the FDA was unable to make an assessment of the scope of the Data Integrity Breach or whether it had ever been resolved;

(c)      On August 14, 2018, the FDA issued a Form 483 to Pehl for the Morris Plains pre-approval inspection. The Form 483 reflected the top-line findings of the FDA inspectors who conducted the pre-approval inspection of the Morris Plains facility. The Form 483 stated that the Data Integrity Breach included the manipulation of bioburden samples, misrepresentation of drug manufacturing

4810-6879-4098.v1

integrity testing procedures and backdating of batch records, including the dates of the analytical results; and

(d)    With regard to Defendants' Class Period statements and omissions made after September 4, 2018, those statements were materially misleading when made for the additional reason that Defendants knew that their September 4, 2018 final written response to the Form 483 again failed to provide the FDA with the documentary evidence the agency had repeatedly asked for during the August 8 through 14, 2018 pre-approval inspection, and expressly noted in the Form 483.    The FDA had requested this information for the purpose of verifying Immunomedics' verbal assertions concerning the purported scope and remediation of the Data Integrity Breach.    By no later than September 4, 2018, therefore, Defendants knew that the FDA would remain unable to make an assessment of Immunomedics' verbal claims concerning the scope and resolution of the Data Integrity Breach.    For the same reason, Defendants knew that the FDA would most likely reject the BLA.

## DISCLOSURES OF THE TRUTH

122.    Before the market opening on December 20, 2018, Favus issued an analyst report that disclosed further details of the Form 483, Data Integrity Breach and cGMP violations identified by the FDA during its inspection of the Morris Plains facility.    Specifically, Favus revealed that the FDA had issued a Form 483 to Pehl

- 59 -

and Immunomedics on August 14, 2018, as a result of the agency's August 6 through August 14, 2018 pre-approval inspection. It was also disclosed that the Form 483 noted "'[i]nterviews [of] Immunomedics personnel involved in the [Data Integrity Breach] were conducted under attorney/client privilege and no additional documentation is available . . . [Thus] no assessment could be made'" of the extent of the Data Integrity Breach.

123. As a result of this news, Immunomedics' share price on the Nasdaq fell to a low of $12.96 during the trading day on December 20, 2018, or 27% from the prior day's closing of $17.46. To respond to the Favus Report, and as alleged herein, Pehl and Immunomedics contacted friendly sell-side analysts for purposes of defending the Company's stock price. *See* ¶¶115-120, *supra*. Within hours, several sell-side analysts published additional false claims made by Immunomedics management such as: The information in the Favus Report was "old news"; "many of the [FDA's] observations were flagged by an internal [Immunomedics] audit ahead of the inspection and discussed with the FDA beforehand. These issues were resolved rapidly after the inspection . . ."; and "remediation has long been put in place." As a result of these misleading statements, Immunomedics' stock price partially recovered during the trading day, and closed at $14.17 per share on December 20, 2018, down $3.47 from the December 19, 2018 close.

4810-6879-4098.v1

124. After the market closed on January 17, 2019, Immunomedics announced it had received a CRL from the FDA, which rejected the approval of IMMU-132. Defendants acknowledged that "[t]he issues [in the CRL] were exclusively focused on Chemistry, Manufacturing and Control matters . . . ." Immunomedics further stated that it intended to continue discussions with the FDA regarding the contents of the CRL.

125. The next morning, on January 18, 2019, and before the market opened, Immunomedics conducted a special conference call to discuss the CRL. During Pehl's opening remarks, he confirmed that the issues identified by the FDA in the CRL "related to the approvability [of IMMU-132]" and "were exclusively focused" on CMC matters. During the conference call, Pehl made the following statements during a discussion with Guggenheim Securities analyst Michael Schmidt ("Schmidt"):

> [SCHMIDT:] Maybe, Michael, first, could you help us and investors to understand this by providing maybe some more details? Maybe, first, could you confirm whether these CMC issues are exclusively related to your facility in Morris Plains?

> [PEHL:] Yes, Michael. Thanks for the question. So to start with, I have to say the CRL was clearly unexpected as we felt we had fully addressed all the open questions during our interactions with the agency.

> And what I want to make very clear is that we continue to believe that all the issues are fully addressable.

- 61 -

To your question, the questions that we got, as I was just saying, are in relation to questions that we felt we have handled already. They are not clinical. They are not preclinical of nature. They don't required any new data generation, no tox. They are not [study] site related. They are not partner related. So they are obviously questions where we had a lot of interaction already.

Once again, we feel they are fully addressable. Our next step, of course, is to interact with the agency to fully understand those, this is certainly a very fresh situation for us, and then come up with a very robust plan for the fastest resubmission possible.

126. As a result of the January 17 and January 18 disclosures, Immunomedics' share price on the Nasdaq fell to a close of $13.31 on January 18, 2018, or 26.4% from the prior day's closing of $18.09. This represented a one-day market capitalization loss of approximately $1 billion.

## ADDITIONAL ALLEGATIONS OF SCIENTER

127. With a long history of operating losses and almost four decades of existence without successfully developing a drug that obtained FDA approval, Immunomedics finally had a chance at achieving success with IMMU-132. Realizing that they could not achieve this alone, Immunomedics entered into a $2 billion licensing agreement for IMMU-132 with Seattle Genetics, wherein Seattle Genetics would be responsible for conducting a Phase 3 clinical trial for IMMU-132, in addition to the manufacturing and commercializing IMMU-132. Seattle Genetics would pay Immunomedics $300 million upfront, with the balance paid upon achieving certain clinical, development, regulatory and sales milestones.

- 62 -

4810-6879-4098.v1

128.   However, activist shareholder venBio believed Immunomedics was selling IMMU-132 at a steep discount and waged a successful proxy war resulting in the installation of venBio representatives Aghazadeh, Canute, Hutt and Islam on the Company's Board of Directors.  At the same time, Rosenberg was hired to get the Morris Plains manufacturing plant ready for the FDA pre-approval inspection, and Pehl was hired as CEO based on his purported track record of successfully seeing drugs through FDA approval at Celgene.

129.   After the collapse of the $2.0 billion Seattle Genetics deal, Immunomedics was faced with immense financial pressure.  To raise funds, Defendants misled the public about the state of Immunomedics' BLA and failed to disclose the Data Integrity Breach.  Based on these misrepresentations and material omissions, Defendants artificially inflated Immunomedics' stock price and, in June 2018, launched a follow-on offering of Immunomedics' common stock.  Notably, the $300 million obtained from investors was to be used, in part, to correct the Data Integrity Breach and ready the Morris Plains manufacturing facility for the FDA pre-approval inspection.  The total net proceeds from the June 2018 offering, including the underwriters' full exercise of the over-allotment option, was $300 million from the sale of 13.225 million shares of common stock at $24.00 per share.

130.   But for Defendants' deliberate decision to withhold information related to the Data Integrity Breach, Immunomedics' Class Period stock price would have

4810-6879-4098.v1

been significantly lower, and the Company would not have been able to obtain the $300 million on the same terms and without significant additional dilution to Defendants, venBio and other current shareholders. Without the financing from the June 2018 offering, Immunomedics would not have had the funding to make manufacturing improvements and address the Data Integrity Breach, thereby impeding its ability to obtain FDA approval of its BLA and ultimate commercialization of IMMU-132.

### LOSS CAUSATION/ECONOMIC LOSS

131.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated the price of Immunomedics stock and operated as a fraud or deceit on Class Period purchasers of Immunomedics stock by misrepresenting and omitting material information about the Data Integrity Breach. When Defendants' prior misrepresentations and omissions were disclosed to the market, Immunomedics' stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Immunomedics' stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

132.    Defendants' misleading statements and omissions of material facts, identified herein at ¶¶93-103, 106, 108-113, 115-120, had the intended effect and

4810-6879-4098.v1

caused Immunomedics' stock to trade at artificially inflated prices during the Class

Period. As a direct result of the November 7, 2018, December 20, 2018 and January

18, 2019 disclosures, as detailed in **¶¶Error! Reference source not found.**-126,

Immunomedics' stock price suffered significant declines.

133. The disclosure after the market closed on November 7, 2018, as detailed

at **¶¶Error! Reference source not found.-Error! Reference source not found.**,

had a direct impact on the Company's stock price. On November 8, 2018, the price

of Immunomedics' stock fell more than 8%, from $24.24 per share at the close

November 7, 2018, to close at $22.02 on November 8, 2018, in response to

Defendants' vague warning about "issues" with the FDA

134. The disclosure before the market opened on December 20, 2018, as

detailed in ¶¶122-123, also had a direct impact on Immunomedics' stock price. On

December 20, 2018, the price of Immunomedics' stock dropped $4.86 per share

during the first hours of trading on December 20, 2018, and even with Defendants'

efforts to prop up the stock price with additional misleading statements, it was down

$3.47 per share for the day. This represented a 20% drop in direct response to the

disclosures regarding the Data Integrity Breach and the FDA's August 2018 pre-

approval inspection.

135. The disclosures prior to the market opening on January 18, 2019, when

Immunomedics announced that it had received a CRL from the FDA, as detailed

- 65 -

above in ¶¶124-126, also had a direct impact on the Company's stock price. The price of Immunomedics' stock fell 26.4% on January 18, 2019, from a closing price of $18.09 on January 17, 2019 to a close of $13.31 on January 18, 2019, as a direct result of receipt of the CRL and Defendants' explanations as to why the CRL had been issued by the FDA.

136.  The declines in Immunomedics' stock price on November 7, 2018, December 20, 2018 and January 18, 2019 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market.

137.  The timing and magnitude of Immunomedics' stock price decline negates any inference that the losses suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. On November 8, 2018, Nasdaq was down only 0.5%, with the Nasdaq U.S. Smart Pharmaceuticals Index flat.  On December 20, 2018, the Nasdaq declined 1.6% and the Nasdaq Smart Pharma Index declined 1.9%.  And on January 18, 2019, when Immunomedics' stock fell by 26.4%, the Nasdaq and Nasdaq Smart Pharmaceuticals Index increased 1.0% and 0.6%, respectively.

138.  The economic losses suffered by Lead Plaintiffs and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate

- 66 -

4810-6879-4098.v1

Immunomedics' stock price and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

139.   Plaintiffs incorporate ¶¶1-138 by reference.

140.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes, and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Immunomedics securities during the Class Period.

- 67 -

142.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Immunomedics' operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

143.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Immunomedics common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Immunomedics securities and experienced losses when the artificial inflation was released from Immunomedics securities as a result of the revelations and prices decline detailed herein.   Plaintiffs and the Class would not have purchased Immunomedics securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

4810-6879-4098.v1

144. By virtue of the foregoing, Immunomedics and the Exchange Act Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the
### Exchange Act Against All Defendants

145. Plaintiffs incorporate ¶¶1-144 by reference.

146. The Individual Defendants acted as controlling persons of Immunomedics within the meaning of §20(a) of the Exchange Act. Immunomedics controlled all of its employees and the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, and awareness of the operational status of the Morris Plains manufacturing facility, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants participated in the conference calls with investors and analysts, described herein at ¶¶94-96, 98-99, 108, 113, 115-120, and/or prepared and approved the Company's SEC filings and press releases, described herein at ¶¶93, 97, 100-103, 106, 109-112, alleged by Plaintiffs to be misleading.

- 69 -

147.   In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. By reason of such conduct, Defendants are liable pursuant to §20(a).

148.   As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Immunomedics common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages

4810-6879-4098.v1

sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


DATED:  July 19, 2021                          _____ /s/ James E. Cecchi _____

                                CARELLA, BYRNE, CECCHI, OLSTEIN,
                                   BRODY & AGNELLO, P.C.
                                JAMES E. CECCHI
                                LINDSEY H. TAYLOR
                                5 Becker Farm Road
                                Roseland, NJ  07068
                                Telephone:  973/994-1700
                                973/994-1744 (fax)
                                jcecchi@carellabyrne.com
                                ltaylor@carellabyrne.com

                                Co-Liaison Counsel

4810-6879-4098.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (*pro hac vice*)
DEBRA J. WYMAN
TRIG R. SMITH (*pro hac vice*)
JENNIFER N. CARINGAL (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
debraw@rgrdlaw.com
trigs@rgrdlaw.com
jcaringal@rgrdlaw.com

BLOCK & LEVITON LLP
JEFFREY C. BLOCK
JACOB A. WALKER
260 Franklin Street, Suite 1860
Boston, MA  02110
Telephone:  617/398-5600
617/507-6020 (fax)
jeff@blockleviton.com
jacob@blockleviton.com

Co-Lead Counsel for Lead Plaintiffs and the
Class

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

4810-6879-4098.v1

LITE DePALMA GREENBERG LLC
SUSANA CRUZ HODGE
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone:  973/623-3000
973/623-0858 (fax)
scruzhodge@litedepalma.com

Co-Liaison Counsel

4810-6879-4098.v1

# EXHIBIT A

# Immunomedics

Office: 973-605-8200 Ext. 180
Mobile: 973-722-5355
dwhiteley@immunomedics.com

300 The American Road
Morris Plains, NJ 07950
immunomedics.com

*Via Federal Express and Email*

September 4, 2018

U.S. Food and Drug Administration
CDER Division of Inspectional Assessment
10903 New Hampshire Avenue
White Oak Building 51, Room 4328
Silver Spring, MD  20993

Attn.:   Dr. Mahesh Ramanadham, Director

**Re:    Initial Response to the Inspectional Observations
        (Form FDA 483) Dated August 14, 2018**

Dear Dr. Ramanadham:

On August 6, 2018, U.S. Food and Drug Administration (FDA) Investigators, Dr. Reyes Candau-Chacon, Dr. Madushini Dharmasena, Dr. Gunther Boekhoudt, and Dr. Rajiv Srivastava, concluded an inspection of Immunomedics' Morris Plains facility, located at 300 The American Road, Morris Plains, New Jersey and issued Inspectional Observations on the Form FDA 483.  Enclosed, in duplicate, is the Company's response and corrective action plans.

We recognize, and take seriously, the significance of the observations on the Form FDA 483, and are committed to taking all actions necessary to ensure that our systems are in compliance with FDA requirements, and that our products are safe and effective.  As is described in our detailed responses attached, in addition to correcting the specific items listed in the Form FDA 483, we have taken and are continuing to address and implement these corrective actions.

In **Appendix 1**, "Response to the FDA-483 dated August 14, 2018," we describe our completed and planned actions.  Supporting documents



300 The American Road, Morris Plains, NJ 07950      immunomedics.com

Dr. M. Ramanadham
September 4, 2018
Page 2

related to the completed and planned actions outlined in the responses
are included in **Appendix 2**. Please note that, some remediation actions
require an extended period of time to address. Therefore,
Immunomedics requests that it be permitted to provide interim
remediation progress updates to the FDA. In this regard Immunomedics
commits to providing progress reports to FDA, by end of each month to
include activities completed and accomplished since the previous report.

To facilitate review, the Form FDA 483 observations are in bold text,
followed by our response in plain text.

We consider the information contained in this letter and its attachments
to be confidential commercial information and not subject to disclosure
under the Freedom of Information Act. Accordingly, we have designated
this letter and its attachments as confidential.

Should you have any questions, please do not hesitate to contact me at
973-605-8200, ext. 180 or via e-mail at dwhiteley@immunomedics.com.

Sincerely,

Diane Whiteley
Vice President
Regulatory Affairs


cc:    Reyes Candau-Chacon
       (via email: Maria.Candauchacon@fda.hhs.gov)



**Appendix 1: Observations and Actions**

In this section, the text of the FDA 483 Observations is in bold text, and the Company response, completed and planned actions are in plain text.  Supporting documents related to the completed and planned actions outlined in the responses are included in **Appendix 2**.

<u>Contents</u>

FDA Observation 1 ................................................................................................................................. 2

FDA Observation 2 ................................................................................................................................. 4

FDA Observation 3 ................................................................................................................................. 5

FDA Observation 4 ................................................................................................................................. 6

FDA Observation 5 ................................................................................................................................. 8

FDA Observation 6 ............................................................................................................................... 11

FDA Observation 7 ............................................................................................................................... 13

FDA Observation 8 ............................................................................................................................... 14

FDA Observation 9 ............................................................................................................................... 15

FDA Observation 10 ............................................................................................................................. 17

FDA Observation 11 ............................................................................................................................. 20

FDA Observation 12 ............................................................................................................................. 23

FDA Observation 13 ............................................................................................................................. 25

List of Attachments in Appendix B ...................................................................................................... 29

**FDA Observation 1**

**The quality control unit lacks authority to investigate critical deviations of approved procedures. Specifically, the discovery of a data integrity breach in February 2018 did not trigger a deviation. The scope of the data integrity breach included manipulation of bioburden samples, misrepresentation of the (b) (4)       integrity test procedure in the batch record and backdating of batch records, including dates of analytical results.**

| Response: | Immunomedics appreciates the importance of a robust deviation investigation and resolution process as part of an effective quality system, and agrees that it is of the utmost importance that the Quality Unit have the authority to initiate deviations and carry out CAPAs through documented completion. In light of Observation 1, we would like to clarify that the Company's Quality Unit did and does have full authority to investigate deviations and initiate Non-Conformance Report (NCR) forms under our SOPs, including SOP-Q014 Rev. 14: Non-Conformance/Deviation Reporting, Investigation, and CAPA (in effect at the time), and our recent updated SOP-0152: Deviation Handling (effective August 24, 2018). We acknowledge, however, that relative to the matters referenced in Observation 1, our quality documentation did not meet the Agency's expectations in terms of comprehensiveness and timeliness, and will provide our assessment of the root cause of this observation, and our corrective and preventive actions relative to the observation, below. |
|---|---|
| | For context on the matters referenced in Observation 1, it is important to clarify the circumstances through which the relevant deviations were alleged and verified, and the Company's prompt and proactive actions in response. As opposed to emerging in manufacturing operations or a routine quality audit, the data integrity issues referenced were identified in a non-routine situation where company personnel came forward describing past misconduct. With respect for "open door" compliance principles and corporate best practices when personnel raise potential compliance concerns, the Company immediately identified the allegations as a matter deserving its utmost attention. The allegations were first raised on Wednesday, January 31, 2018, and in the days immediately following the Company escalated the matter up to the CEO, engaged counsel to investigate the matter with the active and essential support of the Quality Unit, briefed board leadership, and began evaluating potential product and patient impact. As a result of the investigative efforts with the full support of Company leadership, by Monday, (b) (4)      the Company had sufficient verification of the allegations to voluntarily notify FDA about these matters. The Company initially disclosed these matters in summary form to FDA in letters dated (b) (4)      addressed to Dr. Patricia Keegan, Director, Division of Oncology Products 2 (DOP2), to the attention of Ms. Leah Her, MS, Regulatory Health Project Manager for (b) (4)          The investigative effort continued and the Company submitted a follow-up voluntary notification to the relevant (b) (4)  on (b) (4)  (b)  which identified that other matters with a common root cause (employee misconduct) had been detected, and that a number of remedial measures had been and were being taken. The Company's assessment was that the employee misconduct identified and verified—while of significant concern, and to a level triggering prompt action including the separation of three managers from the Company—did not impact finished product quality or (based on a health hazard evaluation which was submitted |

|  | to the agency and a risk assessment document, TR-QC-IMMU-132-18-012: "Assessment of the Risk Arising from Pre and Post Use Testing of (b) (4) (b) (4)                     During Purification of (b) (4)          present a health risk to those taking the finished product.

For clarification regarding Observation 1, the Company's Quality Unit did document deviations that were deemed to have a potential for product quality impact under the Company's Non-Conformance Report (NCR) process: deviations in connection with the mishandling of Bioburden and Endotoxin samples (18-009U) and improper (b) (4) integrity testing of the (b) (4)          (18-053U). These deviations were reviewed by FDA investigators during the inspection. The Company acknowledges, however, that the Quality Unit did not initiate these NCRs at the beginning of the investigation.

Below we explain the measures we have taken and will take to correct where possible the observed circumstances, and to prevent the recurrence of these or similar circumstances. |
| Completed Actions: | The Company has issued an Ethical Conduct and Data Integrity corporate policy (**Appendix 2, Attachment 1**), initiated a Data Governance Program (**Appendix 2, Attachment 2**) and provided training on data integrity and good documentation practices to all pertinent staff, with completion certified by signature.

The Deviation Handling SOP (SOP-0152) has been updated to ensure a deviation is initiated (b) (4)          of identification. Staff training on this SOP has been completed, with completion certified by signature. |
| Planned Actions: | The Company considers this item to be closed. |

**FDA Observation 2**

There is no assurance that samples and batch records from the (b) (4)  intermediate process validation and commercial batches manufactured prior to February 2018 were not impacted by the data integrity breach. Interviews by Immunomedics to personnel involved in the event were conducted under attorney/client privilege and no additional documentation is available, therefore no assessment could be made during the pre-license inspection in support of (b) (4)

| | |
|---|---|
| Response: | Immunomedics acknowledges this observation. Due to placing the investigation of the data integrity breach under Attorney Client Privilege, it was difficult for the FDA investigators to assess the impact of the data integrity breach. Immunomedics would like to emphasize that immediately upon discovery of this issue, the Company submitted multiple communications to FDA updating the center on the progress of the investigation including a Health Hazard Evaluation (HHE). The communications were dated (b) (4)  and (b) (4)  and included a HHE, as stated. Additionally, during the inspection, a completed risk assessment report was shared with FDA investigators. Subsequent to the inspection, in response to (b) (4) (b) (4)  a summary of the risk assessment was also submitted. |
| | The HHE and the Risk Assessment clearly demonstrate that the manufacturing process for the (b) (4)  intermediate provides sufficient assurances that PPQ manufactured batches carry a very low patient safety risk. The risk assessment concludes that the technical merits of the process validation studies were not adversely impacted to the extent which would render Drug Product derived from the (b) (4)  manufacturing process a risk to patient safety or, in any way invalidate the key technical findings of the process validation study. Furthermore, as stated in the response to (b) (4)  the Company has made a commitment to conduct additional testing of (b) (4)  intermediate batches for (b) (4)  as requested by the Agency. For more details, please see response to (b) (4)  **(Appendix 2, Attachment 3)**. |
| | Immunomedics acknowledges the importance of compliance to cGMPs and have a zero-tolerance policy for data integrity breaches from a corporate and ethical perspective. As mentioned in response # 1, the Company has implemented a corporate ethical conduct and data integrity policy and data governance program. All PPQ batches remain "on hold" pending acceptability of the (b) (4) |
| Completed Actions: | • Health Hazard Evaluation dated (b) (4)  , submitted to FDA<br>• Risk Assessment for (b) (4)  Process Report #TR-QC-IMMU-132-18-012, dated July 6, 2018<br>• (b) (4)  a summary of the risk assessment<br><br>Issued an Ethical Conduct and Data Integrity Policy (POL-0018) and Data Governance Program (POL-0019) and completed training of staff. |
| Planned Actions: | Additional testing for (b) (4)  will be performed on (b) (4)  intermediate batches as described in (b) (4)<br>**Target Completion Date: December 31, 2018** |

<u>FDA Observation 3</u>
Retesting procedure for the (b) (4)      intermediate is inadequate.  Specifically:

A.  **SOP-0162 "Out of Specification Investigations" indicates that "if the company believes there is possibility the laboratory test did have error, and the error was undetected, then the company may wish to perform a retest." OOS Investigation report 18-001 shows that routine retesting was performed due to an initial OOS result.**

| | |
|---|---|
| <u>Response:</u> | As discussed during the Pre-Approval Inspection, we acknowledge that SOP-0162, the Out of Specification (OOS) procedure, should be revised and we will do so under Document Change Control-000464 to clarify that retesting is not permitted in response to an initial OOS test result on a discretionary basis but only if specific criteria are met. The modified procedure will follow FDA's guidance document on "Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production" and will specify that retesting procedures may only be allowed after a test plan, supported by sound scientific judgment is approved by the Head of Quality. The test plan will describe the testing to be performed and the scientific and/or technical handling of the data. The modified procedure will also require that unconfirmed OOS results are documented and thoroughly investigated to either substantiate or rule out any possible error. |
| <u>Completed Actions:</u> | Our actions in response to Observation 3A are in process. |
| <u>Planned Actions:</u> | The OOS Procedure (SOP-0162) will be modified under Document Change Control-000464 to clarify that retesting may only be allowed under strictly defined conditions that are consistent with FDA guidance.<br>**Target Completion Date: September 28, 2018** |

B. **Specifically: SOP-0162 allows for retesting of microbiology samples. An OOS result for the** (b) (4) (b) (4) **in-process bioburden sample was recorded on 12/23/2017. A retest was conducted using a retain sample on 1/5/2018 and the results on 1/10/2018 were OOS (OOS 18-001). Initiation of a non-conformance report (NCR 18-009U) was delayed until the results of the retest were reported on 1/10/2018.**

| | |
|---|---|
| Response: | We acknowledge the deficiencies in the handling of this retesting procedure and the delay in the NCR initiation. |
| Completed Actions: | Our actions in response to Observation 3B are in process. |
| Planned Actions: | The Company has opened CAPA 18-034 to conduct and document a review of all bioburden test results starting with the initiation of the PPQ campaign (Aug-2017) to present. The impact of any occurrences of retesting of microbiological samples will be assessed and included in a summary report under the CAPA. **Target Completion Date:** September 28, 2018 |
| | The OOS Procedure (SOP-0162) will be revised under Document Change Control-000464 to specify that OOS results from bioburden testing are a deviation. In addition, as reviewed with the Inspection team during the Pre-Approval Inspection, the practice of resampling for microbiology testing (Change Control 18-177P) will be eliminated. **Target Completion Date:** September 28, 2018 |

## FDA Observation 4
**The raw material sampling and testing program is inadequate.**

| | |
|---|---|
| Response: | Immunomedics recognizes the importance of enhancing the control of the raw material sampling and testing program. |
| Completed Actions: | The Supplier Qualification Program (SOP-0148, **Appendix 2, Attachment 4**) has been updated to provide additional criteria for the selection of raw materials, supplier approval process, quality agreements and supplier qualification. |
| | A new SOP (SOP-0698, **Appendix 2, Attachment 5**) has been created to describe the GMP Raw Material Qualification Program, which involves sampling and testing of the raw material prior to being released for us in manufacturing. As part of SOP-0698 each material, based on quality attributes and material risk assessment, will be fully tested according to the Certificate of Analysis each time the material is received. A raw material may qualify for reduced testing, when three (3) consecutive lots are fully tested and documented as passing and the supplier qualification process has been completed. Per SOP-0698, (b) (4) full testing is required to maintain the reduced testing status. |
| | The Sampling of Raw Materials SOP (SOP-0185, **Appendix 2, Attachment 6**) has been revised to include a statistically justifiable sampling (ANSI/ASQ z1.4), testing, and retention program. |

| Planned Actions: | The Company will implement a GMP Raw Material Sampling and Testing Program. This action will be tracked under CAPA 18-004. **Target Completion Date:** December 31, 2018 |
|---|---|

Specifically:

A. (b) (4) solution (b) (4) supplied by (b) (4) has never been sampled and there is no assurance that the manufacturer can consistently provide material meeting specifications. The solution is (b) (4) sterilized from the vendor and is added unfiltered to the cell culture bioreactors. Deviations 18-081U and 18-163U were initiated due to contamination in the (b) (4) bioreactors. In both cases, probable root causes included the (b) (4) addition assembly (b) (4) bag, line and valve). Testing of an unused (b) (4) bag in inventory also resulted in a positive sample.

| Response: | Recognizing the importance of ensuring sterility of the (b) (4) Immunomedics will implement sterility testing on each lot of (b) (4) solution (b) (4) prior to the lot being released for use in manufacturing. |
|---|---|
| Completed Actions: | Our actions in response to Observation 4A are in process. |
| Planned Actions: | Immunomedics will perform full testing on each lot of (b) (4) solution in accordance with the supplier Certificate of Analysis as part of qualification of the raw material detailed in Response 4 above unless and until it meets the criteria for reduced raw material testing under SOP-0698. **Target Completion Date:** November 30, 2018 |

B. Product-contact (b) (4) and (b) (4) used during cell culture of the (b) (4) intermediate are not tested for bioburden.

| Response: | Immunomedics acknowledges the deficiency and agrees to test product-contact (b) (4) and (b) (4) for viable count and total particulate counts. The (b) (4) and (b) (4) are utilized to maintain pH and the appropriate dissolved (b) (4) levels within the culture, respectively. |
|---|---|
| Completed Actions: | Our actions in response to Observation 4B are in process. |
| Planned Actions: | To mitigate any potential for risk to the process and to ensure quality, each of the above (b) (4) will be evaluated for both viable and total particle count as part of material qualification. Post qualification, incoming (b) (4) will be tested for identification and viable and total particle count prior to release.

Immunomedics to initiate testing following qualification of vendor to conduct testing. **Target Completion Date:** December 31, 2018 |

## FDA Observation 5

The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the (b) (4)     intermediate.  Specifically:

A. **The firm does not keep records tracing the use of raw material. Raw material reconciliation cannot be conducted as discarded raw materials are not documented. During the tour to the manufacturing facility on 8/6/2018, the inspection team observed a (b) L container of (b) (4) (b) (4)     in the loading dock for destruction. The material could not be traced.**

| | |
|---|---|
| Response: | Immunomedics acknowledges the deficiencies in inventory control noted during the Pre-Approval Inspection and commits to resolve each deficiency.<br><br>Immunomedics is taking steps to improve our record keeping systems to support reconciliation of materials received and used. Understanding the criticality of Inventory Control, Immunomedics has signed an agreement with a vendor to support implementation of a computerized inventory system to track and monitor the movement of raw materials. |
| Completed Actions: | Immunomedics utilizes Form FRM-0157: Material Usage Card designed to manually record and track the movement of raw materials from the GMP warehouse (Building 410) to other processing areas (Quality, Manufacturing, Research & Development) located in Building (b) (4) .  The Material Usage Card will continue to be the primary reconciliation of materials received until the Company's electronic inventory system is online and validated in December 2018. |
| Planned Actions: | Immunomedics is implementing additional processes for reconciling all materials transferred to Manufacturing in Building (Bldg.) (b) (4)  Currently, Quality creates a Material Usage Card for receipt of every controlled material. When material is distributed to Bldg. (b) (4)  the transfer is recorded on the Material Usage Card maintained in Bldg. 410. Each material transfer will include a Manufacturing Usage Card which will be used by the recipient in Bldg. (b) (4)  to record and reconcile the amount received, identify amount used, where/when used and or discarded until the received quantity is completely accounted for. Once reconciled, the Bldg. (b) (4) Material Usage Card is matched with the Bldg. 410 Manufacturing Usage Card to have a complete reconciliation of materials used. Reconciliation of the Material Usage Card and Manufacturing Usage Card is the responsibility of the Supply Chain Department.<br>**Target Completion Date: October 31, 2018**<br><br>The computerized ERP Inventory Control module is scheduled to go online in December 2018. Until the ERP Inventory system is online and validated, Immunomedics will continue utilizing the manual reconciliation process, i.e., Location Tracking Report and Material Usage Card.<br>**Target Completion Date: December 31, 2018** |

**B.** **Warehouse raw material inventory list is kept in an Excel Spreadsheet that lacks history traceability. During the tour of the warehouse on 8/6/2018 Warehouse inventory cannot be located using the Excel Spreadsheet. Specifically,** (b) (4) **(catalog #**(b) (4) **Lot** (b) (4) **was present in the warehouse, however the location and inventory could not be provided.**

| | |
|---|---|
| Response: | During the Pre-Approval Inspection Immunomedics provided a copy of the Location Tracking Report which identifies the location and quantity of each material stored in the GMP warehouse (Bldg. 410). The Location Tracking Report is printed (b) (4) The report is manually updated by warehouse operators to reflect any movements, additions or deletions of materials. Once the (b) (4) movements are complete and recorded on the report, the report is updated, and a new copy is printed to support the (b) (4) transactions. All copies of the Location Tracking Report are retained for history/traceability of movements within the warehouse. |
| Completed Actions: | Interim measure: Process implemented |
| Planned Actions: | Location Tracking Report work instruction is in development. **Target Completion Date: September 30, 2018** <br><br> The computerized ERP Inventory Control module is scheduled to go online in December 2018. Until the ERP Inventory system is online and validated, Immunomedics will continue utilizing the manual reconciliation process, i.e. Location Tracking Report and Material Usage Card. **Target Completion Date: December 31, 2018** |

C. **The warehouse is not adequately mapped for inventory purposes with floor plans. Items stored on the floor have no assigned location. In addition, quarantine and released items on the floor are kept side-by-side without a system in place to prevent the use of quarantined raw material.**

| | |
|---|---|
| Response: | To prevent the potential of quarantine material being used, Immunomedics will utilize visual control for usage of approved materials.  No materials will be used by manufacturing unless labeled with the appropriate "Approved" or "Conditional Release" label. |
| Completed Actions: | With the implementation of the Location Tracking Report described in Response 5b, a detailed map of locations, including floor sections (L/K/J) was created (**Appendix 2, Attachment 7**). |
| | Approved and quarantined materials have been segregated by locating material with a single status per warehouse floor section (L/K/J) at any given time. All product in a specific warehouse floor section have been accounted for and designated as either approved or quarantine. |
| | To further prevent the potential of using quarantine material, the warehouse has racks labeled with Approved and Quarantine. Reject material is placed in a fenced-locked area.  Any floor area used for storage are clearly segregated to identify the material as quarantine or approved. |
| | As described above, Immunomedics has signed an agreement with a vendor to support implementation of a computerized inventory control system. |
| Planned Actions: | The computerized ERP Inventory Control module is scheduled to go online in December 2018. Until the ERP Inventory system is online and validated, Immunomedics will continue utilizing the manual reconciliation process, i.e. Location Tracking Report and Material Usage Card which will be the responsibility of supply chain. |
| | **Target Completion Date:** December 31, 2018 |

## FDA Observation 6

**Differential pressure between GMP areas of different area classification is not adequately maintained and monitored.**

| | |
|---|---|
| Response: | Immunomedics acknowledges that differential pressure between controlled areas with different area classifications has not been adequately maintained and monitored. Pressure differentials to assure protection of product through an appropriate (b) (4)     has been maintained throughout production of clinical and commercial lots.<br><br>Historically, the monitoring of pressure differentials has been performed through manual monitoring of magnehelic pressure gauges. In January 2018, Immunomedics authorized a project to install a new (b) (4)   environmental monitoring system. This system provides continuous monitoring of the critical area parameters including pressure differential, temperature and humidity and will also monitor conditions in the temperature-controlled storage areas. |
| Completed Actions: | (b) (4)      performed a preliminary review of the documentation of (b) (4)    from the most recent production campaign. Their findings were that the differentials between areas of differing classification meet or exceed guidance values (10-15 Pa). |
| Planned Actions: | Complete final set-up, training and qualification of the (b) (4)   environmental monitoring system.<br><br>Establish appropriate set-points for alert and alarm action levels.<br><br>Update SOPs for managing alarm responses.<br><br>Enhance the existing pressure differential monitoring procedure to ensure timely review of differential pressure readings and issuance of deviations, as required.<br>**Target Completion Date: December 31, 2018** |

Specifically:

A. **Air pressure in the GMP areas is not adequately maintained. For example, differential pressure between Rooms (b) (4) (Class C (b) (4) suite (b) (4) and (b) (4) (Class D corridor) was out of action levels in 37 out of (b) (4) measurements between July 24, 2018 and August 1, 2018.**

| | |
|---|---|
| Response: | Immunomedics is conducting a review of all manual readings from the start of the PPQ campaign to present (August 2017 – July 2018) and appropriately assess deviations and conduct investigations as needed. |
| Completed Actions: | The following controls were in place to mitigate the impact of any deviations:<br>• (b) (4) with the highest pressures in rooms where critical operations are performed were maintained to protect product, according to HVAC balancing reports and filter certification.<br>• Sanitization was performed (b) (4) per SOP–0076 using (b) (4) (b) (4) and (b) (4) using (b) (4) to ensure maximum bioburden control.<br>• Static and dynamic environmental monitoring for total and viable particulate was conducted per SOP-0275. A review showed all results to be within established specifications.<br>• Operators were retrained and recertified in controlled area gowning practices.<br>• HEPA filters were tested (b) (4) and passed integrity testing. The last date tested was April 2018 |
| Planned Actions: | The Company will complete review of all manual magnehelic pressure readings from the start of the PPQ campaign to present (August 2017 – July 2018) and appropriately assess deviations and conduct investigations as needed.<br>**Target Completion Date: October 31, 2018** |

B. **Continuous monitoring of pressure in the GMP areas has been installed in July 2018 and is undergoing qualification, however not all adjacent rooms with different air classification are alarmed for low pressure differential. For example, differential pressure between the Rooms (b) (4) (b) (4) (Class C (b) (4) suite (b) (4) and (b) (4) (Class D corridor) is not alarmed.**

| | |
|---|---|
| Response: | A review of our current installation indicated that with the exception of the above-mentioned (b) (4) to corridor, the monitoring points are all adequate to monitor and alarm differential pressure between ISO classifications and critical room (b) (4) |
| Completed Actions: | Our actions in response to Observation 6B are in process. |
| Planned Actions: | A sensor will be installed in Room (b) (4) to provide continuous monitoring of pressure differentials and alarming between Room (b) (4) and Room (b) (4) This addition will provide monitoring and alarming across all Grade C and Grade D classifications.<br>**Target Completion Date: September 28, 2018** |

### FDA Observation 7

**The design of the facility is inadequate in that no drains are present in the purification rooms. In addition, there is no SOP for liquid containment and disposal after a catastrophic spill. All process streams downstream the (b) (4)          Bioreactor are held in disposable bags.**

| | |
|---|---|
| **Response:** | Immunomedics recognizes the importance of providing adequate spill protection in the areas utilizing (b) (4)  bags for transfer of product, however the Company contends that the lack of drains in the purification area does not make the facility inadequate for its intended purpose. |
| | In designing the purification suites, the decision to not install drains will permit the tightening of room classifications beyond Class "C" (ISO level 8), if required, per The Eudralex Volume 4 Annex 1 guidelines to ensure Immunomedics meets bioburden requirements on a global level. |
| **Completed Actions:** | Our actions in response to Observation 7 are in process. |
| **Planned Actions:** | While the purification facility does not have drains, Immunomedics will assemble an appropriate spill control kit containing the necessary equipment to quickly control any spill up to the (b) (4)  L contained in the transfer bags. |
| | A detailed SOP will be developed, and production personnel trained to utilize equipment to contain any spill and initiate an appropriate response from management and environmental health and safety. |
| | **Target Completion Date: October 31, 2018** |

**FDA Observation 8**

There is no signed Quality Agreement between (b) (4)                                    and Immunomedics Inc.
(b) (4)                    is the supplier of cell culture media and all (b) (4)      solutions (including (b) (4) , and
(b) (4)                          used for (b) (4)      purification of the (b) (4)            intermediate.

| | |
|---|---|
| Response: | Following Immunomedics SOP-Q010: Vendor Qualification/External Audit Program, the (b) (4)                                                      facility in (b) (4) was audited on 08 Nov 2017 as a supplier of critical materials (cell culture media, (b) (4)   and (b) (4)     The outcome of this facility confirmed (b) (4) (b) (4)         as a qualified supplier for these critical materials. The facility where the (b) (4)                                            are manufactured is located in (b) (4)                An audit of the (b) (4)    facility is scheduled for 25 Oct 2018. These (b) (4)                        facilities are governed by the overarching Quality Agreement.

Furthermore, we recognize the importance of a robust vendor quality management program and are in the process of putting in place quality agreements and conducting audits as outlined below under Planned Actions. |
| Completed Actions: | A Quality Agreement between (b) (4)                          and Immunomedics was fully executed on 07 Aug 2018 and provided to the investigation team on August 8, 2018. |
| Planned Actions: | CAPA 18-004 discussed during the inspection, outlines the plan for all quality agreements with Critical Level 1 Suppliers to be fully executed by March 29, 2019.

Additionally, as part of the Vendor Qualification Program, all levels of vendors (i.e., Levels 1, 2 and 3) will have current Quality Agreements or equivalent Quality Statements established.
**Target Completion Date: March 29, 2019** |

<u>FDA Observation 9</u>

**No procedure is in place for** (b) (4) **intermediate** (b) (4) **trending of results. During the process validation (PPQ) campaign, bioburden levels in the** (b) (4) **were not trended and inadequately high bioburden levels were not investigated. Low level bioburden (29 to 186 CFU/100 mL) was observed in the** (b) (4) **after sanitization in PPQ batches** (b) (4) **and the bioburden level increased to too numerous to count in PPQ batch** (b) (4) **No deviation was initiated.**

| Response: | Immunomedics Manufacturing and Quality Assurance are in the process of establishing a continuous process improvement program that will be used to monitor and improve the (b) (4) intermediate (b) (4) manufacturing activities. This will be one component of a broader program to monitor and improve (b) (4) manufacturing throughout the entire supply chain. |
|---|---|
| | An initial process control strategy (PCS) for (b) (4) has been prepared based on Process (b) (4) and the recently completed process validation studies. The PCS will serve as the basis for establishing a data monitoring program for the intermediates and products produced at Immunomedics as well as at our contract manufacturing partners. Data monitoring, in conjunction with continued process verification (CPV), will utilize the manufacturing and supporting data, (e.g., QC and QC micro) for periodic re-evaluation of the process parameters and attributes identified in the PCS, and provide a basis for appropriate statistical process control (SPC) and trending analysis of manufacturing activities. |
| | Supporting documentation (SOPs) will be established to delineate the data gathering (mining) and storage methods (compliant with data integrity initiatives), data analysis methods, reporting and review requirements for the data, and documentation of the results of the program on a periodic basis. |
| | The program will be initiated in September 2018 with data mining of the PPQ campaign and subsequent data to populate the database. Concurrent with the data mining efforts, SOPs will be drafted and approved by October 2018, allowing an initial periodic product quality review (PPQR) in November 2018, at which time sufficient data will be available for a meaningful review. |
| | The PPQR meetings are planned to occur approximately (b) (4) and cumulatively, serve as the basis for the annual product review (APR). |
| | SOPs that will be developed include: |
| | • Data Gathering- delineating the data to be collected, stored and data integrity requirements for the database; |
| | • Data Monitoring- establishing the content, attendees, and frequency for data monitoring reviews at the local/team level; |
| | • Data Trending- establishing the expectations/requirements for statistical process control, statistical analysis, trend recognition, capability analysis, and associated methodologies for data monitoring and analysis; |
| | • PPQR- establishing the requirements for the frequency, content, and attendees at the PPQR meetings; and |

| | |
|---|---|
| | • APR- an existing SOP will be evaluated and modified as necessary and appropriate. |
| Completed Actions: | Our actions in response to Observation 9 are in process. |
| Planned Actions: | Initiate data mining activities<br>Develop SOPs outlining:<br>• Data Gathering- delineating the data to be collected, where it is to be stored, data integrity requirements for the database;<br>• Data Monitoring- establishing the content, attendees, and frequency for data monitoring reviews at the local/team level;<br>• Data Trending- establishing the expectations/requirements for statistical process control, statistical analysis, trend recognition, capability analysis, and associated methodologies for data monitoring and analysis;<br>• PPQR- establishing the requirements for the frequency, content, and attendees at the PPQR meetings; and<br>• APR- evaluate existing SOP and modified as necessary. and appropriate.<br>Conduct PPQR meeting<br>**Target Completion Date:** November 30, 2018 |

<u>FDA Observation 10</u>
**Deviation investigations and CAPA implementations are inadequate.**

| | |
|---|---|
| <u>Response:</u> | Immunomedics is developing a remediation plan to comprehensively and holistically improve cGMP compliance across all quality systems, processes and procedures. The goal will be to define a quality system that supports quality and operational processes and drives continuous improvement across the Company. Immunomedics plans to make systemic enhancements that will lead to broad based improvements in system controls, system operations and system effectiveness.<br><br>In support of this plan, Immunomedics commits to re-designing various elements of the Quality System, including deviation handling and CAPA procedures. |
| <u>Completed Actions:</u> | Our actions in response to Observation 10 are in process. |
| <u>Planned Actions:</u> | The Company's systemic improvements to its Quality System include the re-design of the Deviation and CAPA management processes. These changes include (but are not limited to):<br>• Establishing timelines for initiation of deviations, implementation and documentation of containment actions and development of interim reports for deviations requiring additional time for closure<br>• Performing investigations by staff qualified in conducting investigations<br>• Enhancing the investigation process by incorporating investigative plans, CAPA plans and identification of interim control measures<br>• Including requirements for lot specific impact assessment<br>• Including requirements for documented risk assessments<br>• Including requirements for assessment by Quality Assurance of evidence of CAPA implementation and effectiveness<br>• Defining the use of Root Cause analysis tools to support the investigation process<br>**Target Completion Date:** December 31, 2018 |

For example, Deviation 18-053U was initiated after an internal audit concluded that the (b) (4)    had not been adequately tested for integrity pre- or post-(b) (4)    .

A.  **Lot number in the deviation form indicates "multiple lots" without specifying the potential lots impacted.**

| Response: | Deviation 18-053U was non-routine, as it was initiated in relation to allegations verified through counsel's investigation (discussed in the response to Observations 1 and 2) and Quality concluded that all lots processed were potentially impacted by the event. We recognize, however, that as documented this reference appeared imprecise, and agree that the specific lot numbers should have been listed. |
|---|---|
| Completed Actions: | Deviation 18-053U has been amended to include a list of lots impacted or potentially impacted by this deviation (**Appendix 2, Attachment 8**).<br><br>Further, a "Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant (b) (4) Intermediate Bulk PPQ Lots" (**Appendix 2, Attachment 9**) has been approved to ensure previously closed Deviations include lot-specific impact assessments. |
| Planned Actions: | The Company will fully execute the "Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant (b) (4) Intermediate Bulk PPQ Lots". As required, deviations will be amended to include full impact assessment.<br>**Target Completion Date: November 30, 2018**<br><br>The Company will improve its Quality System including the re-design of the Deviation and CAPA management processes.<br>**Target Completion Date: December 31, 2018** |

B.  **Product impact assessment includes the conclusion of a clinical Health Hazard Assessment, but no risk assessment on the presence of (b) (4) in the product is documented.**

| Response: | An "Assessment of the Risk Arising from Inappropriate Pre- and Post-Use Testing of (b) (4) During Purification of (b) (4) was approved on July 6, 2018. This risk assessment determined that the materials in question carry a low safety risk from potential (b) (4) contamination. It is acknowledged the risk assessment should have been included as part of Deviation 18-053U prior to closure. |
|---|---|
| Completed Actions: | Deviation 18-053U has been amended to include the risk assessment on the presence of (b) (4) in the product (**Appendix 2, Attachment 8**).<br><br>A "Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant (b) (4) Intermediate Bulk PPQ Lots" (**Appendix 2, Attachment 9**) has been approved to review and ensure previously closed Deviations include a risk assessment, as applicable. |
| Planned Actions: | The Company will fully execute the "Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant (b) (4) Intermediate Bulk PPQ Lots". As required, deviations will be amended to include a risk assessment. |

| Target Completion Date: November 30, 2018 |
| --- |

C.  For example, Deviation 18-053U was initiated after an internal audit concluded that the (b) (4) (b) (4) had not been adequately tested for integrity pre- or post (b) (4) . **Deficiency C:** The CAPA section indicates that remediation included "...purchasing additional test equipment to evaluate the (b) (4) pre & post its use." However, at the date of the inspection no additional equipment has been purchased and no information about the CAPA is documented in the deviation.

| Response: | Deviation 18-053U was closed in April 2018. At the time there was no system in place to monitor completion of Corrective and Preventive Actions (CAPAs). In June 2018, Immunomedics implemented a new CAPA procedure SOP-0652 (**Appendix 2, Attachment 10**). The procedure requires assignment of CAPA tracking numbers, an owner and due dates for each action outlined in the deviation. A designated Quality Assurance staff member monitors CAPA progress to ensure timely completion of actions. Further, CAPA effectiveness checks have been instituted and evidence of CAPA completion and effectiveness is required.  Immunomedics is committed to sustainable compliance and currently requires metrics for on time CAPA completion as part of the Immunomedics Quality Council Charter (**Appendix 2, Attachment 11**) to monitor quality system health. The "Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant (b) (4) Intermediate Bulk PPQ Lots" (**Appendix 2, Attachment 9**) includes verification of CAPA actions. Any pending actions will be added to the current CAPA monitoring system to ensure closure. |
| --- | --- |
| Completed Actions: | Actions were taken to implement the CAPA for the acquisition of new (b) (4) test equipment. While investigating alternatives for automated testing of the (b) (4) (b) (4) the (b) (4) manufacturer, (b) (4) informed Immunomedics that the standard instruments available for (b) (4) integrity testing did not perform well for testing of the (b) (4) Based on this information, the actions were redirected to further collaborate with (b) (4) to improve the testing methodology. These actions included staff training on the (b) (4) i recommended method for integrity testing of the (b) (4) . The initial training occurred in March 2018. Additional training, using (b) (4) that pass and fail integrity testing will be conducted in September 2018. Subsequent to training applicable procedures will be updated. |
| Planned Actions: | Conduct (b) (4) integrity testing<br>**Target Completion Dates: September 28, 2018**<br><br>Conduct additional (b) (4) integrity test training.<br>Update to (b) (4) integrity test procedure.<br>**Target Completion Dates: November 30, 2018** |

FDA Observation 11
**Deviation initiation and closing times are inadequate.**

| | |
|---|---|
| Response: | Immunomedics acknowledges the deviation procedure has not been consistently followed. As discussed during the Pre-Approval Inspection, Immunomedics is fully committed to establishing a first-class quality system. |
| | Immunomedics commits to implementing the Deviation and CAPA management processes. These changes include (but are not limited to): |
| | • Defining timelines for initiation of deviations, implementing and documenting containment actions and development of interim reports for deviations requiring additional time for closure |
| | • Performing investigations by staff qualified in conducting investigations |
| | • Enhancing the investigation process by incorporating investigative plans, CAPA plans and identification of interim control measures |
| | • Including requirements for lot specific impact assessment |
| | • Including requirements for documented risk assessments |
| | • Including requirements for assessment by Quality Assurance of evidence of CAPA implementation and effectiveness |
| | • Defining the use of Root Cause analysis tools to support the investigation process |
| Completed Actions: | As an initial step to accomplish this goal Quality Assurance leadership provided coaching and mentoring to staff on: |
| | • Assessing events for proper management notification/escalation, |
| | • Properly documenting deviations, |
| | • Procedures on prioritization of activities to escalate and address critical and major events in a timely manner while directing resources to close overdue records. |
| | Immunomedics implemented enhancements to the Deviation Handling SOP-0152 to clearly establish requirements for notification to Quality Assurance within (b) (4) (b) (4) from discovery. These requirements will ensure that all events are reported to Quality Assurance in a timely manner. New requirements for completion of interim reports with extension justification for records that cannot be closed in (b) (4) (b) (4) have been implemented. In addition, the Deviation Form has been enhanced to provide clarity regarding timing for completion of different steps of the investigation process. |
| | As part of the mechanisms in place for management oversight of Deviations is the Deviation Review Board, consisting of the Head of Quality and functional Directors. This forum provides leadership in prioritization of activities to support timely closure of deviations, defines investigative plans to ensure all required elements are included in deviation reports and provides coaching and mentoring to deviation leads during the investigation process. |
| | For sustainable compliance a re-organization of the Quality unit has been approved to include a Deviation/CAPA Manager with dedicated resources to ensure timely closure of deviations as well as ensuring all required elements are properly documented. Recruiting for the Deviation/CAPA Manager is in progress. |

| Planned Actions: | Closure of all overdue Deviations.<br>Hire Deviation/CAPA manager within Quality unit.<br>**Target Completion Date: December 31, 2018** |
|---|---|

A. **SOP-0152 "Deviation Handling" indicates that if the deviation cannot be completed by the assigned due date, a one-time extension can be requested to the QA unit. The following deviations were not closed by the due date and did not include an extension:**

   i. **18-116U: deviation due was 7/20/2018; deviation was open at the time of the inspection**

   ii. **18-081U: deviation due date was 6/17/2018; deviation was open at the time of the inspection**

   iii. **18-079U: deviation due date was 6/16/2018; deviation was closed on 8/3/2018**

   iv. **18-050U: deviation due date was 5/9/2018; deviation was open at the time of the inspection**

| Response: | Immunomedics acknowledges the deviation procedure has not been consistently followed. As discussed during the Pre-Approval Inspection, Immunomedics is fully committed to establishing a first-class quality system. Immunomedics commits to implementing a Deviation management process to include new requirements for completion of interim reports with extension justification for records that cannot be closed in (b) (4) |
|---|---|
| Completed Actions: | An interim report has been completed for Deviations 18-116U and 18-081U. These reports included all facts known to date, preliminary impact assessment, interim controls to mitigate risk and extension of due date justification.<br>Deviation 18-050U was closed on August 3, 2018. |
| Planned Actions: | Please refer to the additional broader planned actions regarding Deviations noted in Response 11.<br>**Target Completion Date: December 31, 2018** |

B. **SOP-0152 "Deviation Handling" does not specify a time limit between time/discovery of event and deviation initiation. The following observations were initiated more than one month after event discovery:**

    i.   **18-009U: investigation into bioburden OOS #18-001 for** (b) (4) **date of event was 1/10/2018, deviation was initiated on 3/27/2017**

    ii.  **18-053U:** (b) (4) **related discrepancy; date of event was February 2018, deviation was initiated on 4/9/2018**

| | |
|---|---|
| <u>Response:</u> | Immunomedics recognizes the need for improving the Deviation Handling SOP-0152 to specify a time limit between discovery of the event and deviation initiation. |
| <u>Completed Actions:</u> | The Deviation procedure was revised and made effective on August 24, 2018 specifying (b) (4) from discovery to notification to Quality and Deviation initiation.<br><br>To heighten awareness of the importance of promptly reporting and documenting deviations, a training session including the Manufacturing, Quality Assurance and Quality Control management team was conducted on August 15, 2018. |
| <u>Planned Actions:</u> | The Company considers this specific observation closed.<br>Please refer to the additional broader planned actions regarding Deviations noted in Response 11.<br>**Target Completion Date: December 31, 2018** |

FDA Observation 12

Cleaning of downstream equipment, including (b) (4)          and product-contact parts of the (b) (4)
(b) (4)  is not validated or verified. Non-conformance report 18-009 initiated due to a (b) (4)
OOS bioburden sample includes as the primary root cause the (b) (4)          contaminated during vendor
(b) (4)      testing.

| Response: | Immunomedics, Morris Plains facility is a (b) (4)          dedicated facility manufacturing (b) (4)                   drug component that is further manufactured into (b) (4)<br>(b) (4)<br><br>The current validated downstream manufacturing process has several engineering and in-process controls to ensure cleaning/ sanitization of the downstream equipment and to monitor and control bioburden and endotoxin levels throughout the purification process.<br><br>The purification process takes place in a class C environment with a limited access to the personnel who have been specifically trained on the gowning practices and aseptic techniques to minimize any contribution to the bioburden levels in the area. As per the current procedure SOP-0134, (b) (4)     is sanitized (b) (4) with (b) (4)      for (b) (4)     and each of the (b) (4)               are also sanitized (b) (4)           with (b) (4)     for (b) (4)           or (b) (4) for (b) (4)               as part of manufacturing procedures MP-54901, MP-54902 & MP-54903 respectively. Based on the (b) (4)  article, (b) (4)<br><br>Application note, (b) (4)          , even with (b) (4)      and exposure for (b) (4) (b) (4)          is effective in inactivating a number of yeasts and bacteria with log reduction ranging from 3.5 – 8.1 (**Appendix 2, Attachment 12**).<br><br>Additionally, Immunomedics has several existing in-process controls to monitor and control bioburden and endotoxins as listed below:<br>• During the (b) (4)                     pH and conductivity samples are taken to verify that the sanitization solution has been completely removed.<br>• Bioburden and endotoxin samples are taken from (b) (4) during the (b) (4)      post sanitization.<br>• In-process samples are taken for bioburden and endotoxins and tested to meet the in-process acceptance criteria.<br>• Post storage samples are taken for (b) (4) (b) (4)      for bioburden and endotoxin samples.<br><br>(b) (4)      is sanitized (b) (4)                    and stored in (b) (4) (b) (4)      to prevent any bioburden increase. A recent procedure change was made to move the (b) (4)      and (b) (4)          sanitization from (b) (4) (b) (4)          eliminating the (b) (4)      hold time in (b) (4) (b) (4)          for the system. |
| --- | --- |

|  | Components of the (b) (4) systems are washed and (b) (4) prior to use in the purification process thus controlling the bioburden level in the process. Additionally, all incoming (b) (4) are also monitored for bioburden. |
|---|---|
| **Completed Actions:** | Our actions in response to Observation 12 are in process. |
| **Planned Actions:** | As part of continuous improvement program, Immunomedics will execute a comprehensive cleaning validation program for the (b) (4) . purification process. This program will include the following elements and studies. 1. Cleaning validation will be executed for the (b) (4) and samples will be for total organic carbon (TOC) -swab and rinse, bioburden and endotoxins. 2. The cleaning process of (b) (4) will be validated as part of the life time studies and will also include (b) (4) (b) (4) to evaluate any carry over. 3. Currently (b) (4) are dedicated to a single product. This approach will be further enhanced by dedicating (b) (4) to specific (b) (4) Visual verification after rinsing to assure absence of (b) (4) particles (easily visible); exchange of wear & tear parts prior to re-assembly/packing. 4. Cleaning validation will be executed for the (b) (4) associated with (b) (4) operations and samples taken for TOC rinse, endotoxins and bioburden. 5. All (b) (4) components are currently being washed in a washer. The cleaning validation of the washer is ongoing and will be completed as per the manufacturing schedule. **Target Completion Date: March 29, 2019** |

**FDA Observation 13**

The procedure to prevent contamination of the (b) (4)          intermediate after (b) (4)        is inadequate for a product stored 2 to 8°C for up to (b) (4)

| | |
|---|---|
| <u>Response:</u> | The operations observed and discussed in Observation 13 are conducted in a Grade C area relative to aseptic processing, and in a Grade A biosafety cabinet (BSC) monitored to Grade A environmental conditions, which is used for bioburden control. |
| | The techniques/operations, equipment, and environment for the activities observed were intended to control bioburden and maintain product integrity. The Company takes seriously the importance of effective procedures and controls in these areas. |
| | We have considered Observation 13 carefully and determined that our procedures and their implementation can be improved relative to filling of the purified (b) (4) prior to storage, as explained below. |
| <u>Completed Actions:</u> | Our actions in response to Observation 13 are in process. |
| <u>Planned Actions:</u> | We will implement a program to re-develop the procedures filling of purified (b) (4) for the filling operation to include: <br> 1. The use of (b) (4)                              e.g. (b) (4) <br>    (b) (4)                   and/or <br> **Target Completion Date: March 29, 2019** <br><br> 2. The development and use of a manifold system for the filling and sampling of bottles eliminating the intermediary bag for receiving (b) (4) . <br> **Target Completion Date: April 30, 2019** <br><br> 3. A process engineer has been hired and a second process engineer is being recruited to focus on process improvements to enhance processing effectiveness, bioburden control, and containment of product. <br> **Target Completion Date: December 31, 2018** <br><br> 4. An experienced operations trainer, from upstream operations, will be reassigned to downstream operations to enhance our on-going training and educational initiatives. <br> **Target Completion Date: October 31, 2018** <br><br> The net result of these four procedural improvements will be to reduce the risk of inadvertently introducing a microbial contaminate to the product. <br><br> In addition, Immunomedics has retained microbiology and aseptic processing experts from (b) (4)                       to perform a comprehensive review of all ISO 5 aseptic processing operations. A formal report will be issued to Senior Management highlighting any key findings and improvement opportunities. Further improvements, wherever feasible will be established based on this continuous improvement initiative. |

| | Target Completion Date: October 31, 2018 |
|---|---|

Specifically, during a mock (b) (4)            and dispensing of an (b) (4)      intermediate surrogate conducted on August 9, 2018, the following was observed:

A. After (b) (4)       , the surrogate was transferred first to a single use (b)   L bag (SUB) and then from the SUB to (b) (4)   The SUB was removed from its container and assembled in the Biologic Safety Cabinet. (BSC) used for (b) (4)       and dispensing. Multiple open-process manipulations were conducted to prepare the SUB, including (b) (4)
(b) (4)                           to the SUB.

| Response: | We acknowledge the deficiencies in the material handling in the BSC. |
|---|---|
| | We have assessed that the multitude of materials prepared, and activities performed in the BSC may have contributed to the observed actions. |
| Completed Actions: | Our actions in response to Observation 13A are in process. |
| Planned Actions: | The single-use bag activities observed will be moved to the BSC in room (b) (4) reducing the amount of materials and number of activities that occur in the BSC in room (b) (4)   where the product is dispensed, and facilitating the actions/activities required to prepare the bag for use. **Target Completion Date: September 28, 2018** |
| | Immunomedics has retained microbiology and aseptic processing experts from (b) (4) (b) (4)             to perform a comprehensive review of all ISO 5 aseptic processing operations.  A formal report will be issued to Senior Management highlighting any key findings and improvement opportunities. Further improvements, wherever feasible will be established based on this continuous improvement initiative. **Target Completion Date: October 31, 2018** |
| | A review of SOP-0059: Use of (b) (4)       and SOP-0063: General Cleanroom Guidelines and Practices will be conducted to enhance operations in the final bulk filling operation. Additional training on proper aseptic practices and (b) (4) operations in the BSC, will be conducted as indicated above. **Target Completion Date: October 31, 2018** |

**B.  During the SUB preparation process, the end of the** (b) (4) **downstream the** (b) (4) **was observed to touch the operator's hands, the surfaces of the BSC and the material placed inside the BSC.**

| | |
|---|---|
| Response: | We acknowledge the deficiencies in the operator's aseptic handling of material in the BSC. |
| | Immunomedics is committed to training operators to ensure all operators involved in aseptic operations use proper techniques at all times as indicated above, and also take practical steps related to allocation of activities among available rooms to facilitate best practices. |
| | We have reminded our production staff and QA Supervisors that all aseptic operations should be monitored and observed by Production and/or QA on the floor personnel. Any potential compromise or poor technique that is observed will be noted as a deviation and referenced during the execution of respective batch production control records. |
| Completed Actions: | Our actions in response to Observation 13B are in process. |
| Planned Actions: | As noted above, the single-use bag activities observed will be moved to the BSC in room (b) (4) , reducing the amount of materials and number of activities that occur in the BSC in room (b) (4) where the product is dispensed, and facilitating the actions/activities required to prepare the bag for use. **Target Completion Date: September 28, 2018** |
| | As noted above, a review of SOP-0059: (b) (4) set-up and operation in the BSC and SOP-0063: Clean Room Practices will be conducted to enhance operations in the final bulk filling operation. Additional training on proper aseptic practices and (b) (4) operations in the BSC, will be conducted. **Target Completion Date: October 31, 2018** |

C. Prior to filling the (b) (4)    analytical samples were collected into (b) (4)    The (b) (4)    of the (b) (4)    used to fill the (b) (4)  and the (b) (4)    are similar. In addition, the flow of the (b) (4)    surrogate was not continuous and was difficult to control. As a result, the surrogate was spilled during the sampling process.

| Response: | We acknowledge the deficiencies in the material handling in the BSC. |
|---|---|
| | We agree that the sampling equipment utilized made the filling operation difficult to complete in a controlled manner. |
| | Personnel have been retrained on proper techniques required to minimize the potential for spillage during the sampling process. In order to further reduce the microbial risks associated with the collection of analytical samples, the samples will be taken after most, if not all the product has been filled into (b) (4) |
| | As a longer term, preventative action, we are evaluating the feasibility of using a pre-assembled or manifolds with sample containers pre-assembled that facilitate the taking of analytical samples in a manner that is more closed. |
| Completed Actions: | Our actions in response to Observation 13C are in process. |
| Planned Actions: | The sample handling procedures and equipment will be modified to improve the controlled collection of samples, to reduce the likelihood of spillage or of contamination of either the samples or the (b) (4)   intermediate.<br>**Target Completion Date: September 28, 2018** |

**List of Attachments in Appendix B**

|  | **Document** | **483 Reference** |
|---|---|---|
| 1. | **Ethical Conduct and Data Integrity Policy** | #1 |
| 2. | **Data Governance Program** | #1 |
| 3. | (b) (4)                              Risk Assessment Summary | #2 |
| 4. | SOP-0148: Supplier Qualification Program | #4 |
| 5. | SOP-0698: GMP Raw Material Qualification | #4 |
| 6. | SOP-0185: Sampling of Raw Materials | #4 |
| 7. | GMP Warehouse Location Tracking Map | #5 |
| 8. | Deviation 18-053U (amended) | #10 |
| 9. | Protocol for Retrospective Review of Major and Critical Deviations and CAPA Relevant(b)(4)   Intermediate Bulk PPQ Lots | #10 |
| 10. | SOP-0652 | #10 |
| 11. | Immunomedics Quality Council Charter | #10 |
| 12. | (b) (4) | #12 |

# EXHIBIT B

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT OFFICE ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| CDER Division of Inspectional Assessment; Attn. Mahesh Ramanadham, Director E-MAIL: Mahesh.Ramanadham@fda.hhs.gov; PHONE +1-301-796-3272 Mail address: 10903 New Hampshire Ave. White Oak Building 51, Room 4328 Silver Spring, MD-20993 Industry Information: www.fda.gov/oc/industry | August 6 to August 14, 2018 |
| | FEI NUMBER |
| | 1000526871 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT IS ISSUED

TO: Michael Pehl, Chief Executive Officer

| FIRM NAME | STREET ADDRESS |
|---|---|
| Immunomedics, Inc. | 300 The American Road |
| CITY, STATE AND ZIP CODE | TYPE OF ESTABLISHMENT INSPECTED |
| Morris Plains, NJ-07950 | Drug Substance Intermediate Manufacturing Facility |

THIS DOCUMENT LISTS OBSERVATIONS MADE BY THE FDA REPRESENTATIVE(S) DURING THE INSPECTION OF YOUR FACILITY. THEY ARE INSPECTIONAL OBSERVATIONS, AND DO NOT REPRESENT A FINAL AGENCY DETERMINATION REGARDING YOUR COMPLIANCE. IF YOU HAVE AN OBJECTION REGARDING AN OBSERVATION, OR HAVE IMPLEMENTED, OR PLAN TO IMPLEMENT CORRECTIVE ACTION IN RESPONSE TO AN OBSERVATION, YOU MAY DISCUSS THE OBJECTION OR ACTION WITH THE FDA REPRESENTATIVE(S) DURING THE INSPECTION OR SUBMIT THIS INFORMATION TO FDA AT THE ADDRESS ABOVE. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT FDA AT THE PHONE NUMBER AND ADDRESS ABOVE

DURING AN INSPECTION OF YOUR FIRM (I/ WE) OBSERVED:

1. The quality control unit lacks authority to investigate critical deviations of approved procedures. Specifically, the discovery of a data integrity breach in February 2018 did not trigger a deviation. The scope of the data integrity breach included manipulation of bioburden samples, misrepresentation of the (b) (4) integrity test procedure in the batch record and backdating of batch records, including dates of analytical results.

2. There is no assurance that samples and batch records from the (b) (4) process validation and commercial batches manufactured prior to February 2018 were not impacted by the data integrity breach. Interviews by Immunomedics personnel involved in the event were conducted under attorney/client privilege and no additional documentation is available, therefore no assessment could be made during the prelicense inspection in support of (b) (4)

3. Retesting procedure for the (b) (4) is inadequate. Specifically:
   a. SOP-0162 "Out of Specification Investigations" indicates that "if the company believes there is possibility the laboratory test did have error, and the error was undetected, then the company may wish to perform a retest." OOS Investigation report 18-001 shows that routine retesting was performed due to an initial OOS result.
   b. SOP-0162 allows for retesting of microbiology samples. An OOS result for the (b) (4) in-process bioburden sample was recorded on (b) (4). A retest was conducted using a retain sample on 1/5/2018 and the results on 1/10/2018 were OOS (OOS 18-001). Initiation of a non-conformance report (NCR 18-001U) was delayed until the results of the retest were reported on 1/10/2018.

4. The raw material sampling and testing program is inadequate. Specifically:
   a. (b) (4) supplied by (b) (4) has never been sampled and there is no assurance that the manufacturer can consistently provide material meeting specifications. The solution is (b) (4) from the vendor and is (b) (4) cell culture bioreactors. Deviations 18-081U and 18-163U were initiated due to contamination in the production bioreactors. In

| | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or Type) | DATE ISSUED |
|---|---|---|---|
| SEE REVERSE OF THIS PAGE | | Reyes Candau-Chacon, Microbiologist; Madushini Dharmasena, Staff Fellow; Gunther Boekhoudt, Staff Fellow; Rajiv Srivastava, CSO | 08/14/2018 |

FORM FDA 483 (9/08)   PREVIOUS EDITION OBSOLETE                **INSPECTIONAL OBSERVATIONS**                Page 1 of 4

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT OFFICE ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| CDER Division of Inspectional Assessment; Attn. Mahesh Ramanadham, Director<br>E-MAIL: Mahesh.Ramanadham@fda.hhs.gov; PHONE +1-301-796-3272<br>Mail address: 10903 New Hampshire Ave. White Oak Building 51, Room 4328<br>Silver Spring, MD-20993<br>Industry Information: www.fda.gov/oc/industry | August 6 to August 14, 2018 |
| | FEI NUMBER |
| | 1000526871 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT IS ISSUED |
|---|
| TO: Michael Pehl, Chief Executive Officer |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Immunomedics, Inc. | 300 The American Road |
| CITY, STATE AND ZIP CODE | TYPE OF ESTABLISHMENT INSPECTED |
| Morris Plains, NJ-07950 | Drug Substance Intermediate Manufacturing Facility |

both cases, probable root causes included the (b)(4) addition assembly (b)(4) bag, line, and valve). Testing of an unused (b)(4) bag in inventory also resulted in a positive sample.

   b. Product-contact (b)(4) and (b)(4) used during cell culture of the (b)(4) are not tested for bioburden.

5. The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the (b)(4). Specifically,

   a. The firm does not keep records tracing the use of raw material. Raw material reconciliation cannot be conducted as discarded raw materials are not documented. During the tour to the manufacturing facility on 8/6/2018, the inspection team observed a (b)(4) L container of (b)(4) (b)(4) in the loading dock for destruction. The material could not be traced.

   b. Warehouse raw material inventory list is kept in an Excel Spreadsheet that lacks history traceability. During the tour of the warehouse on 8/6/2018 Warehouse inventory cannot be located using the Excel Spreadsheet. Specifically, (b)(4) (catalog # (b)(4) Lot # (b)(4) (b)(4) was present in the warehouse, however the location and inventory could not be provided.

   c. The warehouse is not adequately mapped for inventory purposes with floor plans. Items stored on the floor have no assigned location. In addition, quarantine and released items on the floor are kept side-by-side without a system in place to prevent the use of quarantined raw material.

6. Differential pressure between GMP areas of different area classification is not adequately maintained and monitored. Specifically,

   a. Air pressure in the GMP areas is not adequately maintained. For example, differential pressure between Rooms (b)(4) (Class C (b)(4) and (b)(4) (Class D corridor) was out of action levels in 37 out of (b)(4) measurements between July 24, 2018 and August 1, 2018.

   b. Continuous monitoring of pressure in the GMP areas has been installed in July 2018 and is undergoing qualification, however not all adjacent rooms with different air classification are alarmed for low pressure differential. For example, differential pressure between the Rooms (b)(4) (Class C (b)(4) (b)(4) ) and (b)(4) (Class D corridor) is not alarmed.

7. The design of the facility is inadequate in that no drains are present in the (b)(4) rooms. In addition, there is no SOP for liquid containment and disposal after a catastrophic spill. All process (b)(4)

| | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or Type) | DATE ISSUED |
|---|---|---|---|
| SEE<br>REVERSE<br>OF THIS<br>PAGE | *[signatures]* | Reyes Candau-Chacon, Microbiologist; Madushini<br>Dharmasena, Staff Fellow; Gunther Boekhoudt,<br>Staff Fellow; Rajiv Srivastava, CSO | 08/14/2018 |

FORM FDA 483 (9/08)    PREVIOUS EDITION OBSOLETE    **INSPECTIONAL OBSERVATIONS**    Page 2 of 4

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT OFFICE ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| CDER Division of Inspectional Assessment; Attn. Mahesh Ramanadham, Director E-MAIL: Mahesh.Ramanadham@fda.hhs.gov; PHONE +1-301-796-3272 Mail address: 10903 New Hampshire Ave. White Oak Building 51, Room 4328 Silver Spring, MD-20993 Industry Information: www.fda.gov/oc/industry | August 6 to August 14, 2018 |
|  | FEI NUMBER |
|  | 1000526871 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT IS ISSUED

TO:  Michael Pehl, Chief Executive Officer

| FIRM NAME | STREET ADDRESS |
|---|---|
| Immunomedics, Inc. | 300 The American Road |
| CITY, STATE AND ZIP CODE | TYPE OF ESTABLISHMENT INSPECTED |
| Morris Plains, NJ-07950 | Drug Substance Intermediate Manufacturing Facility |

the Production Bioreactor are held in (b) (4) bags.

8. There is no signed Quality Agreement between (b) (4) and Immunomedics Inc. (b) (4) is the supplier of cell culture media and all buffers, solutions (including (b) (4), and chromatography resins used for (b) (4) of the (b) (4)

9. No procedure is in place for (b) (4) trending of results. During the process validation campaign, bioburden levels in the chromatography resins were not trended and inadequately high bioburden levels were not investigated. Low level bioburden (b) (4) CFU/(b) (4) mL) was observed in the (b) (4) resin chromatography after sanitization in (b) (4) batches (b) (4) and the bioburden level increased to too numerous to count in (b) (4) batch (4) No deviation was initiated.

10. Deviation investigations and CAPA implementations are inadequate. For example, Deviation 18-053U was initiated after an internal audit concluded that the (b) (4) had not been adequately tested for integrity (b) (4) The deviation included the following deficiencies:
   a. Lot number in the deviation form indicates "multiple lots" without specifying the potential lots impacted.
   b. Product impact assessment includes the conclusion of a clinical Health Hazard Assessment, but no risk assessment on the presence of (b) (4) n the product is documented.
   c. The CAPA section indicates that remediation included "... purchasing additional test equipment to evaluate the (b) (4) ts use." However, at the date of the inspection no additional equipment has been purchased and no information about the CAPA is documented in the deviation.

11. Deviation initiation and closing times are inadequate. Specifically:
   a. SOP-0152 "Deviation handling" indicates that if the deviation cannot be completed by the assigned due date, a one-time extension can be requested for the QA unit. The following deviations were not closed by the due date and did not include an extension:
      i. 18-116U: deviation due date was 7/20/2018; deviation was open at the time of the inspection
      ii. 18-081U: deviation due date was 6/17/2018; deviation was open at the time of the inspection
      iii. 18-079U: deviation due date was 6/16/2018; deviation was closed on 8/3/2018
      iv. 18-050U: deviation due date was 5/9/2018; deviation was open at the time of the inspection

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or Type) | DATE ISSUED |
|---|---|---|---|
|  | *[signatures]* | Reyes Candau-Chacon, Microbiologist; Madushini Dharmasena, Staff Fellow; Gunther Boekhoudt, Staff Fellow; Rajiv Srivastava, CSO | 08/14/2018 |

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT OFFICE ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| CDER Division of Inspectional Assessment; Attn. Mahesh Ramanadham, Director  E-MAIL: Mahesh.Ramanadham@fda.hhs.gov; PHONE +1-301-796-3272  Mail address: 10903 New Hampshire Ave. White Oak Building 51, Room 4328  Silver Spring, MD-20993  Industry Information: www.fda.gov/oc/industry | August 6 to August 14, 2018 |
| | **FEI NUMBER**  1000526871 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT IS ISSUED

TO:  Michael Pehl, Chief Executive Officer

| FIRM NAME | STREET ADDRESS | ( |
|---|---|---|
| Immunomedics, Inc. | 300 The American Road | ( |
| **CITY, STATE AND ZIP CODE** | **TYPE OF ESTABLISHMENT INSPECTED** | |
| Morris Plains, NJ-07950 | Drug Substance Intermediate Manufacturing Facility | |

b. SOP-0152 "Deviation Handling" does not specify a time limit between time/discovery of event and deviation initiation. The following deviations were initiated more than one month after event discovery:
  i. 18-009U: investigation into bioburden OOS #18-001 for (b)(4)                : date of event was 1/10/2018, deviation was initiated on 3/27/2017.
  ii. 18-053U: (b)(4)             related discrepancy; date of event was February 2018. deviation was initiated on 4/9/2017

12. Cleaning of (b)(4)         equipment, including (b)(4)        and product-contact parts of the (b)(4)     is not validated or verified. Non-conformance report 18-009 initiated due to a (b)(4)         OOS bioburden sample includes as the primary root cause the (b)(4)         contaminated during vendor pressure testing.

13. The procedure to prevent contamination of the (b)(4)              after (b)(4)        is inadequate for a product stored 2 to 8°C for up to (b)(4)       Specifically, during a mock (b)(4)        and dispensing of an (b)(4)      surrogate conducted on August 9, 2018. the following was observed:
  a. After (b)(4)      the surrogate was transferred first to a (b)(4)      L bag (b)(4) 3) and then from the (b)(4) 3 to (b)(4)       The (b)(4) 3 was removed from its container and assembled in the Biologic Safety Cabinet (BSC) used for (b)(4)         and dispensing. Multiple (b)(4)       process manipulations were conducted to prepare the (b)(4) 3, including cutting, closing, and connecting several lines and assembly of the (b)(4)      to the (b)(4) B.
  b. During the (b)(4) B preparation process, the end of the tubing (b)(4)             was observed to touch the operator's hands. the surfaces of the BSC, and the material placed inside the BSC.
  c. Prior to filling the (b)(4)     analytical samples were collected into (b)(4)  ml (b)(4)     tubes. The diameter of the tubing (b)(4)  inch; (b)(4)  mm) used to fill the tubes and the (b)(4)     tubes (b)(4)   nm) are similar. In addition. the flow of the (b)(4)     surrogate was not continuous and was difficult to control. As a result, the surrogate was spilled during the sampling process.

RC  8/14/2018

| | EMPLOYEE(S) SIGNATURE | EMPLOYEE(S) NAME AND TITLE (Print or Type) | DATE ISSUED |
|---|---|---|---|
| SEE REVERSE OF THIS PAGE | | Reyes Candau-Chacon. Microbiologist; Madushini Dharmasena, Staff Fellow; Gunther Boekhoudt, Staff Fellow; Rajiv Srivastava. CSO | 08/14/2018 |

FORM FDA 483 (9/08)   PREVIOUS EDITION OBSOLETE          **INSPECTIONAL OBSERVATIONS**                    Page 4 of 4

# EXHIBIT C

| | | |
|---|---|---|
| **Date Assigned:** 06/28/2018 | **Inspection Start Date:** 08/06/2018 | **Inspection End Date:** 08/14/2018 |

**Firm Name & Address:**   Immunomedics, Inc. , 300 The American Rd Morris Plains, NJ 07950-2460 US

**Firm Mailing Address:**   300 American Rd, Morris Plains, NJ 07950-2460 United States

| | | |
|---|---|---|
| **FEI:** 1000526871 | **JD/TA:** 35 | **County:** MORRIS | **Est Size:** 0 - 24,999 |
| **Phone:** (973)605-8200 | | **District:** CDER-DIA | **Profiled:** Yes |
| **Conveyance Type:** | **% Interstate:** | **Inspectional Responsibility:** Field | |

## Endorsement

This pre-license inspection of Immunomedics Inc. (b) (4)     intermediate manufacturing site was conducted from August 6 ? 14, 2018 following a request by the Division of Microbiology Assessment, Branch IV (DMA/OPF/OPQ//CDER) and Division of Inspectional Assessment, Branch 1 (DIA, OPF/OPQ). The inspection was conducted in support of (b) (4)     for (b) (4)     .

The inspection covered (b) (4)     intermediate manufacturing, testing laboratories, utilities, and warehouse. The inspection was system-based and covered Quality, Facility and Equipment, Production, Material, and Laboratory systems.

A thirteen-item Form FDA 483 was issued to the firm at the close of the inspection on August 14, 2018 with the following observation:

1. The quality control unit lacks authority to investigate critical deviations of approved procedures.

2. There is no assurance that samples and batch records from the (b) (4)     intermediate process validation and commercial batches manufactured prior to February 2018 were not impacted by the data integrity breach.

3. Retesting procedure for the (b) (4)     intermediate is inadequate.

4. The raw material sampling and testing program is inadequate.

5. The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the (b) (4)   (b) (4)     intermediate.

6. Differential pressure between GMP areas of different area classification is not adequately maintained and monitored.

7. The design of the facility is inadequate in that no drains are present in the purification rooms. In addition, there is no SOP for liquid containment and disposal after a catastrophic spill. All process streams downstream the (b) (4)     Bioreactor are held in disposable bags.

8. There is no signed Quality Agreement between (b) (4)     and Immunomedics Inc.

9. No procedure is in place for (b) (4)   intermediate (b) (4)   trending of results.

10. Deviation investigations and CAPA implementations are inadequate.

11. Deviation initiation and closing times are inadequate.

12. Cleaning of downstream equipment, including (b) (4)     and product-contact parts of the (b) (4)     is not validated or verified.

13. The procedure to prevent contamination of the (b) (4)     intermediate after (b) (4)     is inadequate for a product stored 2 to 8?C for up to (b) (4)     .

Initial Recommendation:  Withhold

**Date:** 02/06/2019                              **Page:** 1  of  6

**Endorsement Location:** FACTS

| **Inspector Name** | **Date & Time of Signature** | **Supervisor Name** | **Date & Time of Signature** |
|---|---|---|---|
| Reyes Candau-Chacon | 10/02/2018  12:25 PM  ET | | ET |

.

**FEI:** 1000526871      **Inspection Start Date:** 08/06/2018      **Inspection End Date:** 08/14/2018

**Firm Name & Address:**     Immunomedics, Inc. , 300 The American Rd Morris Plains, NJ 07950-2460 US

**Related Firm FEI:**      **Name & Address of Related Firm:**

**Registration Type**                  **Registration Dates**

DRG    Drug                     12/01/2006     05/01/2000     04/01/1999

**Establishment Type**            **Industry Code**

| | | | | |
|---|---|---|---|---|
| 5 | Sponsor-Investigator | | 57 | Bio & Licensed In-Vivo & In-Vitro Diag |
| 5 | Sponsor-Investigator | | 64 | Human and Animal Drugs |
| M | Manufacturer | | 57 | Bio & Licensed In-Vivo & In-Vitro Diag |
| Q | Corporate Headquarters | | 57 | Bio & Licensed In-Vivo & In-Vitro Diag |

**District Use Code:**

**Date:** 02/06/2019          **Page:** 3 of 6

Establishment Inspection Report

**FEI:** 1000526871        **Inspection Start Date:** 08/06/2018        **Inspection End Date:** 08/14/2018

**Firm Name & Address:**    Immunomedics, Inc. , 300 The American Rd Morris Plains, NJ 07950-2460 US

**Inspection Basis:**    Surveillance

## Inspected Processes & District Decisions

| PAC | Establishment Type | Products/ Process | MQSA | Reschedule Insp Date | Re-Inspection Priority | Inspection Conclusions |
|---|---|---|---|---|---|---|
| 46832M | Manufacturer | (b) (4) | | 08/2020 | Surveillance | Correction Indicated (CI) |

| Final Decision? | District Decision Date | District Decision Type | | District Decision Made By | Org Name |
|---|---|---|---|---|---|
| | 08/14/2018 | Official Action Indicated (OAI) | | Candau-Chacon, Reyes | CDER-DIA |

**Remarks:**

========================================================================================

**FEI:** 1000526871          **Inspection Start Date:** 08/06/2018          **Inspection End Date:** 08/14/2018

**Firm Name & Address:** Immunomedics, Inc. , 300 The American Rd Morris Plains, NJ 07950-2460 US

## Products Covered

| Product Code | Est Type | Description | | Additional Product Description |
|---|---|---|---|---|
| (b) (4) | Manufacturer | (b) (4)  N.E.C.; For Further Manufacture | | |

## Assignees Accomplishment Hours

| Employee Name | Position Class | Hours Credited To | PAC | Establishment Type | Process | Hours |
|---|---|---|---|---|---|---|
| Candau-Chacon, Reyes | BUR | CDER-DIA | 46832M | Manufacturer | (b) (4) | 160 |
| Srivastava, Rajiv R | INV | PHRM1 | 46832M | Manufacturer | | 95.5 |
| | | | | | **Total Hours:** | 255.5 |

**Date:** 02/06/2019                    **Page:** 5  of  6

FEI: 1000526871          **Inspection Start Date:** 08/06/2018          **Inspection End Date:** 08/14/2018

**Firm Name & Address:** Immunomedics, Inc. , 300 The American Rd Morris Plains, NJ 07950-2460 US

## Inspection Result

**EIR Location**                                                                              **Trips Num**
DMPQ files

**Inspection Summary**
This pre-license inspection of the drug substance manufacturing facility at Immunomedics Inc., Morris Plains, NJ was conducted on
August 6th ? August 14th, 2018 following a request by Branch IV of Division of Microbiology Assessment, Office of Process and
Facilities, Office of Pharmaceutical Quality, CDER under FACTS assignment 11853796, operation ID 9856447.  The inspection was
conducted to support the approval of (b) (4)                                        The inspection covered the production building (DS
intermediate manufacturing) and Quality Control Laboratories in the Building (b) (4) In addition, the inspection covered the Warehouse
in building 401 and the Utilities.

## IB Suggested Actions

**Action**                    **Remarks**

## Referrals

**Org Name**          **Mail Code**              **Remarks**

## Refusals

**Inspection Refusals:**

## Samples Collected               ## Recall Numbers                    ## Related Complaints

**Sample Number**                  **Recall Number**                    **Consumer Complaint Number**

## FDA 483 Responses

**483 Issued?:**  Y     **483 Location:** DMPQ files

                         Response      Response
**Response Type**          Mode          Date      **Response Summary**

**Date:** 02/06/2019                        **Page:** 6  of  6

**Establishment Inspection Report**

Immunomedics. Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC. MD. GB, RS

## I. Summary of findings

This pre-license inspection of the drug substance manufacturing facility at Immunomedics Inc.,
Morris Plains, NJ was conducted on August 6th – August 14th, 2018 following a request by
Branch IV of Division of Microbiology Assessment, Office of Process and Facilities, Office of
Pharmaceutical Quality, CDER under FACTS assignment 11853796, operation ID 9856447.
The inspection was conducted to support the approval of (b) (4)
(b) (4)         The inspection covered the production building (DS intermediate manufacturing) and
Quality Control Laboratories in the Building (b) (4)   In addition, the inspection covered the
Warehouse in building 401 and the Utilities.

## II. Administrative data

The name and address of the site is:

Immunomedics. Inc.,
300 The American Road,
Morris Plains, NJ

The (b) (4)                       drug substance intermediate is manufactured in Building (b) (4)

The facility has approximately (b) (4) employees distributed as follows: (b) (4) in CMC (engineering,
manufacturing. process sciences, QA, QC, micro. and supply chain), (b) (4) contractors (clinical,
data management, regulatory, safety), (b) (4) in the business office. (b) (4) commercial. (b) (4) in finance and
administration. (b) (4) in human resources, and (b) (4) in legal affairs. Hours of operations are (b) (4)
(b) (4)

The inspection team consisted of following members:

Reyes Candau-Chacon, CDER/OPQ/OPF/DMA (RC)
Madushini Dharmasena, CDER/OPQ/OPF/DMA (MD)
Gunther Boekhoudt (GB), CDER/OPQ/OPF/DIA (GB)
Rajiv Srivastava, ORA (RS)
Dates of inspection:    August 6th – August 14th, 2018 (weekend excluded)
Days in the facility:    7

Each inspector wrote his/her assigned corresponding sections of this report, as identified with
initials.

At the beginning of the inspection, a 482-FDA notice of inspection (Attachment 1) and the
inspection team's FDA Inspector Credentials were presented to Morris Rosenberg, PhD. Chief
Technical Officer of Immunomedics and the most responsible person at the facility at the start of
the inspection.

1

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

---

Immediately after the firm presented an overview of the company, facility, and process, the inspectors were taken on a tour through the facility. Individuals present at the opening of the inspection are listed in Exhibit 1.  Individuals present at the closeout are shown in Exhibit 2.

A 13-item Form FDA 483 was issued to the firm on August 14, 2018 at the inspection's closeout meeting on August 14, 2018, to Michael Pehl, Chief Executive Officer, (Attachment 2) with the following observation summaries:

1.  The quality control unit lacks authority to investigate critical deviations of approved procedures.
2.  There is no assurance that samples and batch records from the (b) (4)            intermediate process validation and commercial batches manufactured prior to February 2018 were not impacted by the data integrity breach.
3.  Retesting procedure for the (b) (4)         intermediate is inadequate.
4.  The raw material sampling and testing program is inadequate.
5.  The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the (b) (4)          intermediate.
6.  Differential pressure between GMP areas of different area classification is not adequately maintained and monitored.
7.  The design of the facility is inadequate in that no drains are present in the purification rooms. In addition, there is no SOP for liquid containment and disposal after a catastrophic spill. All process streams downstream the (b) (4)        Bioreactor are held in disposable bags.
8.  There is no signed Quality Agreement between (b) (4)                    and Immunomedics Inc. (b) (4)            is the supplier of cell culture media and all (b) (4) solutions (including (b) (4)   ), and (b) (4)              used for (b) (4)        purification of the (b) (4)         intermediate.
9.  No procedure is in place for (b) (4)   intermediate (b) (4)      trending of results.
10. Deviation investigations and CAPA implementations are inadequate.
11. Deviation initiation and closing times are inadequate.
12. Cleaning of downstream equipment, including (b) (4)          and product-contact parts of the (b) (4)        is not validated or verified.
13. The procedure to prevent contamination of the (b) (4)            intermediate after (b) (4) (b) (4)       is inadequate for a product stored 2 to 8ºC for up to (b) (4)

4 verbal observations/discussion items were communicated to the firm throughout the inspection. They are provided in the General Discussion with Management Section (Section XV).

2

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

## III. Refusals

The firm refused to provide documentation to assess the data integrity breach that was discovered in January 2018. The firm alleged that they could not share those documents because they were under attorney/client privilege. Review of those documents was necessary to assess the scope and impact of the data integrity breach.

## IV. History

Immunomedics is a Public Biotech company, incorporated in 1982 that has historically focuses in research and early development and has no previous experience with commercialization of therapeutic products in the US.

A brief history of the company is included in the table below provided by the firm during the inspection.

| Date | Key Event |
|---|---|
| July 1982 | Immunomedics was founded |
| 19 Apr 1984 | IPO (NASDAQ:IMMU) |
| 1990 - 2000 | Generated antibody platform |
| May 2002 | Acquired IBC Pharmaceuticals |
| 2008 | Developed Linker platform |

(b) (4)

The Immunomedics headquarters and manufacturing site (Building (b) (4) are located in American Enterprise Park in Morris Plains, NJ. The manufacturing and QC site (Building (b) (4) is a (b)(4) story building that was built in 1991. Immunomedics leased the building and constructed the Research and Manufacturing facilities in 1996. The laboratories and offices are architecturally segregated. The manufacturing facilities include a (b) (4) sq. ft. ((b) (4) m²) (b) (4) facility (Rooms (b) (4) a (b) (4) sq. ft. ( (b) (4) m²) large-scale bioreactor facility (Rooms (b) (4) and a (b) (4) sq. ft. (b) (4) m²) downstream processing facility (b) (4)

3

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

This is the first FDA inspection for biologic product manufacturing. The inspectional history of the facility, duplicated from documentation provided by the firm during the inspection, is shown below.

**FDA Inspections:**

- Pre-approval GCP Inspection – June 14 – August 1, 2018.
- February 13, 2006 (b) (4)           – investigator came to site, but inspection not held since
  (b) (4)
  (Routine,
- January 14-17 and 23, 2003 (b) (4)
- February 27, 2001 – March 6, 2001 (Routine, (b) (4)
- July 7-11, 1997, New Manufacturing Facility Inspection (Morris Plains, NJ location (b) (4)
- March 11-14, 1996 (PAI for (b) (4)     none performed for (b) (4)     - not approved in US)

**EMA/PEI/RP Routine Inspections for (b) (4)     and/or (b) (4)**

- February 22-24, 1996 (PAI)
- 3/9-11, 1998
- 3/12-14, 2001
- 9/15-20, 2004
- 3/27-28, 2007
- 1/19-21, 2010
- 9/12-14, 2012
- 4/26-28, 2016 (not held within 2-3-year period since no manufacturing was being performed)

**PEI GCP Inspection for (b) (4)**

- January 8-12, 2007

## V. Interstate commerce

This inspection was limited to (b) (4)           and at this time, Immunomedics is not approved for distribution of this product within United States (pending approval of (b) (4)
(b) (4)          .

## VI. Jurisdiction (Products manufactured and/or distributed)

The facility has been a (b) (4)     manufacturing facility since April 2017. (b) (4)
                                                                      A list of products manufactured at the facility in the past 5 years and their description, duplicated from documentation provided by the firm during the inspection, is shown below.

4

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

| Immunomedics Product Codes (Active Past 5 years) | | | | | |
|---|---|---|---|---|---|
| IMMU Code (b) (4) | Internal Name | Description | Manufacturing Area | Shared Equipment | Last Production Date |

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS



A list of products manufactured at the facility prior to the past 5 years, duplicated from documentation provided by the firm during the inspection, is shown below.

## VII. Individual responsibilities and persons interviewed:

Michael Pehl, Chief Executive Officer, is the most responsible person at the Immunomedics site. More details on the organizational chart of the company are available in Exhibit 3.

A list of individuals who provided relevant information and accompanied us during the inspection is attached (Exhibit 4).

6

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

## VIII. Firm's training program
*(This section was written by MD)*

The firm's training program was covered during the 8/6/2018 to 8/14/2018 pre-license inspection. According to Ms. (b) (6)            Manager, Training Unit, the firm's training program is governed by following SOPS.

SOP-0660 "Qualifying Department Subject Matter Experts as Trainers" (version 2.0, Effective 6/1/2018).
SOP-0659 "Preparing training material" (version 1.0, Effective 5/31/2018).
SOP-0658 "Managing Performance Assessment" (version 1.0, Effective 5/31/2018).
SOP-0657 "Delivering Training and Conducting Assessment" (version 2.0, Effective 6/2/2018).
SOP-0158 "QA training program" (version 2.0, Effective 5/31/2018).

The firm requires all employees to attend training on current good manufacturing practices (cGMP) and (b) (4)     all employees are required to take cGMP refresher course. In addition, the employees are trained on official documents such as SOPs, batch records, position responsibilities and job-specific procedures. Throughout the duration of the inspection, I (MD) requested and reviewed the following employees' training records for their GMP and job-function specific training:

- (b) (6)            Director, Cell Culture Bioreactor
- (b) (4)            (b) (4)      purification, Technician
- (b) (6)            QC Microbiology, Technician

Their training files include job-specific trainings as well as cGMP trainings. Most training includes reading the SOPs and training on the job. In addition, some trainings are given in a classroom setting. Since there is a high turnover in the firm, most employees are new in their jobs.

*No observations were made.*

## IX. Tours of the facility
*(This section was written by GB)*

On 8/6/2018, the inspection team toured the Warehouse facility (Building 410). Inside building 410, we got a tour of how materials flow in and out of the warehouse. We toured the receiving dock, material received staging area, the warehouse area where "Release" and "Quarantine" materials are kept, the new raw material sampling lab, and the warehouse staff office. We returned to Building (b) (4)  and went to the raw material sampling room followed by the old warehouse, the future cell bank storage area, the current cell bank storage area, and the cell culturing area. On 8/7/2018 GB and RS toured to the QC lab and observed the execution of the (b) (4)            assay. On 8/8/2018, the inspection team went back to the warehouse (Building 410) and looked inside the temporary office storage area accessible from the warehouse. Back in Building (b) (4)  GB toured the QC lab and observed the training run of the HPLC assay. The inspection team also toured the (b) (4)       purification suite and observed the

7

**Establishment Inspection Report**                    Immunomedics. Inc., 300 The American Road.
                                                       Morris Plains. NJ FEI # 1000526871
                                                       Inspection Dates: August 6ᵗʰ – August 14ᵗʰ. 2018
                                                       RC. MD. GB. RS

---

detergent inactivation by (b) (4)      On 8/10/2018, GB toured the QC lab and observed the
exsiccation of the (b) (4)     assay. GB. MD and RS toured the (b) (4)       purification suite and
observed the set-up and the washing of the (b) (4)    purification column.

## X. Quality system
*(This section was written by RC)*

The inspection team was aware prior to the inspection that the firm had communicated to the
FDA in (b) (4)      that some of the employees were using procedures that were not
specified in the batch records. At the beginning of the inspection I addressed the concern of a
potential data integrity breach in the facility and had extensive conversations with Morris
Rosenberg, CTO and Mujtaba Ali, head of Quality. They confirmed a data integrity breach that
discovered during the review of bioburden data in January 2018. However, the firm did not
initiate a deviation as a consequence of the data integrity breach and the firm refused to provide
information to the inspection team to assess the extent and duration of the data integrity breach
because the investigation had been conducted under attorney/client privilege.

> *Inspector Comment*: This was a FDA-483 observation (*Observation 1: The quality
> control unit lacks authority to investigate critical deviations of approved procedures*")

Deviation Procedures
*(This section was written by RC)*

I reviewed SOP-0152 "Deviation Handling" v3.0, effective June 29, 2018. The deviation
procedure does not include a time limit between detection of the event and opening of the
deviation.

> *Inspector Comment*: This was a FDA-483 observation (*Observation 11: Deviation
> initiation and closing times are inadequate*")

The Department manager with the help of QA decides if an event constitutes a deviation, and if it
does, QA assigns a deviation number and the department manager completes the fields of the
Form FRM-0074 associated with the deviation.

8

**Establishment Inspection Report**                     Immunomedics, Inc., 300 The American Road,
                                                        Morris Plains, NJ FEI # 1000526871
                                                        Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                        RC, MD, GB, RS

---

Deviations:
*(The following was written by RC)*
I reviewed the following deviations:
17-084U, 17-094U, 17-096U, 17-135P, 17-156U, 17-166U, 17-215U, 17-222U, 18-009U, 18-015U, 18-039U, 18-053U, 18-081U, 18-091U, 18-095U, 18-111U, 18-129U, 18-131U, 18-163U.

The following deviations related to filter integrity test were reviewed: 18-079U, 18-094U, 18-096U, 18-145U, 18-156U, 18-166U.

U stands for "unplanned deviation", P stands for "planned deviation". Planed changes were reported as panned deviations in 2017 and are currently reported as change controls.

> *Inspector Comment: Deviation investigations were deficient. This was a FDA-483 observation (Observation 10: Deviation investigations and CAPA implementations are inadequate.") In addition, not all fields in form FRM-0074 are completed for most deviations. The following fields are usually left blank and substituted by a summary: description of the event, initial impact assessment Investigation details, probable root cause, reoccurrence, CAPA and other actions. The summary consists of an attachment without traceability; for example, in deviation 18-009U (Exhibit RC-1), opened on March 27, 2018 and closed on March 29, 2018, most of the fields are left blank. The deviation includes an attachment that is not dated, not signed and has no information on the chronology of the deviation investigation. In addition, the summary attachment may be modified as the investigation proceeds. For example, deviation 18-081U (Exhibit RC-9) opened on May 18, 2018, indicates in the sections of the FRM-0074 form "see attachment JH 10Jul2018", but the date included in the attachment is from August 5, 2018. It is not clear if the attachment was initiated on July 10 and then modified or if the attachment was initiated on August 5. In addition, the dates cannot be verified, as it is just typed at the beginning of the attachment (no dated digital signatures). This was a verbal observation communicated to the firm during the inspection (Verbal observation RC-1: Deviations documentation is inadequate).*

*(The following was written by GB)*
I(GB) requested and reviewed the following events:

- NCR 17-154U: The lack to recover the ⁽ᵇ⁾⁽⁴⁾ samples from the bioreactors. No viable cells were recovered for ⁽ᵇ⁾⁽⁴⁾ culture from ⁽ᵇ⁾⁽⁴⁾                   The samples taken had low starting viability (36%) on day 9 of the bioreactor. On the ⁽ᵇ⁾⁽⁴⁾ day 1 viability was < 6% and by day 2 the viability was 0%. This drop in viability was expected for bioreactor. culture between day 8 and 10. The investigation determined that the lack of ⁽ᵇ⁾⁽⁴⁾ for the ⁽ᵇ⁾⁽⁴⁾ lot was not needed since a successful culture was previously obtained from lot ⁽ᵇ⁾⁽⁴⁾                      and from ⁽ᵇ⁾⁽⁴⁾                          Both these ⁽ᵇ⁾⁽⁴⁾ banks were appropriately tested and satisfy the QC requirements. The Corrective and Preventative Action (CAPA) implemented based on this NCR include the construction of an ⁽ᵇ⁾⁽⁴⁾ bank from the

9

Establishment Inspection Report

Immunomedics, Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
RC. MD. GB. RS

MCB. This (b)(4) bank was tested through (b)(4) generations to capture the maximum in-vitro age of fed-batch processing from the MCB of (b)(4) generations. This deviation has no impact to product quality and was performed appropriately.

- NCR 18-114U and 18-127U: Using expired of (b)(4) purchased from (b)(4) such as, (b)(4) were randomly assigned a (b)(4) expiration date with no data supporting the it. After the plant (b)(4) most of the (b)(4) expired and (b)(4) was unable to provide new material in a timely manner. A risk assessment was conducted and determined that the use of these expired (b)(4) has a low risk to product quality. In addition, bioburden and endotoxin testing were performed providing information of the potential microbial load. The use conditional release (b)(4) are part of the umbrella deviation 18-157U. This deviation has no impact to product quality and was performed appropriately.

- NCR 18-092U and 18-098U: Clinical material request were submitted less than the required (b)(4) . Per SOP-Q242, "Shipment of Controlled and non-Controlled Materials", states that material request must be submitted to QA at least (b)(4) prior to the requested shipment date. The investigation determined that the (b)(4) timeline in the SOP is driven by business efficiency goals and is not necessary. CAPA # 18-006 was initiated to revise the SOP-Q240 to remove the required (b)(4) deadline. This deviation has no impact to product quality and was performed appropriately.

- NCR 18-100U: Out of range (b)(4) during the transfer of (b)(4) cultured from (b)(4) L bioreactor to the (b)(4) L bioreactor. The (b)(4) L (b)(4) bioreactor (b)(4) ranges are between (b)(4) and (b)(4) Here, for lot (b)(4) the (b)(4) reading was (b)(4) The investigation determine that the (b)(4) reading was due to a sterilization cycle on the (b)(4) bioreactor which had to go through a second sterilization cycle as part of deviation NCR 18-103U. Due to the second sterilization cycle, less time was available for the (b)(4) L bioreactor to equilibrate. Also, the culture in the (b)(4) L bioreactor had to go longer. In order avoid going out of range for (b)(4) in the (b)(4) L bioreactor, supervisor recommended to transfer the culture to the (b)(4) L bioreactor prior reaching the desired (b)(4) There was no impact to product quality since the bioreactor are allowed to run at (b)(4) as (b)(4) as (b)(4) Document change order, 18-241, was initiated to change the (b)(4) ranges. This deviation was performed appropriately.

- NCR 17-157U: Material receiving report Q500 contained multiple errors. Receiving reports dated 09-15-2017 had some data entry errors and were not properly crossed out, initialed, and dated. The correct information was provided in the package and there was no product impact. The investigation determine that the root cause was a personal error and retraining was part of the corrective action. This deviation was performed appropriately.

10

Establishment Inspection Report

Immunomedics. Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6ᵗʰ – August 14ᵗʰ. 2018
RC. MD. GB. RS

- NCR-18-136U: Documentation discrepancy in sample preparation for stability samples (b) (4)           The SOP-0330 and SOP-0310 were not followed. The SOP specify that sample documentation must be performed on the controlled form and in a word document. In this case, samples documentations were only performed on a word document. There was no impact to product quality. The sample were later transcribed on the controlled form. The root cause was determined to be some inconsistent instructions in the SOPs. The corrective action taken was to update the SOPs. This deviation was performed appropriately.

- NCR 17-224U: Manufacturing rooms were used before completion of the environmental qualification protocol. The investigation determined that the root cause was the failure to follow SOP. The CAPA implemented includes:
  - Site-wide training
  - Reinforced awareness of change control
  - Accountability for failure to follow the change control SOP
  - Tag-out added to change control and work order SOPs to prevent use of equipment and facilities before completion of changes.

  The deviation was performed appropriately.

Annual Product Review Procedure:
*(This section was written by GB)*
Annual product review is described in SOP-0159 "Annual Product Review". The SOP outlines in detail the required information that need to be included in an annual product review. This will include summaries of manufacturing process control, and quality data to evaluate the commercial products licensed to Immunomedics. Responsibilities are also outline indicating who is responsible for specific section. The SOP was reviewed in its entirety and appeared to be comprehensive and appropriate.

*No observations were made.*

Quality Agreements & Contract Lab Qualification Procedures:
*(This section was written by RC)*
I reviewed the quality agreement between (b) (4)           and Immunomedics and no deficiencies were found.

I reviewed a draft of the quality agreement between (b) (4)           and Immunomedics Inc. However, the draft was not signed and therefore, we could not assess whether the information in the quality agreement has been implemented. all information at the time of the inspection. All raw materials used in (b) (4)     purifications (b) (4)     (b) (4)     etc) and all the cell culture media is supplied by (b) (4)

*Inspector Comment: This was a FDA-483 observation (Observation 8: There is no signed Quality Agreement between* (b) (4)           *and Immunomedics Inc.)*

11

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

Change Control:
*(This section was written by RC)*
I reviewed SOP-0163 "Change control for GxP related process, equipment, and systems" v2.0
effective June 29, 2018.

<u>*No observations were made*</u>

Complaint Procedure, AE:
*(This section was written by RS)*
The firm's SOP-0156 "Customer Complaint Management" v2.0 eff 7/31/2018 describes the
procedure to manage and evaluate all customer complaints associated with licensed commercial
products. The firm uses FRM-0134 Complaint Communication Data Sheet v1.0 eff 7/31/2018, to
record the complaint and assign a tracking number. The communications with customer are
recorded on FRM-0135 Complaint Communication v1.0 eff 7/31/2018. The firm has (b)(4)
(b)(4)        to complete the investigation and document the findings on FRM-0136 Complaint
Closure Summary v1.0 eff 8/8/2018. If complaint investigation is not closed within (b)(4)
(b)(4)    the quality assurance can grant a second (b)(4)    extension by documenting the justification
on FRM-0134.

Ms. Sandra Roque, Director of Quality Assurance and Operations provided me the Product
Complaint Logbook ID # 00185 issued on August 1, 2018. I observed that only one complaint
was recorded, Complaint Tracking No. 18-001. The complaint was received on August 10, 2018
for two infusion vials with collapsed core. The compliant was classified as Quality Complaint
and firm resoled the issue by not using the vials. I observed that FRM-0134 Complaint
Communication Data Sheet was used to record the complaint.

Ms. Roque stated that since the product is not commercial, no Quality Complaint has been
recorded and all the patients adverse event data from the clinical trials are compiled in the (b)(4)
The firm recorded its first Quality Complaint on August 10, 2018. Ms. Roque informed me that
the QA plans to complete the investigation and close it within (b)(4)        I found that the
firm's complain management procedure appeared to be adequate.

<u>*No observations were made*</u>

Recall
*(This section was written by RS)*
The firm's SOP-0161 "Product Recall" v2.0 eff 8/3/2018 describes the firm's responsibilities
and procedures to initiate, evaluate, conduct, and close recall actions. I reviewed the procedure
and verified that it contains all the necessary elements for an effective recall including (but not

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

limited to); recall classification, recall strategy, effectiveness check, and recall letter. The procedure also has provision for annual mock recall.

Mr. Mohit Gupta, Head of the Validation explained me the firm's recall policy and stated that the firm has not recalled any products so far. He also informed me that the mock recall is planned in the fall of 2018.

*No observations were made*

Document Control Procedures:
*(This section was written by RS)*
The firm's SOP-0141 "Management of Regulated Documents" v2.0 eff 6/13/2018 describes the procedure for management of regulated documents throughout their entire life cycle from creation to revision, archival, and obsoletion. The firm's Regulated Documents System is a controlled electronic and paper-based system that is managed by quality assurance department. During walkthrough of the (b) (4) system, I observed that the data for (b) (4) (Serial # 167381-1) and (b) (4) (Serial # 283447) were recorded on uncontrolled forms. In addition, >40% of the data suggested that the system was operating outside the operating range (See **Verbal Observation RS1**).

*Verbal Observation RS1: The firms document control procedure is deficient*

The firm's document control procedure is described in SOP-0141 "Management of Regulated Documents" v2.0 eff 6/13/2018 (**Exhibit RS-1**). Specifically,

a. Section 7.1 (**Exhibit RS-1**, page 4) indicates that "…Regulated Document System is a controlled electronic and paper-based system managed by the Quality Assurance Department." However, during walkthrough of the facility, I observed that the (b) (4) log data for the (b) (4) (Serial No. 167381-1) and the (b) (4) (b) (4) (Serial No. 283447) on the uncontrolled forms (**Exhibits RS-2**).

b. Section 7.3 (**Exhibit RS-1**, page 5) indicates that "…users of the documents are required to comply with the parameters and procedures set forth within the documents." However, the following data did not comply with the parameters set forth within the documents:

   i. The (b) (4) log data for the (b) (4) (Serial No. 167381-1) suggests that the system was operating outside the operational ranges during the period (including but not limited to) July 16, 2018 to August 3, 2018 (**Exhibit RS-2** pages 1-3) without initiating any action.

   ii. The (b) (4) log data for the (b) (4) (Serial No. 283447) suggests that the system was operating outside the operating ranges during the period

13

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
                                                       Morris Plains, NJ FEI # 1000526871
                                                       Inspection Dates: August 6th – August 14th, 2018
                                                       RC, MD, GB, RS

(including but not limited to) July 9, 2018 to August 8, 2018 (**Exhibit RS-2**, pages 5-6) without initiating any action.

I enquired with Mr. Mike Levitt, VP Manufacturing about the use of uncontrolled forms in the boiler room and not running the (b) (4) equipment within the defined operational ranges. Mr. Levitt acknowledged the observations and promised to correct the issues. Later in the day, Mr. Levitt informed me that the firm has opened a deviation for the use of noncontrolled forms in the boiler room and provided me a copy of the deviation # 18-1854 dated 8/9/2018 (**Exhibit RS-3**).

 *No observations were made*

Computerized Systems:
*(This section was written by RS)*
The firm uses Veeva Vault v17R3 QualityDocs enterprise resource planning (ERP) system to manage all the Quality documents. This is a cloud based ERP system. I reviewed the validation summary report VV.PMO.QD.00108 v1.0 dated 4/10/2018 and found it to be adequate. The firm is migrating all the older SOPs to Veeva Vault. I found that the current quality documents that are generated through Veeva Vault has complete trackability.

 *No observations were made*

**XI. Facilities and equipment system**

**Facilities**
The facility has been modified from the initial R&D facility by a series of upgrades that were initiated in a (b) (4) during December to March, 2018 and included the following upgrades:

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

# Facilities Changes Post-PPQ Campaign



**Seed Lab**
Replaced 2 Biosafety cabinets
Replaced (b) (4)  floor
Upgraded Wall systems for cleanability
Installed new card access points to control personnel and process flow
Rebalanced area to improved (b) (4)
Mounted scale displays to improve cleanability

**Purification**
Installed new (b) (4)
Installed new parts washer
Replaced (b) (4)  with (b) (4)
Replaced (b) (4)  floor
Installed (b) (4)  for improved protection from tankage
Installed viewing windows for critical process steps
Installed new card access for new rooms to control personnel flow
Installed new gowning room (b) (4)
Reconfigured exit equipment (b) (4)
Rebalanced area to improved (b) (4)
Installed (b) (4)  to improve segregation of waste and permit separation of pre and post (b) (4)  filtration

**Cell Culture**
Upgraded Wall systems for cleanability
Refurbished (b) (4)
Replaced (b) (4)  floor
Installed (b) (4)  to improve segregation of facility (dedicated hallway) from R&D
Installed (b) (4)  to improve pressure control
Rebalanced area to improved (b) (4)

**Utilities**
Installed back up (b) (4)  System (not yet qualified)
Installed back up (b) (4)  (not yet qualified)
Upgraded controls on existing (b) (4)
Replaced TOC meter on (b) (4)  System
Installed new Environmental Control System (EMS) to monitor T, RH, Diff Pressure and Environmental Chambers

**B410 Warehouse**
Completed construction of a temperature controlled remote warehouse

In addition to these changes, the firm implemented a new (b) (4) pressure, temperature, and humidity monitoring in July and the system was being qualified during the inspection. Other changes in the planned before distribution and commercialization of the product include:

- Installation of a (b) (4) in the (b) (4) systems. This will allow for the use of the in-house generated (b) (4) to be used for manufacturing. Currently, the (b) (4) generated in-house is only used for the (b) (4) of the equipment and (b) (4) of the (b) (4) filter. The (b) (4) used for manufacturing is provided by (b) (4)

- Replacement of all HVAC air handling units,

- Commissioning of a new master cell bank storage room,

- Commissioning of raw material sampling and testing areas in the warehouse building 410,

- Implementation of Great Plains to track the raw material inventory.

*Inspector Comment: The facility should be inspected after the upgrades included above are implemented and/or the systems are qualified.*

During the tour to the purification areas on August 7, 2018, the inspection team noticed that the purification areas have no drains. In addition, the facility has no SOP to contain and dispose of

**Establishment Inspection Report**   Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

liquids in case of a catastrophic spill. All operations downstream the (b) (4) bioreactor are conducted using single-use bags, which may contain up to (b) (4) L liquid material.

> *Inspector Comment: This was a FDA-483 observation (Observation 7: The design of the facility is inadequate in that no drains are present in the purification rooms.)*

HVAC and BMS
*(This section was written by RC)*
I reviewed the drawings of the facility. The facility was designed for research and development, with multiple small room. The manufacturing areas are Grade D (upstream processing) with Biological Safety Cabinets (BSC) monitored to Grade A for open processes, including master cell bank thaw and (b) (4) and (b) (4) and assembly of critical open operations conducted during manufacturing (for example (b) (4)
. Purification areas have Grade C and D classification. All (b) (4) have the same classification that the rooms that they feed. Upstream manufacturing areas in a different part of the building that purification areas; (b) (4) purification areas and (b) (4) areas are separated by a clean corridor.

The facility is serviced by (b) (4) air handling units in the (b) (4) area and (b) (4) units in the purification areas. Air flow is segregated between cell culture, purification (b) (4) and (b) (4) The air handling unit that services the (b) (4) (b) (4) area (AHU7) is also used for a storage room in the (b) (4) area. However, the room has 100 % filtered air with no recirculation. The target number of air exchanges is (b) (4) room changes/hour in Grade C areas and (b) (4) room changes/hour in Grade D areas.

The differential pressure in the facility has a (b) (4) design, with pressure increasing with the criticality of the process. Pressure monitoring of the facility has been conducted manually until a (b) (4) continuous pressure monitoring system was installed in July; the system is currently being qualified.

I reviewed SOP-0239 "Monitoring differential pressure, temperature and humidity" v2.0 effective August 4, 2018. According to the SOP, temperature. Humidity and differential pressure in manufacturing areas are monitored (b) (4) during operations. However, when inspecting the pressure differential logs, it was noticed that pressure is monitored (b) (4) (b) (4) during operations. I reviewed the differential pressure data between room (b) (4) (Class C (b) (4) and (b) (4) (Class D corridor) between July 24th and August 1st, 2018. Most of the measurements were out of limits.

> *Inspector Comment: This was an FDA-483 observation (Observation 6.a: Air pressure in the GMP areas is not adequately maintained.")*

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                                   Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                   RC, MD, GB, RS

I reviewed form FRM-0267, that is part of SOP-0239. The form lists all adjacent monitoring rooms that are alarmed in the (b) (4) continuous monitoring system. Not all adjacent rooms are monitored for pressure differential. For example, there differential pressure between room (b)(4) (b) (4) (Class C (b) (4) and (b) (4) (Class D corridor) is not alarmed.

> *Inspector Comment: This was an FDA-483 observation (Observation 6.b: Air pressure in the GMP areas is not adequately maintained.")*

(b) (4)  System and (b) (4)
*(This section was written by RC)*
(b) (4) used in the manufacturing process is supplied by (b) (4) The label of the (b) (4) indicates that it is (b) (4) tested to USP standards of (b) (4) therefore it was not clear the type of (b) (4) The CofA indicates that the (b) (4) is tested to (b) (4) standards. I reviewed information provided by the firm regarding the generation of the (b) (4) and the generation process includes a (b) (4) step.

*(This section was written by RS)*
I inspected the (b) (4) production system in Building (b) (4) I found that (b) (4)

I reviewed the SOP-Q220 "Sampling Plan for (b) (4) v13 eff 9/11/2012. The (b) (4) is sampled at (b) (4) for (b) (4) (action level > (b) (4) ppm). The TOC (action level > (b)(4) ppm) and conductivity (action level > (b)(4) µS/cm) are measured (b) (4) on (b) (4) (b)(4) TOC Analyzer in the mechanical room. Sampling for microbial testing (action level > (b) (4) cfu/mL, alert level > (b)(4) cfu/mL) is done according to SOP-Q649 "Microbial Monitoring of (b)(4) v24 eff 9/3/2013. The samples for microbial testing are collected (b) (4) (b) (4) at (b) (4) and (b) (4) at (b) (4) (b) (4) system). The rest of the use points are sampled on a (b) (4) basis such that each use point is sampled (b) (4)

I observed that (b) (4) was removed from the (b) (4) distribution loop through a change control CC # 17-144P. After the change, the firm requalified the (b)(4) system. I reviewed the Document No. FC-0001-PQ-03-R "Performance Qualification Final Summary Report" and found it adequate.

The (b) (4) is used as (b) (4) for the manufacturing of (b) (4) I inspected the (b) (4) system that was installed in the boiler room. The firm uses (b) (4) (Serial # 167381-1) and (b) (4) (Serial # 283447) to manufacture (b) (4) respectively. The (b) (4) is stored at (b)(4) °C in a (b) (4) -gallon (b) (4) storage tank. The storage tank

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

supplies (b)(4) through a distribution loop that is fitted with (b)(4) POU. The (b)(4) operates at (b)(4) °C. I observed that firm was in the process of installing (b)(4) and a storage tank to manufacture and store ambient (b)(4)

I reviewed SOP-Q626 "Monitoring of USP (b)(4) System v9 eff 4/1/2013. The (b)(4) is sampled (b)(4) from (b)(4) and (b)(4) for (b)(4) (action level > (b)(4) ppm), TOC (action level > (b)(4) ppm) and conductivity (action Level > (b)(4) µS/cm). The samples for microbial testing (action level > (b)(4) cfu/100 mL, alert level > (b)(4) cfu/100 mL) are collected (b)(4) at (b)(4) (b)(4) and (b)(4) from rest of the POU (except (b)(4) and (b)(4) .

In the (b)(4) manufacturing area, I observed that the data for (b)(4) (Serial # 167381-1) and (b)(4) (Serial # 283447) are recorded on uncontrolled forms. In addition, more than 40% of the recorded data suggested that the systems were operating outside the operational ranges (See **Verbal Observation RS1**). I also observed that most of the plumbing system and the recirculation loops were hidden behind the wall and the ceiling tiles.

I reviewed (b)(4) testing reports for 2017 and 2018 and the firm's procedure to report and investigate the OOS, SOP-0162 "Out of Specification Investigations" v4.0 eff8/3/2018. The SOP-Q626 "Monitoring of USP (b)(4) System v9 eff 4/1/2013 requires resampling and second consecutive OOS prior to initiating an investigation. However, the firm's resampling procedure is deficient that makes it impossible to resample a representative batch of (b)(4) (See **Verbal Observation RS2**)

*Verbal Observation RS2: The resampling procedure for (b)(4) is deficient*

The SOP-Q626 "Monitoring for USP (b)(4) Systems" v9.0 eff 4/1/2013 is deficient in resampling to assure the quality of the (b)(4) Specifically, the procedure requires resampling and second consecutive OOS prior to initiating an investigation. However, the resampling procedure is deficient. Section 9.3.4 (**Exhibit RS-4**, page 7) indicates that, "…routinely collected samples, subsequent to initial sample, may serve as a resample." However, the (b)(4) System continuously manufactures (b)(4) and the (b)(4) is in constant circulation. This makes it impossible to resample a representative batch of (b)(4) on a later date and/or time point. I explained to Mr. Indrajit Giri, Director, QC Raw Material and Contract Testing that the firm's current procedure is deficient in resampling of the (b)(4) Mr. Giri acknowledged my observation and promised to discuss the issue with the management.

_No observations were made_

Process (b)(4) (b)(4)
*(This section was written by MD)*
The firm's (b)(4) is governed by SOP Q697 "Routine monitoring of the (b)(4) system" (Revision 0, effective 5/31/2016) and microbial analysis is governed by SOP Q617

**Establishment Inspection Report**
Immunomedics. Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th. 2018
RC. MD. GB. RS

"Total Particulate monitoring of controlled environments using (b) (4) particulate counter". The (b) (4) distribution system is composed of (b)(4) sample ports and sampled (b) (4) (b) (4) found within the (b) (4) are in purification suites. and (b) (4) are located within (b) (4) area. The (b) (4) is (b) (4) at the point of use. except for the (b) (4) used to (b) (4) container during (b) (4) and to conduct the (b) (4) integrity test. There were no excursions or negative trends within the year 2018. Both (b) (4) verification and (b) (4) are checked (b) (4) and executed as per SOP Q697.

*Inspector's comment: See* (b) (4) *section written by RC*

The firms (b) (4) are supplied to all (b) (4) rooms and bioreactors and the (b) (4) and (b) (4) testing are governed by SOP Q823 "Identification test for (b) (4) (b) (4) (Revision 7.0, effective 5/13/2016). (b) (4) are (b) (4) (b) (4) at the point of use and the (b) (4) is tested for (b) (4) integrity. However. (b) (4) are purchased from (b) (4) are not tested for bioburden at the firm or at the supplier (supplier specifications do not include microbial testing-see Exhibit MD-1

*Inspector's comment: The product contact* (b) (4) *used in the bioreactors are not tested for bioburden. The lack of microbial testing increases the contamination risk. This resulted in FDA-483 observation 4b.*

Facility Cleaning:
*(This section was written by RC)*
I reviewed SOP-0076 "Sanitization of manufacturing clean areas" v5.0 effective August 4. 2018. The SOP lists the frequency of sanitization of the different areas. the sanitizing reagent. and the cleaning method using three buckets. (b) (4)

I asked (b) (6) Head of QC microbiology whether the firm had conducted studies to demonstrate the efficacy of the sanitizing agents. No study has been conducted yet. However. I was shown a study protocol that is being reviewed by Immunomedics and a contractor.

*Inspector Comment: Although the firm did not conduct efficacy studies to support its room cleaning and sanitization process, the sanitizing agents are standard agents used in biotech manufacturing areas and they are not rinsed from the surfaces. In addition, the firm is in the process of conducting a study. This did not result in an FDA-483 observation.*

Environmental Monitoring (EM)
*(This section was written by RC)*
I reviewed SOP-Q608 "Microbiological monitoring of the controlled manufacturing and support areas" v35.0, effective August 18, 2017. The document lists the different areas in the facility, and

19

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

the EM samples taken (air, surface and personnel), as well as a brief description on how the
samples are taken, and action and alert limits (shown below, duplicated from the SOP.)

TABLE 2: Environmental Monitoring Acceptance Criteria

| Grade | Viable in Air cfu/m³ | | Surfaces cfu (b) (4)     Plate | | Personnel cfu (b) (4)     Plate | |
|---|---|---|---|---|---|---|
| | Alert* | Action* | Alert | Action | Alert | Action |
| (Grade A) | (b) (4) | | | | | |
| (Grade C) | | | | | | |
| (Grade D) | | | | | | |

\* Alert and Action levels are also applicable to settling plates when used.
N/A - Not Applicable
WE – Walls and Equipment

The SOP indicates that in case of a sample out of action limit, the area will be sanitized, and an
additional sample will be taken within (b) (4) (refer to Q608 step (b) (4) and a non-conformance
report will be initiated only in case that the resample is also out of action limit. This is applied to
samples taken from all area classifications in and out of operations.

> *Inspector Comment: The resampling practice is inappropriate because it invalidates the
> first above-action-limit sample; in addition, since the resample is taken immediately after
> sanitization, the result would not be representative of the hygienic status of the area. This
> resulted in a verbal observation that was communicated to the firm throughout the
> inspection (Verbal observation RC-2: Environmental monitoring sampling is
> inadequate). However, this did not result in an FDA-483 observation because the initial
> results are documented in the EM result charts, the firm sanitizes the area after finding
> the initial excursion, lowering the risk to product contamination, and the firm has
> initiated a change control to initiate a deviation after the initial excursion.*

*(This section was written by MD)*
I reviewed 2018 EM monitoring results from upstream and downstream manufacturing. Only
one excursion (EM18-001) occurred during this period. I reviewed the Environmental Alert form
for EM18-001. According to this report, 18 CFU of *Paracoccus caeni* was found on the (b)(4) L

20

**Establishment Inspection Report**                          Immunomedics. Inc., 300 The American Road.
                                                                Morris Plains. NJ FEI # 1000526871
                                                       Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                                         RC. MD. GB. RS

bioreactor on (b)(4)     suite. In addition, I reviewed 2017 Environmental Monitoring
Microbiological Trend Analysis Summary Report. According to this report:
- Total of 6 excursions occurred in viable air and surface sampling within the (b)(4)
  (b)(4)        area
- 12 within Cell Culture / Upstream area
- 9 downstream manufacturing area
- 44 within for personal monitoring area

  *Inspector Comment: The firm initiated a non-conformance report (NCR) to investigate
  the root cause of the recoveries and established NCR # 17-202U and 17-203. Thus, the
  excursions were appropriately investigated.*

  *No observations were made*

## Equipment

Equipment Maintenance (Preventative Maintenance and Calibration. Logbooks):
*(This section was written by RS)*
Mr. Mohit Gupta. Head of the Validation informed me that the site manufactures (b)(4)     drug
substance, (b)(4)        and all the equipment are either single use or dedicated equipment. I
reviewed a list of all the equipment used in the manufacture of (b)(4)   (**Exhibit RS-5**). I found
that all the equipment are qualified. I randomly selected a (b)(4) L Bioreactor Model # (b)(4)
(Equipment ID # 00060) that was located in (b)(4)   I reviewed the equipment use log book and
observed that the equipment usages, cleaning, and maintenance was recorded in a chronological
order.

I reviewed SOP-C210 "Cleaning of the (b)(4)    Bioreactor" v16 eff 3/23/2018. I observed
that the procedure contained all the necessary elements to effectively clean the reactor. I also
reviewed the Cleaning Validation Report, Document No. CC-0135-CV-01-R dated 5/23/2017.
The report provides documented evidence that the cleaning procedure, SOP-C210 v16 eff
3/23/2018 is capable of removing product residue from (b)(4)    Bioreactor (Equipment ID #
00060) after its use from the manufacturing of (b)(4)    drug substance. The report also
establishes a (b)(4)    dirty hold time.

I reviewed SOP-C399 "Preventive Maintenance Program for Cell Culture Process Equipment"
v6 eff 1/31/2018 (**Exhibit RS-6**). I found that the procedure contained all the necessary
elements for PM of the equipment used to manufacture (b)(4)    drug substance. The
procedure suggests preventive maintenance (b)(4)    or after(b)(4) runs. I verified that
(b)(4)    Bioreactor (Equipment ID # 00060) had (b)(4) runs to its credit and the firm had
conducted PM on 5/24/2018 and 7/12/2018. I reviewed the scope of PM and found that the firm
failed to replace a number of consumables as suggested by the firm's SOP-C399 "Preventive

**Establishment Inspection Report**                  Immunomedics, Inc.. 300 The American Road.
                                                                                  Morris Plains. NJ FEI # 1000526871
                                                                     Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                                                                     RC, MD. GB. RS

Maintenance Program for Cell Culture Process Equipment" v6 eff 1/31/2018 (See **Verbal Observation RS3**).

*Verbal Observation RS3: Failing to perform preventive maintenance of the cell culture process equipment*

The procedure for the PM of <span>(b) (4)</span> Bioreactor (Equipment ID # 00060) is included in SOP-C399 "Preventive Maintenance Program for Cell Culture Process Equipment" v6 eff 1/31/2018 (**Exhibit RS-6**, pages 9-12). I observed that the equipment received PM on 5/24/2018 and 7/12/2018. Mr. <span>(b) (6)</span>, Interim Director of Engineering Maintenance provided me a list of consumables (**Exhibit RS-7**) that are replaced during the PM of <span>(b) (4)</span> Bioreactor. Mr. <span>(b) (6)</span> also provided me a list of the consumables (**Exhibit RS-8**) that was replaced during the PM of the <span>(b) (4)</span> Bioreactor. I reviewed the list and observed that a number of consumables were not replaced during the PM including (but not limited to): <span>(b) (4)</span> <span>(b) (4)</span> temperature probe port, and <span>(b) (4)</span> isolation to the <span>(b) (4)</span> filter housing. I asked Mr. <span>(b) (6)</span> why the consumables were not replaced. Mr. <span>(b) (6)</span> stated that only the highly abused items were replaced during the PM. I informed Mr. <span>(b) (6)</span> that the firm should adhere to it SOP-C399 "Preventive Maintenance Program for Cell Culture Process Equipment" v6 eff 1/31/2018 (**Exhibit RS-6**, pages 9-12) and any deviation for the written procedure should trigger a deviation that should be investigate. Mr. <span>(b) (6)</span> acknowledged the observation and promised to discuss the issue with the firm management.

              *No observations were made*

Equipment Qualification:
*(This section was written by MD)*
Mr. Mohit Gupta, Head of Validation provided me (MD) with an overview of <span>(b) (4)</span> validation. <span>(b) (4)</span> in room <span>(b) (4)</span> was initially validated with <span>(b) (4)</span> loads, governed by SOPS FRM-0270, FRM-0271, FRM-0272, FRM-0273, and FRM-0274. Load 2 was found to have the <span>(b) (4)</span> and thus, the load 2 was run for 2 more cycles. The <span>(b) (4)</span> validation was carried out at <span>(b) (4)</span> for <span>(b) (4)</span> where as routine production is carried out at <span>(b) (4)</span> for <span>(b) (4)</span> The <span>(b) (4)</span> will be validated <span>(b) (4)</span> with worst case load 2. No deviations were observed.

              *No observations were made*

*(This section was written by GB)*
The system to identify Immunomedics equipment is described in SOP-0235, Procedure for Equipment and Instrument Identification. The SOP entails that upon receipt of a new equipment, and equipment information record number is assigned. The instrument is identified, and a calibration assessment is performed as part of the instrument information record. If calibration is needed, the information is entered in the Instrument Master List where the schedule and measurement data template are generated. The system was tested using a decommissioned scale

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

(CCA476). The result showed that the equipment was tracked and showed that it was out of service.

Multiple scales, freezers, and (b) (4)　　　　are installed throughout the Immunomedics facility. I requested and reviewed the following calibration record, qualification and/or requalification reports:

- Scale QCA209, QCA240, and QCA-242
- (b) (4)
- Vi-cell XR CCA312
- UPLC E00266

The qualification of the UPLC E00266 was performed to verify the qualified wavelengths span (b) (4)　　　. These (b) (4)　　are important in determining the (b) (4)　　　ratio (b) (4)　) used in the specification of DP. were qualified. The re-qualification report # 048 shows that only wavelengths between (b) (4)　and (b) (4)　were qualified. Further information provided by Waters (manufacturer and instrument qualification company) indicates that the qualification at these wavelengths are appropriate to support the spectral between 205 to 486nm.

*No observations were made*

Incubators/refrigerators
(*This section was written by MD*)
(b) (4)　monitors (b) (4)　refrigerators, incubators, (b) (4)　　　　　The alarm management at the facility is governed by SOP-0772 (version 1.0, effective 8/4/2018). There are (b) (4)　　in the facility. I (MD) requested and performed cursory review of the (b) (4)　used for the storage of DS intermediate. After manufacturing, the DS intermediate is stored in quarantine (b) (4)　ID# E00107 until release (Labeled Quarantine). After release, the DS is transferred to (b) (4)　　　cooler ID#E00105 (Labeled Release). In addition, (b) (4)　had emergency contact information on the door. (b) (4)　　　were calibrated at (b) (4)　(b) (4)　using (b) (4)　(b) (6)　the QA manager confirmed that no excursions occurred since the manufacture of PPQ lots.

*No observations were made*

(*This section was written by GB*)
Multiple incubators, freezers, and (b) (4)　　　are installed throughout the Immunomedics facilty. I requested and reviewed the following temperature-controlled environment equipment temperature chart, qualification and/or requalification reports:

- Incubators E00170 and E00165
- Reference Standard -80 °C E00088
- Drug product 2-8 °C (b) (4)　　E00160
- Purified bulk 2-8 °C (b) (4)　　E00107 and E00105

23

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
RC, MD, GB, RS

---

*No observations were made.*

Temp. Controlled Vessels
(*This section was written by GB*)
Multiple temperature controlled vessels are installed throughout the Immunomedics facility. I
requested and reviewed the following temperature controlled vessels temperature chart,
qualification and/or requalification reports:

- (b) (4)                          E00162 and E00163
- Stability chambers, 25°C E00328 and 40°C E00329

    *No observations were made.*

Laminar Flow Units
(*This section was written by MD*)
There are (b) (4)  Laminar flow hoods in Grade C, Grade D and unclassified areas of the facility.
They are requalified (b) (4)  by a contractor named (b) (4)  The requalification includes
airflow velocity test, alarm test, aerosol challenge installation test, airborne particle count test
and airflow smoke pattern test. The average intake velocity acceptance criteria should be within
(b) (4) (b) (4) - fpm. I reviewed the last requalification of the laminar flow hood used for dispensing the
drug substance intermediate and the results were within specification.

    *No observations were made*

(b) (4)

(*This section was written by RC*)
Reuse of the (b) (4)                has been assessed in small scale studies. The
(b) (4)              were (b) (4)  and discarded after the facility (b) (4)  and the lifetime
studies of the (b) (4)              were restarted in April, therefore there is very limited data.
Review of the bioburden results of the (b) (4)  prior to the facility (b) (4)  included the
following contaminated samples (too numerous to count or TNTC):

- (b) (4)              pre-sanitization, lot (b) (4)          TNTC
- (b) (4)              lot (b) (4)      TNTC

The microbiology results were not trended and no action was taken. In addition, several samples
from the (b) (4)  have resulted in high bioburden count (including TNTC).

    *Inspector Comment: This was an FDA-483 observation (Observation 9: No procedure is
    in place for (b) (4)  intermediate (b) (4)  trending of results.)*

24

**Establishment Inspection Report**            Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

*(This section was written by GB)*
The (b)(4) lifetime protocols and existing data were reviewed. Production scale (b)(4) lifetime studies are currently underway using full scale performance monitoring. Detail information about (b)(4) storage and (b)(4) life cycle was reviewed.
Life cycle studies were reviewed for the (b)(4) . which provided evidence supporting the longevity of (b)(4) reuses and includes monitoring for (b)(4) step yield, bioburden, and endotoxin. The master batch record list that the (b)(4) can be used for up to (b)(4) times or up to (b)(4) This (b)(4) usage was based to the (b)(4) manufacturer. The master batch record will be updated to correct the (b)(4) reuse life cycle as part of the open Document Change Order DCO # 17-532. To further support the (b)(4) life cycle, (b)(4) use logbook (previous look book M155, and current FRM-0226) were reviewed to confirm that the (b)(4) used did not surpass the (b)(4) lifecycle limit. The previous (b)(4) was ran (b)(4) times and the current (b)(4) has been running (b)(4) times, both were below the (b)(4) reuse lifecycle.

<u>Equipment Cleaning</u>
*(This section was written by RC)*
Most of the process is conducted using single-use bags. (b)(4) and media are purchase ready-to-use, therefore equipment cleaning is limited to bioreactors, (b)(4) the (b)(4) vessel used for (b)(4) and small parts. Small parts and equipment are cleaned in a pharmaceutical grade washer (b)(4) located in Room (b)(4) and (b)(4) and (b)(4) . I reviewed SOP-0763 "Operation of the (b)(4) pharmaceutical grade washer" v1.0 effective August 3, 2018. I reviewed the cycle development and load configuration qualification study MF-0124-CQ.1. The study included a (b)(4) coverage of all equipment loads and assessment of removal after washing using (b)(4) Bioburden, conductivity, and bioburden were monitored from the rinse, and TOC was monitored from swabs. Worst-case locations were not identified by the (b)(4) coverage study as the (b)(4) was completely removed during the wash.

> *Inspector Comment: During interview with the cleaning SME I indicated that swabs should be taken from worst-case location and these locations could be identified by (b)(4) coverage followed by a partial washing cycle. This was not an observation.*

Cleaning validation for the equipment washer in the (b)(4) washer is currently being conducted using three consecutive runs. No interim results were available at the time of the inspection.

Cleaning is not validated or verified in the (b)(4) , and in the product-contact section of the (b)(4) used for the (b)(4) step.

> *Inspector Comment: This was an FDA-483 observation (Observation 12: Cleaning of downstream equipment, including (b)(4) and product-contact parts of the (b)(4) (b)(4) is not validated or verified.)*

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

## XII. Materials system

Storage/Distribution & Quarantine
*(This section was written by GB)*
The inspection team toured the warehouse (Building 410) on 8/6/2018 and 8/8/2018. Access to the warehouse is through a guarded door. The process of receiving materials was presented and is initiated, Per SOP-0707 (Receipt of GMP and Non GMP Materials for Warehouse in Building 410) and SOP-0265 (Receipt of Controlled and Non-Controlled Materials in Building (b) (4) , at the loading dock. Here, packages are inspected for any damage, quantity checked. All materials are placed under quarantine. The material received is logged into the FRM-0071 (b) (4) Receiving Log). If the materials are on a (b) (4) pallet, they are transferred to a (b) (4) pallet and the (b) (4) pallet is discarded. Copies of packing slip were made and a new receiving number is assigned. QA verifies the accuracy of the material report and labels to the certificate of analysis and issue a new control number.

While in the warehouse we requested a review of how raw materials are tracked into and out of the facility. The senior manager materials management of the warehouse, (b) (6) demonstrated the electronic system for tracking and storage of all raw materials. The system was tested by verifying the location and amounts available for two materials – (b) (4) (b) (4) (Cat. # (b) (4) internal part # (b) (4) ), and (b) (4) (Cat. # (b) (4) internal part # (b) (4) ). The system in-place is an excel sheet and while (b) (6) was able to find the amount on hand and the location of the (b) (4) However, he was unable to provide any information regarding the (b) (4) In addition, the warehouse was not properly mapped with only the storage racks having location assigned number. Materials received are off loaded and placed inside the warehouse segregated only by a chain on the floor. Materials under quarantine and not properly segregated and are stored side by side to released material. Furthermore, on 8/7/2018, en route to the current cell bank storage area, a barrel containing (b) (4) L of (b) (4) Cat # (b) (4) with a quarantine label was observed at the loading dock of Building (b) (4) Upon request, the barrel was destined for destruction after it was brought from Building 410 for testing. To verify this information, proof of traceability was requested for this barrel. Immunomedics was unable to trace the whereabouts of this (b) (4) (b) (4)

Training records of (b) (6) was requested, reviewed, and the training records showed that he was properly qualified.

*These observations were noted and written as part of the 483 observation 5: "The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the* (b) (4) *intermediate." In addition, verbal observation was provided that SOP-0707 is inadequate.*

Sampling procudures during manufacturing of (b) (4) is described in SOP-0068, Sampling Procedures. The SOP describes how to collect samples from the (b) (4) through

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                                   Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                   RC, MD, GB, RS

the <sup>(b) (4)</sup> _____ using sample bags, using <sup>(b) (4)</sup> _____ and product container, and using <sup>(b) (4)</sup> _____ in the biological safety cabinet. It also briefly notes how samples are delivered to QC lab. Additional information regarding the submission and recording of samples to the QC labs are described in SOP-0197, Submission of Samples to Quality Control. Both SOPs lack details from when samples are collected to the delivery of the samples to QC. Information that is lacking are: Time limits between collection and delivery of samples to the QC labs.

- Temperature requirement of the samples collected.
- Delivery location instruction.
- Delivery chambers instruction.

This was communicated to <sup>(b) (6)</sup> _____ and he agreed that the information is lacking in the SOPs and opened a document change control (DCC-000468) to address these issues.

Sampling program of raw materials
(*This section was written by RC*)
I reviewed the sampling program for <sup>(b) (4)</sup> _____ solution and found that the <sup>(b) (4)</sup> is never sampled. I asked the firm if the product was originally sampled and the sampling was discontinued after a risk assessment, but the product was never sampled.

> *Inspector Comment*: This was an FDA-483 observation (*Observation 4: The raw material sampling and testing program is inadequate.*)

DS Shipping Validation
(*This section was written by RS*)
The firm's SOP-0269 "Shipment of <sup>(b) (4)</sup> to <sup>(b) (4)</sup> " v2.0 eff 7/28/2018 describes the procedure for shipment of <sup>(b) (4)</sup> to <sup>(b) (4)</sup> . I reviewed the corresponding validation protocol, Document No. MF-0147-SV-01. I observed that the firm validated one batch of shipment with <sup>(b) (4)</sup> . The temperature of the bulk was recorded during the transit with <sup>(b) (4)</sup> strategically placed calibrated temptales. The data confirmed that the material remained at the recommended temperature (2 – 8 °C) during the transit.

I observed that the firm did not validate the shipment under different seasons. Mr. Mohit Gupta informed me that the shipment validation is still going on and they plan to carry out a second validation over the winter. Mr. Gupta also shared with me a draft of shipment mater plan, Drug Product Shipping Qualification Master Plan Immunomedics, Inc. Document No. VL-0015-MP-01, 8/13/2018. I reviewed the document and verified that it included acceptance criteria for shipping qualifications to the destinations including: <sup>(b) (4)</sup> _____ (packager); <sup>(b) (4)</sup> _____ and <sup>(b) (4)</sup> _____ (warehouse); multiple locations in <sup>(b) (4)</sup> _____ (distributors).

*No observations were made*

27

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

## XIII. Production system

### a. Processes

Batch Record
(*This section was written by GB*)
I (GB) reviewed the batch records for the following (b) (4)    batches:

(b) (4)

Batch records were provided in separate binders, which include both the upstream and
downstream manufacturing processes. Each manufacturing process unit of operation was
separated from each other and contained their own unique sequence lot number.

(b) (4)

In general:
- All BR were reviewed.
- Deviations (or events) were noted, and the reports on these events were reviewed. All
  were well-defined and appropriately investigated. None of them were determined to have
  an impact on product quality.
- Upstream manufacturing processes were reviewed in their entirety. No events or
  deviation were noted in this section, other than corrected sign off dates. Calculation
  errors were noted in the BR, which had been corrected (and countersigned) by a
  supervisor. The modified calculations were verified
- (b) (4)              and (b) (4)         sections were reviewed in their entirety. No events
  or deviation were noted in these sections, other than corrected sign off dates.
- (b) (4)                        section were reviewed in the their entirety. No events or
  deviation were noted in these sections, other than corrected sign off dates.

- (b) (4)                    sections were reviewed in their entirety. No events or
  deviation were noted in these sections, other than corrected sign off dates.
- (b) (4)          and (b) (4)          sections were reviewed in their entirety. No events
  or deviation were noted in these sections, other than corrected sign off dates.
- (b) (4)                                section was reviewed in their entirety. No
  events or deviation were noted in these sections, other than corrected sign off dates.

28

Establishment Inspection Report                    Immunomedics. Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th. 2018
RC. MD. GB. RS

- (b) (4)     section was reviewed in their entirety. No events or deviation were noted in these sections, other than corrected sign off dates.
- (b) (4)     section was reviewed in their entirety. No events or deviation were noted in these sections, other than corrected sign off dates.
- (b) (4)    and dispensing of (b) (4)    were reviewed in their entirety. No events or deviations were noted in this section, other than corrected calculations as described above.
- Formulated Bulk Drug Substance Formulation sections were reviewed in their entirety. No events or deviation were noted in these sections, other than corrected sign off dates.

*Verbal observation was communicated to Immunomedics for the lack of entering information in a timely manner in the batch records. Specifically, while reviewing the batch record for* (b) (4) *there were several pages that are were not used and were not crossed out, dated, and initialized.* (b) (6) *, Head of Downstream Production, acknowledge the missing information. He attributed the errors to the lack of manufacturing experience, due to the schedule* (b) (4) *earlier this year. In addition, he provided an open document change control form (DCO # 17-532) containing many of the changes discussed.*

<u>Lots Made & Reprocessing</u>
(*This section was written by GB*)
A list of all (b) (4) lots manufactured at Immunomedics was reviewed. In 2016. (b) (4) lots of (b) (4) were manufactured. In 2017. (b)(4) lots of (b) (4) were manufactured including the (b)(4) PPQ lots. In 2018, up to the current inspection, (b) (4) lots of (b) (4) have been manufactured in Immunomedics. Two lots (b) (4) <u>   were not purified due to a bioreactor contamination and one lot</u> (b) (4) <u>   was terminated due to a cell growth issue in the bioreactor.</u> No lot was reprocessing.

      *<u>No observations were made.</u>*

<u>Cell bank</u>
(*This section was written by GB*)
We toured the room where the (b) (4) tanks used for storing the cell bank used in the manufacturing of (b) (4) are located. The (b) (4) freezers located in this room are used to store the MCB vials needed for (b) (4) Only personnel with proper clearance have access to the room. Each of the storage vessels is locked and the keys are kept with QA in separate room. Paper logbooks associated with each freezer identify what was retrieved/submitted, and for what purpose. SOP-C216 "Usage of the (b) (4) Storage Inventory System" was requested and reviewed. The SOP describe the operation of (b) (4) storage equipment, the process for storage of (b) (4) removal of (b) (4) and inventory check of cell banks, and the process for receiving and transfer to storage of (b) (4) shipment. Logbooks were reviewed for the disposition of all vials of (b) (4) MCB removed to date, and comparison to manufacturing records. All vials were accounted for. The SOPs for the Operation and maintenance of the (b) (4)

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                                   Inspection Dates: August 6th – August 14th, 2018
                                                   RC, MD, GB, RS

---

(b) (4)    Freezers (SOP-C521) and Thawing of Cells From (b) (4)    Storage (SOP-C503) were also reviewed.

I performed an inventory spot check on – E00162 for (b) (4)    MCB located in rack # 8, drawer # 3, position # 20, #21, and # 3. The vials in # 20 and 21 were easily located and as expected from the (b) (4)    log book, vial at potion # 3 was missing because it was already used.

*No observations were made.*

Purification & Formulation
*(This section was written by MD)*
RC and I (MD) observed the mock (b) (4)    and filling carried out in the purification suite in Grade C area. We were accompanied by (b) (6)    head of (b) (4)    manufacturing and (b) (6)    (b) (4)    purification Technician. During the tour, we observed that (b) (4)    Since it is an open process, environmental monitoring was carried out during this process.

*Inspector's comment: This open process is inefficient and includes unnecessary steps. The procedure to prevent contamination of the (b) (4)    intermediate after (b) (4)    is inadequate. Thus, increases the contamination risk. This resulted in FDA-483 ion 13.*

*(This section was written by GB)*
Purification steps were reviewed during the batch record review. In addition, the setup of the (b) (4)    purification (b) (4)    step was observed. Log books were requested and reviewed for the (b) (4)    and the (b) (4)    (b) (4)    of all purification steps for all the PPQ lots were requested and reviewed.

(b) (4)
*(This section was written by RC)*
Most in-process intermediates are (b) (4)    into disposable bags using sterile (b) (4)    All solutions added to the bioreactor except for (b) (4)    is (b) (4)    at the point of use, and the (b) (4)    are tested for integrity after use. All (b) (4)    at (b) (4)    at the point of use, except for the (b) (4)    that is used to (b) (4)    container used for (b) (4)    and to conduct the (b) (4)    integrity test.

*Inspector Comment: Although the (b) (4)    is product-contact and lack of (b) (4)    at the point of use may result in contamination of the product, the (b) (4)    is processed immediately to (b) (4)    In addition, a deviation has*

30

**Establishment Inspection Report**                Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                          Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                                        RC, MD, GB, RS

---

*been initiated with a CAPA for* ⁽ᵇ⁾⁽⁴⁾ ___ *of the* ⁽ᵇ⁾⁽⁴⁾ ___ *at the point of use. This
was not an observation.*

Most ⁽ᵇ⁾⁽⁴⁾ connections are conducted aseptically inside a BSC that is monitored to Grade A.

⁽ᵇ⁾⁽⁴⁾ ___ is conducted using a ⁽ᵇ⁾⁽⁴⁾ ___ I reviewed SOP-M671 "Operation
of ⁽ᵇ⁾⁽⁴⁾ ___ " v8.0 effective April 1, 2018 ⁽ᵇ⁾⁽⁴⁾ ___ is conducted by ⁽ᵇ⁾⁽⁴⁾
                                                                        This operation
takes place in the Class D corridor ⁽ᵇ⁾⁽⁴⁾ The ⁽ᵇ⁾⁽⁴⁾ and the ⁽ᵇ⁾⁽⁴⁾ product in
the ⁽ᵇ⁾⁽⁴⁾ tank are placed in the ⁽ᵇ⁾⁽⁴⁾ corridor and the end of the ⁽ᵇ⁾⁽⁴⁾ connected to the ⁽ᵇ⁾⁽⁴⁾
⁽ᵇ⁾⁽⁴⁾ is ⁽ᵇ⁾⁽⁴⁾ between the corridor and the Class C
⁽ᵇ⁾⁽⁴⁾ room.

The ⁽ᵇ⁾⁽⁴⁾ is tested for integrity before and after use using a visual leak test as per SOP-
M671. I reviewed documentation provided by the ⁽ᵇ⁾⁽⁴⁾ vendor ⁽ᵇ⁾⁽⁴⁾
regarding the appropriate procedures for integrity testing of the ⁽ᵇ⁾⁽⁴⁾ The vendor
recommendations indicate that the ⁽ᵇ⁾⁽⁴⁾ can be tested post-use using a visual leakage test.
The inspection team (RC and MD) inspected the ⁽ᵇ⁾⁽⁴⁾ integrity testing ⁽ᵇ⁾⁽⁴⁾ IT) during the
mock ⁽ᵇ⁾⁽⁴⁾ conducted on August 9, 2018. The ⁽ᵇ⁾⁽⁴⁾ IT ⁽ᵇ⁾⁽⁴⁾ is conducted by
⁽ᵇ⁾⁽⁴⁾ to the ⁽ᵇ⁾⁽⁴⁾ and looking for ⁽ᵇ⁾⁽⁴⁾

> *Inspector Comment: During the* ⁽ᵇ⁾⁽⁴⁾ *IT the inspection team noticed that it is difficult to
> assess whether there are* ⁽ᵇ⁾⁽⁴⁾ *because the goggles of the
> operator had condensation in them. The operator (* ⁽ᵇ⁾⁽⁶⁾ *) indicated that a
> failed* ⁽ᵇ⁾⁽⁴⁾ *IT occurs if* ⁽ᵇ⁾⁽⁴⁾*
>
> We could not get confirmation from the vendor that this is correct, however
> this was not an observation because* ⁽ᵇ⁾⁽⁴⁾ *may be indicative of* ⁽ᵇ⁾⁽⁴⁾
> ⁽ᵇ⁾⁽⁴⁾ *The inspection team indicated throughout the inspection that
> the visual leak test is subjective and prone to data integrity issues. In addition, one of the
> CAPAs for deviation 18-053U indicated that equipment to conduct the* ⁽ᵇ⁾⁽⁴⁾ *IT had been
> purchased. Lack of* ⁽ᵇ⁾⁽⁴⁾ *integrity testing was one of the elements included in the
> data integrity breach and there is no assurance that all lots prior to the detection of the
> data integrity breach were adequately tested for* ⁽ᵇ⁾⁽⁴⁾ *integrity. This resulted in
> FDA-483 observation 2.*

Hold times
(*This section was written by RC*)
The original ⁽ᵇ⁾⁽⁴⁾ did not included information on in-process holds and an information request
was submitted asking for it. At the time of the inspection, the firm was conducting the first of
three in-process hold validation studies at scale.

> *No observations were made.*

31

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

Gowning & Qualifications
(*This section was written by RC*)
Prior to the facility tours, we read and understood the applicable SOP for gowning as follows:

- SOP-0077 "Gowning for entry into Grade C manufacturing areas" v5.0 effective August 3, 2018
- SOP-0078 "Gowning for entry into Grade D manufacturing areas" v5.0 effective August 3, 2018

In general, gowning includes multiple layers of gowning with scrubs for Class D areas and aseptic gowning for Class C areas.

> *Inspector Comment: Gowning may be excessive for a drug substance manufacturing facility. This was not an observation.*

**b.  Contamination/Mix-up**

Pest Control
(*This section was written by MD*)

On 4/24/2018, Mr. Michael Levitt, Head of Manufacturing, provided me (MD) with an overview of the firm's pest control program, which is governed by SOP -0034 (Version 4.0, effective 7/20/2018) "Insect and Pest control program". The firm's pest control is outsourced to a contractor, (b) (4)           . (b) (4)         conducts (b) (4)       checks on the devices deployed in the facility and provides reports of the findings to the firm. According to the SOP, the pest control plan is reviewed by QA to summarize all the data obtained during the past (b) (4)     to assess whether trends appear and to assess gaps and possible changes.

- For rodents: 13 Tin Cats were placed inside the facility and 10 larger rodent bait stations were placed in the exterior of the facility
- 8 insect light trap (ILT) equipped with UV tubes (DEIV) are placed near the doors to destroy flying insects.

I (MD) requested and conducted a cursory review of the 8/03/2018 pest control report on 8/6/2018. The report states that all the rodent traps and insect light traps did not have any activity. However, large number of insects were observed in the light traps on 8/6/2018 (3 days after the inspection by (b) (4)      Mr. Michael Levitt explained that all the insect and rodent traps must reach a certain threshold (See Exhibit MD-2: Pest control threshold) to report as "with activity". For example, 10 large filth flies must be present in the light trap, for the (b) (4)       to report as "with activity". Although (b) (4)       reported "no activity", more than 10 flies were observed just 3 days after cleaning the light traps. This resulted in verbal observation MD-1

32

**Establishment Inspection Report**          Immunomedics, Inc., 300 The American Road,
                                             Morris Plains, NJ FEI # 1000526871
                                             Inspection Dates: August 6th – August 14th, 2018
                                             RC, MD, GB, RS

Multi-product Manufacturing & Area Changeover
(*This section was written by RC*)
The facility is currently (b)(4) manufacturing the (b)(4) intermediate and it has been
doing so since April 2017. Area changeover was not covered during the current inspection.

Microbial Control
(*This section was written by RC*)
I reviewed the bioburden results for all the (b)(4) batches manufactured in the facility. Most of
the samples show no or low bioburden levels, except for the following samples:

- (b)(4) prior to sanitization: TNTC
- (b)(4) 186 CFU/100 mL
- (b)(4) 517 CFU/100 mL
- (b)(4) : 120 CFU/100 mL
- (b)(4) TNTC
- (b)(4) : 103 CFU/100 mL
- (b)(4) 31 CFU/100 mL

Additional samples showed bioburden recovery from the (b)(4) . No limits or
acceptance criteria were established for samples other than the (b)(4) and the bioburden results
were not trended. Bioburden recoveries were mostly identified as *Achromobacter* and
*Burkholderia*, with one incident of *Methylobacterium*.

*Inspector Comment: This was an FDA-483 observation (Observation 9: No procedure is
in place for (b)(4) intermediate (b)(4) trending of results.) During the inspection
interviews it was indicated that the facility had not implemented action limits for
sampling points other than (b)(4) and the results from those samples were not reviewed
or trended. The bioburden results show several samples taken from the (b)(4)
(b)(4) with bioburden recovery (including TNTC), however the results
from the (b)(4) from the (b)(4) did not recovered any bioburden. There is no in-
proces (b)(4) step (b)(4) The firm discovered in
January 2018 that manufacturing personnel in (b)(4) purification had been
(b)(4) the bioburden samples prior to submitting them to QC to prevent in-process
OOS (refer to FDA-483 Observation 1). This practice was conducted only for in-process
samples but not for other samples that were "for information only" and whose results
were not trended. Morris Rosenberg, CTO of the firm told us verbally that from
interviews with the employees at the time of the DIB discovery, the firm knew that the
data integrity breach had stopped prior to the manufacture of the PPQ batches, however
we could not assess the extent of the data integrity breach in terms of when it occurred or
what aspects it included because all the relevant information was protected under
attorney/client privilege and the firm refused to share the information with the inspection
team. The bioburden results from the (b)(4) indicate that the
(b)(4) was heavily contaminated during batch (b)(4) however the (b)(4) sample taken*

33

**Establishment Inspection Report**                    Immunomedics. Inc.. 300 The American Road.
                                                        Morris Plains. NJ FEI # 1000526871
                                                        Inspection Dates: August 6ᵗʰ – August 14ᵗʰ. 2018
                                                        RC. MD. GB. RS

*from this contaminated* ^(b)(4) *resulted in 0 CFU/100 mL. The probability of having no bioburden in the* ^(b)(4) *sample from the contaminated* ^(b)(4) *is very low, even taking into consideration the* ^(b)(4) *washes. Therefore, there is a reasonable probability that the lack of bioburden in the* ^(b)(4) *was due to sample manipulation and that the data integrity breach impacted the PPQ batches. Due to the uncertainty of the time lapse of the data integrity breach, it is not possible to assess whether the microbial data from any of the batches prior to December 2017 can be trusted. The firm initiated* ^(b)(4) *batches* ^(b)(4) *since the personnel involved in the data integrity breach were removed. Out of these* ^(b)(4) *batches, 2 of them* ^(b)(4) *and another one* ^(b)(4) *were aborted due to contamination of the* ^(b)(4) *Bioreactor and another one* ^(b)(4) *was rejected due to poor growth in the bioreactor. This was not an FDA-483 observation because the firm was consistently manufacturing the* ^(b)(4) *intermediate prior to December 2017. After the inspection was closed, it has been noted that one vial thaw does not result in a single lot numbers, and that if one vial resulted in OOS viability, the firm may thaw a second vial keeping the same product batch number (Refer to Exhibit RC-20, vials 201 and 200 thawed for batch #* ^(b)(4) *Recent results from batches manufactured after the facility* ^(b)(4) *show inconsistent cell viability; we cannot discard that poor cell viability was an issue prior to the* ^(b)(4) *but was covered by the data integrity breach.*

## XIV. Laboratory control

QC Chemistry Laboratory
*(This section was written by RS)*
Mr. Mohit Gupta provided me a list of the testing equipment in the QC analytical laboratory (**Exhibit RS-9**). Mr. Gupta informed me that the HPLC System 8, Equipment ID # E00312 was used for the in-process check (IPC), release test and stability test of the ^(b)(4) drug substance for the PPQ batches. I verified that the HPLV System 8 was qualified.  I also verified that the firm has performed PM according to SOP-0715 "Operation and Maintenance of Alliance HPLC in QC Laboratory" v1.0 eff 6/12/18.

I reviewed the SOP-0307 "UV-Size Exclusion HPLC Analysis" v2.0 eff 8/3/2018. I verified that the procedure included all the necessary components to complete the analysis including (but not limited to); sequence list, system suitability requirements, and data analysis. The method was developed by Immunomedics Inc. but validated by a contract lab. ^(b)(4) I reviewed the method validation report, Determination of Purity and Identity of ^(b)(4) by SE-HPLC with UV Detection, Document No. STC-SP023-R-01, dated 1/2/2017. I verified that the method was validated for its intended purpose for determining the purity and identity of ^(b)(4)

I randomly selected to inspect QC assay results for ^(b)(4) batch ID # ^(b)(4) (lot
^(b)(4) I found that the sample was analyzed by Mr. ^(b)(6)
^(b)(6) Supervisor QC. In the QC lab, I observed that the firm uses Empower 3 Software that was validated to comply with 21CFR Part 11. I verified that the system has role based access

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
                                                        Morris Plains, NJ FEI # 1000526871
                                               Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                        RC, MD, GB, RS

and requires unique user ID and password for the access. I requested Mr. (b) (6)      to open and
print the report for (b) (4)      (lot (b) (4)                          I confirmed that
the audit trail was active during the analysis of (b) (4)      . I reviewed the sequence list and
data set. I did not find any issues with the report.

I reviewed the QC Samples Submission Log and verified that the sample for (b) (4)      (lot
(b) (4)                      was submitted to QC lab on 10/2/2017. I reviewed
the BU/TS Reference, Sample and Standard Preparation Form (Appendix D, SOP # Q707 v17
eff 10/20/2017) to verify the lot numbers and expiry dates for reagents and standards used for the
analysis of (b) (4)      drug substance batch ID # (b) (4)      I found the information appeared to be
adequate and no issues noted.

I found that the firm uses same method for stability test. Mr. Ed Rossi, VP Process and
Manufacturing Sciences informed me that the forced degradation study for (b) (4)          drug
substance was carried out by (b) (4)      Mr. Rossi shared a report from (b) (4)
Forced Degradation Screening Study, dated 7/5/2017. I reviewed the report and verified that it
had all the necessary components required of a stability indicating method.

*(This section was written by GB)*
An assessment was made of the laboratory tests performed, the personnel involved, and the
equipment used, throughout the production process of (b) (4)      I toured the Quality Control
laboratories and observed several assays being performed, including those for:
- Purity and impurities by CE-SDS (SOP-0330): Observed sample preparation and
  reviewed the generated data.
- (b) (4)                  Assay (SOP-0480): Observed sample preparation and reviewed
  the generated data.
- Titer by HPLC (SOP-0479): Observed sample preparation during personnel training.

While observing the performance of each assay, it was noted that all operators had an SOP to the
appropriate page. All pipettes, equipment, and other critical components of the assay had
identification number and their calibration schedule and results are tracked. (b) (4)      used in the
assay had stickers affixed containing type of (b) (4)      made on date, expiration date, preparer and
were all within their expiry. The laboratories themselves were neat and clean. Laboratory
notebooks were readily available, well organized, and kept in place. Logbooks for all instruments
were obtained and maintenance and qualification schedules were verified. Operators (when not
involved in assessing samples) were queried regarding their implementation of the assay. The
data reports were reviewed for each of the assays performed and all the results met their
specifications of the samples tested.

During the (b) (4)      assay, information regarding the (b) (4)      used in the assay was
requested. Ed Rossi, VP Process Sciences, described that the (b) (4)      are purchased from
ATCC as needed. The (b) (4)      are cultured for up to (b)(4)  passages and then discarded. Each

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

purchased lot are tracked and can be traced to the assay performed and the (b)(4) lot tested. The quality assurance of the (b)(4) are based on the CofA of ATCC, from information in the literature, and studies performed during the development (b)(4) at Immunomedics.

Information was also requested regarding the (b)(4) used during the identity testing of (b)(4) using SEC assay. The (b)(4) is a (b)(4) that bind specifically to (b)(4) and not to other molecules at Immunomedics. The qualification of the (b)(4) (b)(4) is currently ongoing and will be submitted to the (b)(4) in September 2018. Data provided for review were:

- SDS-PAGE of (b)(4) showing the its purity
- ELISA binding assay confirming its binding to only (b)(4) and to the (b)(4) other molecules.
- SEC data showing that shift seen when (b)(4) binds to (b)(4)

During the CE-SDS analysis, it was noted that the reference standard sample information during sample preparation was not entered correctly on FRM-0008. Upon request of the CofA of the reference standard, the correct information was entered and the incorrect was crossed-out, dated and initialed. In addition, during sample preparation, a (b)(4) aliquot of (4) was made. This (b)(4) aliquot was placed in a (b)(4) which was not labeled. Futhermore, the SOP did not specify the amount of time the samples can stay at room temperature before running using the Maurice system. The analyst, (b)(6) informed me that samples could be held for up to (b)(4) at room temperature and there is assay validation data supporting it. However, the system validation report STC-SP011-R-01 did not have any stability data supporting leaving the samples at room temperature for up to (b)(4) (b)(6) Senior Manager of Quality Control, agreed to update and clarify the SOP.

*This was a verbal observation communicated to the firm during the inspection for the lack of following SOP-0330 (Capillary Electrophoresis Sodium Dodecyl Sulfate (CE-SDS)).*

<u>Microbiology Laboratory</u>
(*This section was written by MD*)
The QC microbiology laboratory performs bioburden and endotoxin testing of in-process samples, release samples and (b)(4) samples. In addition, QC microbiology lab performs environmental monitoring testing, documentation, and identity and method validation.

The two labs inspected were (b)(4) and (b)(4) and each room has (b)(4) laminar flow. Only the area under laminar flow is classified. Compendial organisms are stored (b)(4) at (b)(4)°C. BIs are stored at ambient temperature in the storage room. Bioburden plates are supplied ready to use and each lot and shipment is tested for sterility and growth promotion. The SOP Q621 "Suitability Test for media" (revision 21, effective 10/31/2016) describes the growth promotion and sterility tests for confirming the suitability of the media for microbiological use. I reviewed a recent (10/3/2018) growth promotion and sterility testing report. All the results met the

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

performance specifications. Although the SOP does not specify the sample storage time, <sup>(b) (6)</sup>
<sup>(b) (6)</sup> Head of Microbiology stated that the samples may be stored up to <sup>(b) (4)</sup> prior to
Bioburden and endotoxin testing. I (MD) recommended that they update the SOP to include
sample storage conditions prior to testing.

> *Inspector's comment: I toured each of the individual laboratories and checked
> reagents/plates expiration date and storage conditions and incubator temperature. In
> addition, I observed the bioburden* <sup>(b) (4)</sup> *test for one of the in-process
> samples in the* <sup>(b) (4)</sup> *lab and I observed endotoxin testing for* <sup>(b) (4)</sup> *by gel clot assay in
> the* <sup>(b) (4)</sup> *lab. The bioburden testing and growth promotion studies are performed in the
> same BSC and incubated in the same incubators on different shelves. This resulted in
> verbal observation 2.*

I reviewed bioburden SOP Q601 and qualification for all in-process steps and release. All the
samples including <sup>(b) (4)</sup> in-process and release is tested by <sup>(b) (4)</sup> method. In
addition, I reviewed the SOP Q625 for Quantitation of Endotoxin by Gel-clot method.

I reviewed sample submission and recording procedures. The samples are submitted to QC as per
SOP-0197, which describe the procedure for submission and recording of samples to QC
analytical and Microbiology departments for testing. This SOP describes the information that
needs to be recorded on the sample container and the samples must be accompanied by Material
Specification Sheet (MSS).

OOS Investigations
*(This section was written by RC)*
I reviewed SOP-0162 "Out of Specification Investigations" v4.0 effective August 3, 2018. The
SOP is internally inconsistent, for example the definition of "retesting" in page 6 indicates that
retesting should only occur when there is a scientific rationale that potentially refutes the original
result. However, page 7 indicates that "if the company believes there is possibility the laboratory
test did have error, and the error was undetected, then the company may wish to perform a
retest." *This was an FDA-483 observation (Observation 3: Retesting procedure for the* <sup>(b) (4)</sup>
<sup>(b) (4)</sup> *intermediate is inadequate.)*

*(This section was written by GB)*
The overall method for dealing with OOS results (SOP-0162, Out of Specification
Investigations) was requested for review. This SOP deals with Immunomedics lab generated out-
of-spec results, regardless of the assay or the process stage. The investigation initiated per this
SOP is immediately. However, a completion date and the ability of an extension is not indicated.
The procedure does include description on the approval and closure of the investigation. The
SOP is appropriate for its intended purpose in detailing the extent of the investigation required
when spurious results are obtained, and quality oversight of the investigative results and any
subsequent decisions. The event owner and QA conduct an assessment to decide if the event is
escalated to a deviation as per SOP-0152 "Deviation Investigation", All impacted batches are

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

listed, a product impact justification is provided, material that needs to be segregated is identified, and recurrence of the issue are investigated.

The SOP-0162, lacks a clear time line for initiation, closing, and re-opening, and is inadequate. This was verbally communicated to Immunomedics. The lack of a clear time line for initiation, closing, and re-opening of OOS investigations are inadequate. In addition, there is a statement for retesting samples that is not clear which reads; "if the company believes there is a possibility the laboratory test did have error, and the error was undetected, then the company may wish to perform a retest." Immunomedics agree and initiated a document change order (# CDD-000464) on 8-13-2018 to clarify the retesting and to include a closing timeline.

The following OOS specific to the CE-SDS assay were reviewed:

- OOS 18-014: Samples tested by CE-SDS, cIEF, and IEF were not properly documented. The investigation determine that the analyst failed to request the appropriate forms to document the samples used. The data generated could not be analyzed. The root cause was determined to be human error and not following SOPs. Further investigation determined that this was not an OOS but rather an invalid assay and should have proceeded with SOP-0640 (Invalid Assay Procedure) since no data were generated. The OOS investigation was performed appropriately.

- OOS 18-004: Samples tested by CE-SDS were not properly prepared. The assay results did not visually comparable to the representative electropherogram. The investigation determine that the analyst inadvertently switched the samples with (b)(4) causing the samples to be too diluted. The root cause was determined to be human error and not following SOP. The samples were successfully re-tested and all system suitability and results were as expected. Further investigation determined that this was not a OOS but rather an invalid assay and should have proceeded with SOP-0640 (Invalid Assay Procedure). The OOS investigation was performed appropriately.

- OOS 17-015: Anomalous peaks observed in various injection using CE-SDS. Assay suitability was not met. The anomalous peak was also observed in the blank injection. The investigation determined that the root cause of the anomalous peak was due to a malfunctioning deuterium lamp. The corrective action was to replace the deuterium lamp. The OOS investigation was performed appropriately.

- OOS 17-008: Incorrect method use to run CE-SDS assay. The assay results did not meet system suitability criteria. The investigation determine that the analyst use the wrong method from the drop-down menu. The root cause was determined to be human error and unfamiliarity with the new SOP. The samples were successfully re-tested and all system suitability and results were as expected. The OOS investigation was performed appropriately.

38

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

- OOS 17-012 and 18-007: System suitability for the CE-SDS assay were not met. The assay results using the reference standard did not meet system suitability criteria. The investigation could not determine a root cause but speculated that it could have been a (b) (4) malfunction. The samples were successfully re-tested and all system suitability and results were as expected. The OOS investigation was performed appropriately.
- OOS 18-005: System suitability for the CE-SDS assay were not met. During the run, delayed peaks and current fluctuations were observed. The analyst, at the end of the run saw the presence of a white substance on the (b) (4) The investigation determined the root cause to be an equipment failure. The OOS investigation was performed appropriately.

*Verbal observation was communicated to Immunomedics for the lack of following SOP-0330 (Capillary Electrophoresis Sodium Dodecyl Sulfate (CE-SDS)). See section QC Chemistry Laboratory above for more detail.*

Reference Standards
(*This section was written by GB*)
SOP-0188, "Reference Standard Program", describe the procedure for the manufacture, qualification, control, storage and use of the reference standard prepared in house or procured commercially. It describes the types and uses, how a in-house primary and the working reference standard is prepared, the analysis of the reference standard, the characterization testing, the storage, stability studies, the qualification protocol, the requalification, and the monitoring of the reference standard. Initial requalification dates are (b) (4) for the (b) (4) Stability is monitored and measured by Immunomedics. The stability testing program is conducted per SOP-0665, which dictates batch selection, storage conditions, validated analytical methods used, and acceptance criteria. The SOP was reviewed in its entirety and appeared to be comprehensive and appropriate. Training record of (b) (6) was requested to verify her training for SOP-0665 and confirm that she was trained.

*No observations were made.*

## XV. Objectionable Conditions and Management's Response
### Observation 1:
The quality control unit lacks authority to investigate critical deviations of approved procedures. Specifically, the discovery of a data integrity breach in February 2018 did not trigger a deviation. The scope of the data integrity breach included manipulation of bioburden samples, misrepresentation of the (b) (4) integrity test procedure in the batch record and backdating of batch records, including dates of analytical results.

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

**Supporting Evidence and Relevance:**
*(This section was written by RC)*
A data integrity breach (DIB) was discovered by the firm in January 2018. The inspection team
had knowledge of the DIB because of a communication provided by the firm to the FDA on
**(b) (4)** (Attachment RC-1) indicating "*concern about bioburden sampling and data
collection*". At the beginning of the inspection (August 7, 2018), I (RC) asked the firm's
management, including Morris Rosenberg, CTO and Mujtaba Ali, head of Quality, to provide
additional information regarding the DIB; they indicated that the DIB had been discovered by
analyzing historical bioburden data in January 2018, and that the extent of the breach included
**(b) (4)** of in-process bioburden samples prior to submission to QC and wrong procedure used
for the **(b) (4)** integrity test. I asked again on August 9, 2018 whether the only two procedures
impacted by the DIB were the two indicated above, and Morris Rosenberg indicated that there
had been also backdating of the batch records. Therefore, to my knowledge, the DIB included:

1. **(b) (4)** of bioburden samples: in-process samples were **(b) (4)** by the manufacturing
   operators prior to be submitted to the QC lab for analysis. The **(b) (4)** was conducted to
   prevent potential bioburden non-conformances of the samples. Only in-process samples
   were **(b) (4)** as other bioburden samples did not trigger non-conformances.
2. The **(b) (4)** integrity test **(b) (4)** IT) pre- and post-use was conducted without **(b) (4)**
   **(b) (4)**. The test was recorded in the batch record as conducted as specified. The
   procedure for the **(b) (4)** IT is to fill the **(b) (4)** and then
   monitor visually for the presence of **(b) (4)**
   The actual test prior to the DIB
   discovery was conducted without **(b) (4)** therefore if the **(b) (4)** had holes,
   the test would not have detected any failure in the integrity of the **(b) (4)**
3. Backdating the batch records. Operations in the batch records were not recorded when
   they were conducted. Instead, the operators recorded the operations later using the date
   when the operation was supposed to be recorded. Record backdating included
   information regarding manufacturing operations and input of analytical data.

I asked the firm for the investigation/deviation and the firm indicated that no deviation had been
initiated. Dr. Rosenberg indicated that as soon as they found out the problem, they had a meeting
with the board of directors and it was decided that all investigations regarding the DIB would be
conducted with a lawyer and were therefore protected under attorney/client privilege. Dr.
Rosenberg indicated that they could not provide me any documentation regarding the DIB
because the information was protected.

Because no deviation was initiated and the firm refused to provide documentation regarding the
DIB, I was not able to assess the extent of the DIB, including:

1. The dates during which the DIB occurred. Dr. Rosenberg indicated that although the firm
   did not discover the DIB until 2018 (and the responsible parties were working in the firm
   until 2018) they knew from the interviews conducted by the lawyers that the DIB ended

40

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

---

prior to the PPQ campaign, which was initiated August 1, 2017. The firm refused to provide access to the interview transcripts or any other information regarding the DIB. Bioburden data suggest that in-process bioburden <sup>(b) (4)</sup> results were manipulated during the PPQ campaign (refer to observation 2). In addition, Deviation report 18-009U (Exhibit RC-1, Conclusion 4) initiated on January 18, 2018 indicates that "*false low results are likely present in the historical product-related bioburden tests conducted*". Process validation report (MF-0119-PV-01-R; Attachment RC-3) that is specific to the PPQ batches refers to the lack of <sup>(b) (4)</sup> integrity test.

2.  The operations impacted by the DIB: The letter submitted by the firm to FDA on <sup>(b) (4)</sup> (Attachment RC-1), cites as the only operation impacted by the DIB the <sup>(b) (4)</sup> of bioburden samples but did not disclose the lack of <sup>(b) (4)</sup> integrity testing that was also discovered in February 2018 (Exhibit RC-17, Deviation 18-053U). An update on the investigation was submitted to the FDA on <sup>(b) (4)</sup> (Attachment RC-2) also failed to disclose the lack of <sup>(b) (4)</sup> integrity testing. To my knowledge, no additional letters were submitted to FDA regarding the lack of <sup>(b) (4)</sup> integrity testing and the only mention of the issue is a note at the end of the process validation report (MF-0119-PV-01-R, Attachment RC-3) included in the <sup>(b) (4)</sup> When I reviewed Deviation 18-053U (Exhibit RC-17) during the inspection, I asked Dr. Rosenberg whether that was part of the DIB and he confirmed it but did not disclose any additional operation impacted by the DIB. Later, I asked Dr. Rosenberg if there was any other operation impacted by the DIB and he added the backdating of the batch records. I asked him if he could put the operations impacted by the DIB in writing and he said that those were the only three operations (see bullets above).

In summary, no verbal information could be verified during the inspection because the firm refused to provide information as all the documentation was protected under attorney/client privilege. The firm was reluctant to provide any writing confirmation of the information provided verbally. We were not able to verify which operations were impacted by the DIB nor the batches impacted by the DIB. The inspection team asked the firm to provide a list of all Process<sup>(b)(4)</sup> lots manufactured up to the inspection date. The firm provided the Process<sup>(b)(4)</sup> lot History (Exhibit RC-21), however, we later found that the list was incomplete because not every vial thaw resulted in a unique lot number, underestimating the rate of successful batches (for example, vial 201 was out of specification for cell viability, the culture was discarded and vial 202 was thawed; both vials thaws had the same lot number resulting in an underestimation of failed batches; Exhibit RC-20).

**Management's Response:**
(*This section was written by RC*)
I had multiple conversations with Dr. Rosenberg regarding the assessment of the DIB. I indicated that without any documentation, I could not assess the impact of the DIB.

41

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

On August 9, 2018 Dr. Rosenberg handed me a document and indicated that it was the information provided to the lawyers. However, the document was dated August 7, 2018 and was a written version of the verbal information already communicated. I indicated that to Dr. Rosenberg and asked him if I could keep a copy of the document. Dr. Rosenberg indicated that he preferred to keep the copy.

The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 2:**
There is no assurance that samples and batch records from the (b) (4)            intermediate process validation and commercial batches manufactured prior to February 2018 were not impacted by the data integrity breach. Interviews by Immunomedics to personnel involved in the event were conducted under attorney/client privilege and no additional documentation is available, therefore no assessment could be made during the prelicense inspection in support of (b) (4)

**Supporting Evidence and Relevance:**
*(This section was written by RC)*
During the pre-license inspection, the inspection team tried to assess the scope of the DIB that was discovered in January 2018. As indicated above, the firm refused to provide documentation related to their investigation of the event because it was protected. Consequently, there is no assurance that the DIB did not impact the PPQ or commercial batches or that the DIB was resolved. The DIB included backdating of the batch records, false information in the batch record regarding the (b) (4)     integrity test, and (b) (4)     of bioburden samples prior to handle them to the QC lab.

Dr. Rosenberg indicated that any issues related to the DIB has stopped prior to the PPQ campaign but we could not verify his claim. However, the following data suggests that the DIB was ongoing until its discovery in January 2018:

1. Review of historical bioburden data (Exhibit RC-2) shows that for multiple samples, bioburden was recovered from the (b) (4)                but no bioburden was recovered from the in-process (b) (4)   For example, during manufacturing of batch (b) (4)   (b) (4)          a sample collected on October 30, 2017 from the (b) (4)   (b) (4)   resulted in high bioburden recovery (TNTC), however, the (b) (4)   collected from the same (b) (4)   resulted in 0 CFU/100 mL. No in-process (b) (4)   is conducted between the (b) (4)   and the (b) (4)   collection. The historical data show that prior to (b) (4)   batch, bioburden had been recovered consistently from the (b) (4)        , but no bioburden was even recovered from the (b) (4)          in the applicable batches, for example:

**Establishment Inspection Report**          Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

---

    a.  (b) (4)  sample collected on October 3, 2017; (b) (4)  bioburden
was 35 CFU/100 mL; (b) (4)  collected the same day did not recover
bioburden

    b.  (b) (4)  sample collected on October 10, 2017; (b) (4)  bioburden
was 186 CFU/100 mL; (b) (4)  collected the same day did not recover
bioburden

    c.  (b) (4)  sample collected on October 17, 2017; (b) (4)  bioburden
was 120 CFU/100 mL; (b) (4)  collected the same day did not recover
bioburden

    d.  (b) (4)  sample collected on October 24, 2017; (b) (4)  bioburden
was 29 CFU/100 mL; (b) (4)  collected the same day did not recover
bioburden

    e.  (b) (4)  sample collected on October 31, 2017; (b) (4)  bioburden
was TNTC; (b) (4)  collected the same day did not recovered bioburden

    f.  Post-(b) (4)  sample collected on November 28, 2017; (b) (4).
bioburden was 6 CFU/100 mL; (b) (4)  collected the same day did not
recover bioburden

    g.  Post-(b) (4)  sample collected on December 2, 2017; (b) (4)
bioburden was 103 CFU/100 mL; (b) (4)  collected the same day did not
recover bioburden

    h.  Post-(b) (4)  sample collected on December 12, 2018; (b) (4)
bioburden was 38 CFU/100 mL; (b) (4)  collected the same day did not
recover bioburden

The data presented above does not include bioburden recovered from the (b) (4)  prior to
sanitization or bioburden recovered from the (b) (4)  because bioburden
from those steps is expected to lower considerably after sanitization. When I discuss the
bioburden results with Edmund Rossi, VP Process and Manufacturing Sciences he
indicated that the bioburden from the (b) (4)  did not show in the (b) (4)  because It was
eliminated during the (b) (4)  washes. Although reduction in the bioburden recovered
from the (b) (4)  is expected due during the (b) (4)  wash process, the data above show that
bioburden was constantly present in the (b) (4)  therefore it was not
completely removed during the washes and should have been recovered from the (b) (4)
However, bioburden was not recovered from the (b) (4)  samples.

2.  A similar pattern is found from samples collected from another (b) (4)
For example, (b) (4)  sample collected on October 12, 2017; (b) (4)
bioburden was 517 CFU/100 mL; (b) (4)  collected the same day did not
recover bioburden.

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

3. Deviation report 18-009U (Exhibit RC-1, Conclusion 4) initiated on January 18, 2018 indicates that "*false low results are likely present in the historical product-related bioburden tests conducted.*" There is no mention of false low results impacting only batches prior to the PPQ campaign in August 2017.

4. It is not clear why if the DIB was conducted to avoid non-conformance results, the operators would have stopped manipulating the samples immediately prior to the PPQ campaign. In fact, the historical bioburden results show some bioburden recovery from in-process samples of clinical batches (samples taken in June 2017) but all in-process bioburden samples collected during the PPQ campaign and until December 2017 have bioburden results ≤ 1 CFU/100 mL, consistent with sample manipulation during testing.

5. Process validation report (MF-0119-PV-01-R; Attachment RC-3) specific to the PPQ batches, includes information regarding the lack of (b) (4) integrity test

In summary, the information provided above suggests that the DIB was ongoing during the PPQ campaign and possibly during the commercial campaign. However, the firm's management (Attachment RC-1) and Dr. Rosenberg indicated several times throughout the course of the inspection that data integrity had stopped before the PPQ campaign. There is no information to support this claim. In addition, there is no information to assess if the DIB involved additional data manipulation or batch record falsification as the firm refused to provide documentation regarding the DIB. The inspection team was not able to verify the verbal information provided by the firm's management.

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 3:**
Retesting procedure for the (b) (4) intermediate is inadequate. Specifically:

a. SOP-0162 "Out of Specification Investigations" indicates that "*if the company believes there is possibility the laboratory test did have error, and the error was undetected, then the company may wish to perform a retest.*" OOS Investigation report 18-001 shows that routine retesting was performed due to an initial OOS result.

b. SOP-0162 allows for retesting of microbiology samples. An OOS result for the (b) (4) in-process bioburden sample was recorded on 12/23/2017. A retest was conducted using a retain sample on 1/5/2018 and the results on 1/10/2018 were OOS (OOS 18-001). Initiation of a non-conformance report (NCR 18-009U) was delayed until the results of the retest were reported on 1/10/2018.

44

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
                                                       Morris Plains, NJ FEI # 1000526871
                                                       Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                       RC, MD, GB, RS

**Supporting Evidence and Relevance:**
(*This section was written by RC*)
Out-of-Specifications SOP-0162 (Exhibit RC-3) indicates that the company may wish to decide
to retest any sample in the absence of a laboratory error. Retesting of a sample after an OOS
result is inadequate unless there is an obviously assignable root cause. Otherwise, any OOS
could be invalidated if after retesting, the second sample is within specification. In addition,
microbiological samples that contain living organism should not be retested because samples
after long-term storage are not representative of the original sample.

On August 13, 2018, the inspection team (RC and GB) interviewed Dough Stevens, Director of
QC to address the statement in the OOS SOP. Dr. Stevens indicated that the firm never retested
OOS samples without a documented lab error, with the only exception of samples with
impossible results (results that do not make sense, for example a yield of 300 %) and reiterated
that the firm never retested any sample without an assignable cause. However, a bioburden
sample tested on December 18, 2017 resulted in an OOS on December 23, 2017. OOS
investigation report 18-001 (Exhibit RC-4), initiated on January 3, 2018, indicated no obvious
laboratory error; however, the firm did not initiate a not-conformance report, but submitted the
sample for retesting on January 5, 2018. Eventually, one week after the results of the retest were
obtained and were still OOS, non-conformance report NCR-0009U was initiated. The OOS
investigation report reads in page 2: "*Due to the OOS results, a retest was performed using the
retain sample provided by manufacturing*", indicating that retests are conducted routinely when a
OOS is obtained, what is consistent with SOP-0162 and contradicts the information provided by
Dr. Stevens during the interview on August 13.

In addition, the retest was conducted for a bioburden sample that had been stored at 2 to 8°C for
(b) (4)            and was not representative of the original sample.

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the
observation and they would respond to the FDA.

**Observation 4:**
The raw material sampling and testing program is inadequate. Specifically:

a. (b) (4)            solution (b) (4)    supplied by (b) (4)        has never been
   sampled and there is no assurance that the manufacturer can consistently provide material
   meeting specifications. The solution is (b) (4) -sterilized from the vendor and is added
   unfiltered to the cell culture bioreactors. Deviations 18-081U and 18-163U were initiated
   due to contamination in the (b) (4)    bioreactors. In both cases, probable root causes
   included the (b) (4)  addition assembly (b) (4)                . Testing of an
   unused (b) (4)  bag in inventory also resulted in a positive sample.

b. Product-contact (b) (4)                used during cell culture of the (b) (4)
   intermediate are not tested for bioburden.

45

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
RC, MD, GB, RS

---

**Supporting Evidence and Relevance:**

*(This section was written by RC)*

Observation 4.a

Immunomedics outsource most of the ⁽ᵇ⁾ ⁽⁴⁾ media, and solutions used to manufacture the ⁽ᵇ⁾ ⁽⁴⁾ intermediate to ⁽ᵇ⁾ ⁽⁴⁾ this includes the ⁽ᵇ⁾ ⁽⁴⁾ solution that is added directly to the cell culture media during ⁽ᵇ⁾ ⁽⁴⁾ and production stages.

Prior to February 2017, the firm obtained ⁽ᵇ⁾ ⁽⁴⁾ mL) from ⁽ᵇ⁾ ⁽⁴⁾ (Exhibit RC-5). The Certificate of Analysis (CoA) for the ⁽ᵇ⁾ ⁽⁴⁾ included a certificate of ⁽ᵇ⁾ ⁽⁴⁾ but the firm included the ⁽ᵇ⁾ ⁽⁴⁾ bioburden in the raw material testing sampling plan with specification of NMT$_{(4)}^{(b)}$ CFU/10 mL). On October 11, 2013 the firm initiated a change control (Exhibit RC-6) to remove bioburden the testing of ⁽ᵇ⁾ ⁽⁴⁾ based on acceptable bioburden results in three batches. On February 21, 2017, the firm initiated another change control (Exhibit RC-7) for an ⁽ᵇ⁾ ⁽⁴⁾ (⁽ᵇ⁾ ⁽⁴⁾ Solution, supplied by ⁽ᵇ⁾ ⁽⁴⁾. The new ⁽ᵇ⁾ ⁽⁴⁾ was from a different supplier, therefore the risk assessment used to eliminate bioburden testing from the ⁽ᵇ⁾ ⁽⁴⁾ raw material was not applicable. However, the firm did not review the incoming raw material sampling plan and bioburden of the ⁽ᵇ⁾ ⁽⁴⁾ Solution from ⁽ᵇ⁾ ⁽⁴⁾ was never included in the sampling plan. The material specification sheet from ⁽ᵇ⁾ ⁽⁴⁾ only includes a review of the supplier CoA and visual inspection (Exhibit RC-8).

The following events link contaminations of the ⁽ᵇ⁾ ⁽⁴⁾ bioreactor to ⁽ᵇ⁾ ⁽⁴⁾

- ⁽ᵇ⁾ ⁽⁴⁾ Bioreactor E00064 was contaminated on May 16, 2018 (Deviation 18-081U; Exhibit RC-9). Liquid and swabs samples were taken as part of the investigation and a sample from valve XV070004 ⁽ᵇ⁾ ⁽⁴⁾ ) was positive.
- ⁽ᵇ⁾ ⁽⁴⁾ Bioreactor E00063 was contaminated on July 27, 2018 (Deviation 18-163U; Exhibit RC-10). Liquid and swabs samples were taken as part of the investigation and a microbial growth was observed in the ⁽ᵇ⁾ ⁽⁴⁾ sample.
- Microbial growth was observed from an ⁽ᵇ⁾ ⁽⁴⁾ bag from the same lot of the ⁽ᵇ⁾ ⁽⁴⁾ used for the manufacture of the contaminated lots (Exhibit RC-11).

A summary of samples that resulted in microbial growth after the bioreactor contamination is included in Exhibit RC-9 (attachment within the exhibit).

The information above indicates that the ⁽ᵇ⁾ ⁽⁴⁾ Solution is a probable root cause of the contamination of the two ⁽ᵇ⁾ ⁽⁴⁾ bioreactors occurred in 2018. The contamination could have been prevented if bioburden of the ⁽ᵇ⁾ ⁽⁴⁾ solution had been part of the raw material sampling plan.

*(This section was written by MD)*

Observation 4.b

The firm's ⁽ᵇ⁾ ⁽⁴⁾ are supplied to all ⁽ᵇ⁾ ⁽⁴⁾ rooms and bioreactors. The ⁽ᵇ⁾ ⁽⁴⁾ testing are governed by SOP Q823 "Identification test for ⁽ᵇ⁾ ⁽⁴⁾

46

Establishment Inspection Report

Immunomedics, Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th. 2018
RC. MD. GB. RS

(b)(4) " (Revision 7.0, effective 5/13/2016). However, microbial testing is not carried out at the firm and the supplier specification does not include microbial testing. The (b)(4) are purchased from (b)(4) and supplier specifications include only identity specifications (Exhibit MD-1). Since (b)(4) contact the product in the (b)(4) bioreactors, all the raw materials including the (b)(4) used in the manufacture, needs to be tested for bioburden. Such testing need to be implemented to prevent future contamination events.

**Management's Response:**
When I (MD) requested the microbial testing for (b)(4) used in the facility, Mike Levitt, Head of Manufacture stated that (b)(4) are (b)(4) at the point of use and the (b)(4) is tested for (b)(4) integrity. Therefore, they do not perform microbial testing on (b)(4) I stated that, in addition to (b)(4) microbial testing of (b)(4) is required to reduce the contamination risk. The management agreed to perform microbial testing on (b)(4)
The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 5:**
The firm lacks procedures for inventory audit trail and for tracking and reconciliation of raw materials used to manufacture the (b)(4) intermediate. Specifically:

    a. The firm does not keep records tracing the use of raw material. Raw material reconciliation cannot be conducted as discarded raw materials are not documented. During the tour to the manufacturing facility on 8/6/2018, the inspection team observed a (b)(4) L container of (b)(4) in the loading dock for destruction. The material could not be traced.

    b. Warehouse raw material inventory list is kept in an Excel Spreadsheet that lacks history traceability. During the tour of the warehouse on 8/6/2018 Warehouse inventory cannot be located using the Excel Spreadsheet. Specifically, (b)(4) (catalog # (b)(4) . Lot # (b)(4) was present in the warehouse, however the location and inventory could not be provided.

    c. The warehouse is not adequately mapped for inventory purposes with floor plans. Items stored on the floor have no assigned location. In addition, quarantine and released items on the floor are kept side-by-side without a system in place to prevent the use of quarantined raw material.

**Supporting Evidence and Relevance:**
*(This section was written by RC)*
The warehouse does not have a traceable inventory system. The only manner to track material is through the batch record (looking at every single batch record and recording the material used). In addition, for (b)(4) purification, the batch record only lists the number of containers used but does not specify the volume or mass used. Tracing the raw materials through the batch record defeats the purpose of being able to account for material in case of errors or inconsistencies in the batch record.

47

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

(*This section was written by GB*)
On 8/7/2018, en route to the current cell bank storage area, a barrel containing <span>(b) (4)</span> L of <span>(b) (4)</span> <span>(b) (4)</span> Cat # <span>(b) (4)</span> ) with a quarantine label was observed at the loading dock of Building <span>(b) (4)</span> . Upon request, I was informed that the barrel was destined for destruction after it was brought from Building 410 for testing. To verify this information, proof of traceability was requested for this barrel. Immunomedics was unable to trace the whereabouts of this <span>(b) (4)</span> In addition, the warehouse in Building 410 inventory management is not adequate to trace <span>(b) (4)</span> raw materials.

Without the proper capabilities for tracking and tracing raw material, potential safety issues due to raw materials would be difficult to trace. Furthermore, the lack of properly mapping the warehouse material location has the potential of increasing the risk that the wrong or quarantine materials could be transferred and used in the manufacturing of <span>(b) (4)</span> further potentiating a safety issue.

**Management's Response:**
(*This section was written by GB and RC*)
The firm acknowledged that the inability to trace the raw material was a weakness and they indicated during the inspection that they were planning to implement Great Plains. In order to have some traceability they proposed to print a dated copy of the Excel Spreadsheet every morning to keep in their files (Exhibit RC-24). The inspection team did not comment about that. The firm indicated at the inspection close-out that they understood the seriousness of the observation, that they actively migrating the excel inventory list to a new digital system, and that they would respond to the FDA.

## Observation 6:

Differential pressure between GMP areas of different area classification is not adequately maintained and monitored. Specifically,

  a. Air pressure in the GMP areas is not adequately maintained. For example, differential pressure between Rooms <span>(b) (4)</span> (Class C <span>(b) (4)</span> suite <span>(b) (4)</span> and <span>(b) (4)</span> (Class D corridor) was out of action levels in 37 out of 40 measurements between July 24, 2018 and August 1, 2018.

  b. Continuous monitoring of pressure in the GMP areas has been installed in July 2018 and is undergoing qualification, however not all adjacent rooms with different air classification are alarmed for low pressure differential. For example, differential pressure between the Rooms <span>(b) (4)</span> (Class C <span>(b) (4)</span> suite <span>(b) (4)</span> and <span>(b) (4)</span> (Class D corridor) is not alarmed.

48

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
                                                       Morris Plains, NJ FEI # 1000526871
                                                       Inspection Dates: August 6th – August 14th, 2018
                                                       RC, MD, GB, RS

**Supporting Evidence and Relevance:**
(*This section was written by RC*)
The facility has a design with a ▒▒▒▒ to lower the risk of microbial contamination.
Areas with higher risk (open operations) or higher criticality (last steps of the purification
process) have higher pressure to prevent ingress of microorganisms in those areas.

The facility did not have a continuous monitoring system for pressure, temperature and humidity
prior to July 2018. Pressure was recorded manually ▒▒▒▒▒ during manufacturing
operations and recorded. I reviewed the data logs for the pressure differential between July 24
and August 1, 2018; the dates were chosen randomly as the last five days with recorded data
prior to the inspection. The pressure differential results were out of action levels in over 25% of
the measurements. Differential pressure between the ▒▒▒ suite ▒▒▒ (Room ▒▒▒ Class
C) and the clean corridor (Room ▒▒▒ Class D) were out of action limit in 92% of the
measurements (37 out of 40; Exhibit RC-12). The firm did not initiate a deviation.

In July 2018, the firm installed a continuous monitoring system for pressure, temperature, and
humidity. The system is currently under qualification; however; not all adjacent rooms that have
different classification are alarmed, including the ▒▒▒ suite ▒▒▒ (Room ▒▒▒ Class C)
and the clean corridor (Room ▒▒▒ Class D; Exhibit RC-13). It is not clear whether the lack of
alarm between these two rooms is related to their high number of excursions in the differential
pressure.

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the
observation and they would respond to the FDA.

**Observation 7:**
The design of the facility is inadequate in that no drains are present in the purification rooms. In
addition, there is no SOP for liquid containment and disposal after a catastrophic spill. All
process streams downstream the ▒▒▒ Bioreactor are held in disposable bags.

**Supporting Evidence and Relevance:**
(*This section was written by RC*)
The design of the facility does not include drains in any of the purification areas, although some
of these areas have ▒▒▒ points of use. In addition, all the manufacturing steps during
clarification, capture, and purifications are conducted in single-use bags of up to ▒▒▒ L. During
the purification tour I asked ▒▒▒ head of ▒▒▒ manufacturing, whether the
firm had an SOP for liquid containment and disposal after a catastrophic spill and he indicated
that there was none. Lack of a containment SOP in the absence of drains could result in large
areas of the facility covered by liquids in case of a catastrophic spill and in a potential
viral/microbial contamination.

49

Establishment Inspection Report

Immunomedics, Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC. MD. GB. RS

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 8:**
There is no signed Quality Agreement between (b) (4)                and
Immunomedics Inc. (b) (4)            is the supplier of cell culture media and all (b) (4)    solutions
(including (b) (4)    , and (b) (4)            used for (b) (4)      purification of the (b) (4)
(b) (4)      intermediate.

**Supporting Evidence and Relevance:**
(*This section was written by RC*)
The firm outsource most of the (b) (4)      and solutions used to manufacture the (b) (4)
intermediate from (b) (4)                including (b)(4)        ,
cell culture media, solutions added to the media, (b) (4)        solutions, and all (b) (4)      for
(b) (4)        purification. Because many of the materials provided by (b) (4)              are critical
raw materials for the manufacture of the (b) (4)      intermediate. failure on appropriate
manufacture, analytical procedures, storage, and shipping may result in impact to the (b) (4)
intermediate product quality. It is therefore necessary that the firm has an active oversight of the
supplier and has established procedures to address the responsibilities of each party.

During the inspection. I was informed that there was a Quality Agreement between the two
companies; however, when I asked to review the agreement, I was handed a copy of a final draft
of the agreement (Exhibit RC-14). The draft did not have a date nor signatures from any of the
involved parties (Immunomedics or (b) (4)      The firm indicated that they had an audit
program in place, however the firm does not have a clear understanding of the raw materials
supplier by (b) (4)      For example, on August 6, 2018 during the tour I asked the firm
whether the (b) (4)    supplied by (b) (4)    was (b) (4)    or (b) (4)      (the label
of the (b) (4)    indicates that it is (b) (4)    Quality (b) (4)    tested as per USP Sterile
(b) (4)          It took the firm three days to respond to my question because they did not know
the type of (b) (4)    that the supplier was providing. On August 9, 2018 the firm indicated that they
had called (b) (4)    to question them about the (b) (4)    and provided me with a presentation
(Exhibit RC-15) that indicates that the (b) (4)      is (b) (4)    However, deviation 18-015
was initiated on February 15, 2018 because personnel were incorrectly referring to USP sterile
packaged (b) (4)        as (b) (4)    In summary, it is not clear whether the company knows if they
are using (b) (4)      or (b) (4)

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the
observation and they would respond to the FDA.

**Observation 9:**
No procedure is in place for (b) (4)    intermediate (b) (4)      trending of results. During the process
validation (PPQ) campaign, bioburden levels in the (b) (4)        were not trended and

50

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

---

inadequately high bioburden levels were not investigated. Low level bioburden (29 to 186 CFU/100 mL) was observed in the (b)(4) after sanitization in PPQ batches (b)(4) and the bioburden level increased to too numerous to count in PPQ batch(b)(4) No deviation was initiated.

**Supporting Evidence and Relevance:**

(*This section was written by RC*)

The firm has collected microbiology samples at several points of the manufacturing process since February 2017 (prior to the PPQ campaign). The firm has established in-process specifications for the in-process samples, such as (b)(4) The rest of the samples, including samples before and after sanitization of (b)(4) and samples from the load were for information only and did not have action or alert limits. On august 7, 2018, I requested a list of bioburden results for all samples collected during manufacturing (Exhibit RC-2) and a similar list covering the PPQ and commercial batches was also provided as part of the investigation of NCR18-009U (Exhibit RC-1; Exhibit RC-16). Both lists show an upwards trend of the bioburden in the (b)(4) after sanitization (PPQ batches, bioburden results in CFU/100 mL: 1, 35, 186, 120, 29, TNTC). I indicated that the data showed that the sanitization of the (b)(4) may be inadequate and had contaminated the (b)(4) I asked for the deviation resulting from the contamination event. However, no deviation had been initiated due to the upward trend of bioburden data or to the contamination of the (b)(4) I interviewed Dr. Edmund Rossi, VP Process and Manufacturing Sciences, regarding this event and he indicated that no deviation had been initiated because the data was not trended. Then, he indicated that, except for in-process samples, the bioburden data was not reviewed by QA, and that the microbiology department recorded the data and sent all the organisms for identification, but nobody did anything with the data. This statement was contradicted later by the Quality team, who indicated that all the bioburden data was reviewed.

In summary, the firm collected bioburden data but ignored the data and did not trend or use them. In the case of the (b)(4) lack of data trending resulted in contamination of the (b)(4) Because the low-level bioburden data was ignored by the firm, the firm did not realize that sanitization of the (b)(4) was not adequate, and this eventually resulted in a contamination of the (b)(4) It is not clear what the bioburden levels were in the in-process (b)(4) from the (b)(4) step because those samples were manipulated by (b)(4) them prior to sending them to the QC lab.

**Management's Response:**

(*This section was written by RC*)

The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 10:**

Deviation investigations and CAPA implementations are inadequate. For example, Deviation 18-053U was initiated after an internal audit concluded that the (b)(4) had not been adequately tested for integrity pre- or post-(b)(4) The deviation included the following deficiencies:

Establishment Inspection Report

Immunomedics, Inc.. 300 The American Road.
Morris Plains. NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

a.  Lot number in the deviation form indicates "multiple lots" without specifying the potential lots impacted.

b.  Product impact assessment includes the conclusion of a clinical Health Hazard Assessment, but no risk assessment on the presence of (b) (4)     in the product is documented.

c.  The CAPA section indicates that remediation included "… purchasing additional test equipment to evaluate the (b) (4)    pre & post its use." However, at the date of the inspection no additional equipment has been purchased and no information about the CAPA is documented in the deviation.

**Supporting Evidence and Relevance:**
*(This section was written by RC)*
The review of the deviations indicates that the Quality Unit, not only fails to initiate deviations (refer to observations 1 and 9), but in addition the deviations are not conducted, documented, investigated and corrected properly. One example is NCR 18-053U (Exhibit RC-17): the deviation was initiated after a data integrity breach revealed that the (b) (4)    integrity test had not been conducted. The deviation report lacks specificity and the information it is not accurate. The deviation (non-conformance report) was initiated on April 9, 2018 and closed the same day. Signature authority for approval included 1) Initiator: Anne Kelly, Sr. VP quality; 2) Department manager: Anne Kelly, Sr. VP quality; 3) Regulatory Affairs: (b) (6)            , 4) Quality Assurance: Anne Kelly, Sr. VP quality. Signature authority for closure was also Anne Kelly, Sr. VP quality. It is noted that the deviation was closed on April 9, before Regulatory Affairs signed on the deviation on April 10. The deviation report indicates that the date of the event was February 2018, however February 2018 was the date in which the event was discovered, and the event was ongoing for an undetermined period. Lots impacted by the deviation are not listed, instead there is a vague statement indicating "multiple lots", but no information on which lots or potential lots were impacted by the event. The event description indicates that the practice of not (b) (4)    was widespread "*the practice during* (b) (4)    *of* (b) (4)   *in manufacturing was to visually observe for* (b) (4)    *in the* (b) (4)   *pre- and post-use without* (b) (4)    Therefore, it appears that all lots prior to the discovery of the event were impacted.

The deviation report includes a Product Impact section (Section IV), however, the information included in this section is unrelated to product impact due to lack of (b) (4)    integrity testing. The section refers to a Health Hazard Evaluation submitted to (b) (4)    on March 1st (HHE, Attachment RC-4), 2018. The HHE was conducted to address a "*bioburden sampling procedure for the* (b) (4)   *intermediate, that was not specified in out Master Batch Record*" and addressed patient exposure to pyrogens due to a hypothetical microbial contamination. No information regarding (b) (4)    contamination is included in the HHE. In addition. one of the assumptions in the HHE to assess patient hazard is that "*All purification and sterilization steps and testing to include bioburden,* (b) (4)    *and endotoxin reduction and sterile* (b) (4)    *subsequent to the purification step were in full compliance.*" This assumption is incorrect as the (b) (4)    were not tested for integrity.

**Establishment Inspection Report**                Immunomedics, Inc.. 300 The American Road.
                                                   Morris Plains. NJ FEI # 1000526871
                                                   Inspection Dates: August 6ᵗʰ – August 14ᵗʰ, 2018
                                                   RC. MD. GB. RS

---

The deviation report includes a CAPA section (Section V) that indicates that the event was remediated by February 2018 by "*purchasing additional test equipment to evaluate the* (b) (4) *pre-and post- use.*" However, the firm has not purchase any additional equipment to evaluate the (b) (4) integrity up to the time of the inspection closure. No CAPA documentation or tracking number are included in the deviation report.

On August 4ᵗʰ, 2018 an addendum was added to the deviation report. The addendum appears to be a summary update on the CAPAs for the deviation; however, no CAPA tracking number is included and the information. The person that prepared the addendum is not included, just an illegible signature at the end of it.

In summary, the deviation was opened and closed on the same day two months after the event was discovered. Most of the relevant information that should be part of the deviation is missing, including lots impacted, and impact to product quality. In addition, information related to corrective actions is incorrect.

The example above is one of many deviations that were inadequate. Most of the deviations forms are not filled, but they refer to an attachment that may be provided with the deviation. The attachments cannot be tracked and they are usually not signed. As examples, refer to deviation 18-116U (Exhibit RC-18) opened on June 20, 2018; all sections in this deviation are left blank and refer to attachment 1 from June 20ᵗʰ, 2018; however, the attachment provided with the deviation is dated August 3. 2018. An additional page provided with the deviation indicates that the initial version dated June 20. 2018 is not available.

Deviation 18-050U (Exhibit RC-19) was initiated on April 9, 2018; all sections in this deviation are left blank except for the final justification. The blank sections refer to attachment form dated June 21, 2018; however, the attachment provided with the deviation is dated July 10, 2018. It is noted that the information in the attachment indicates that cell expansion for lot (b) (4) was terminated and a second vial thaw was performed for the same lot number. The attachment indicates that recovery and expansion were also inconsistent following the second vial expansion. The deviation unveiled the following:

- The firm used the same lot number ((b) (4)) for two independent cell vials (vials 200 and 201: Exhibit RC-20),
- A different deviation (18-081U; Exhibit RC-9) was initiated due to a contamination of the (b) (4) Bioreactor for the same lot (b) (4)
- Inconsistent cell growth performance is a recurrent event; batch (b) (4) (b) (4) was stopped due to a cell growth issue. In addition, the second vial thawed for (b) (4) had lower than expected viability.

The fact that the two vial thaws (vial 200 and 201) were assigned the same lot number (b) (4) underestimates the number of failed recent manufacturing runs. The firm provided a Process Lot history (Exhibit RC-21) that shows that after (b) (4) (b) (4) in March 2018, (b) (4) batches were initiated, (b) (4) of them failed due to cell culture contamination and (b) (4) failed due to cell viability issues (60% failure rate); however, the discarded

53

Establishment Inspection Report

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

expansion culture initiated from vial 200 due to poor cell viability was not included in the list. **The number of failed lots relative to started cultures (including the two cultures from lot** (b) (4) **is** (b)(4) **%; from these lots,** (b) (4) **%** (b)(4) **out of** (b)(4) **failed due to contamination of the** (b) (4) **Bioreactor and** (b) (4) **%** (b)(4) **out of** (b)(4) **failed due to poor cell viability. In addition, the culture initiated from vial 200 although was within cell viability specifications resulted in lower growth than expected viability (Deviation 18-050U; Exhibit RC-019, page 7); therefore,** (b)(4) **% of the vials thawed after** (b) (4) **resulted in poor cell viability/growth:**

- **Vial 201 (lot** (b) (4) **poor growth and culture discarded (Deviation 18-050U; Exhibit RC-019)**
- **Vial 200** (b) (4) **note that this is the same lot): the viability of this vial was lower than previous runs but within AC (Deviation 18-050U; Exhibit RC-019)** (in addition, bioreactor contamination; culture discarded (Deviation 18-081U)
- Vial 199 ( (b) (4) ; going through purification at the time of the inspection
- (b) (4) **from vial 199** (b) (4) **: poor growth and culture discarded (No deviation initiated)**
- Vial 197 (b) (4) ; pending purification at the time of the inspection
- (b) (4) from vial 197 (b) (4) ; bioreactor contamination; culture discarded (Deviation 18-163U)
- (b) (4) from vial 197 (b) (4) ; (b) (4) expansion in progress; unknown
- Vial 184 (b) (4) expansion in progress; unknown.

**Cell viability from cultures prior to the facility** (b) (4) **is questionable due to lack of transparency regarding the data integrity breach; the percentage of failed lots cannot be traced because more than one vial may result in the same lot; in addition, a back-up culture is started from each vial, therefore failed vial thaws may have not been accounted for prior to the discovery of the DIB.** Based on these rates, the firm does not appear to be able to consistently manufacture the (b) (4) intermediate. The inspection team was not aware of this information at the time of the inspection close-out.

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA. Note that information regarding Deviation 18-050U was not communicated to the firm as the inspection team was not aware of the problem at the time.

54

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                                   Inspection Dates: August 6th – August 14th, 2018
                                                   RC, MD, GB, RS

---

**Observation 11:**

Deviation initiation and closing times are inadequate. Specifically:

    a.  SOP-0152 "Deviation handling" indicates that if the deviation cannot be completed by the assigned due date, a one-time extension can be requested to the QA unit. The following deviations were not closed by the due date and did not include an extension:

        i.  18-116U: deviation due date was 7/20/2018; deviation was open at the time of the inspection

        ii.  18-081U: deviation due date was 6/17/2018; deviation was open at the time of the inspection

        iii.  18-079U: deviation due date was 6/16/2018; deviation was closed on 8/3/2018

        iv.  18-050U: deviation due date was 5/9/2018; deviation was open at the time of the inspection

    b.  SOP-0152 "Deviation Handling" does not specify a time limit between time/discovery of event and deviation initiation. The following deviations were initiated more than one month after event discovery:

        i.  18-009U: investigation into bioburden OOS #18-001 for (b) (4) date of event was 1/10/2018, deviation was initiated on 3/27/2017.

        ii.  18-053U: (b) (4)      related discrepancy; date of event was February 2018, deviation was initiated on 4/9/2017.

**Supporting Evidence and Relevance:**

*(This section was written by RC)*

Supporting evidence regarding time limits included in the SOP-0152 "Deviation handling" is included in Exhibit RC-22. Supporting evidence for deviations not closed on time are included in Exhibits RC-18 (Deviation 18-116U), Exhibit RC-9 (Deviation 18-081U), Exhibit RC-23 (Deviation 18-079U), Exhibit RC-1 (Deviation 18-009U), and Exhibit RC-17 (Deviation 18-053U). Note that Deviations are sometimes referred to as Non-conformance reports.

**Management's Response:**

*(This section was written by RC)*

The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 12:**

Cleaning of downstream equipment, including (b) (4) and product-contact parts of the (b) (4) is not validated or verified. Non-conformance report 18-009 initiated due to a (b) (4) (b) (4) OOS bioburden sample includes as the primary root cause the (b) (4) contaminated during vendor (b) (4) testing.



**Supporting Evidence and Relevance:**

*(This section was written by RC)*

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                    Morris Plains, NJ FEI # 1000526871
                                                    Inspection Dates: August 6th – August 14th, 2018
                                                    RC, MD, GB, RS

The firm does not have validated the cleaning of downstream equipment; cleaning verification is not conducted either. The firm's rationale was that cleaning validation or verification is not necessary because the facility is dedicated to ⁽ᵇ⁾⁽⁴⁾ intermediate. This is not sufficient because the cleaning protocol needs to be adequate to support microbial control of the product. The main root cause of a contamination (refer to Deviation 18-0009U, Exhibit RC-1) that resulted in an OOS and lot rejection was traced to a contaminated ⁽ᵇ⁾⁽⁴⁾ If the firm had had a validated cleaning procedure or had verified the sanitization of the ⁽ᵇ⁾⁽⁴⁾ prior to use, the OOS may have been prevented.

**Management's Response:**
(*This section was written by RC*)
The firm indicated at the inspection close-out that they understood the seriousness of the observation and they would respond to the FDA.

**Observation 13:**
The procedure to prevent contamination of the ⁽ᵇ⁾⁽⁴⁾ intermediate after ⁽ᵇ⁾⁽⁴⁾ is inadequate for a product stored 2 to 8°C for up to ⁽ᵇ⁾⁽⁴⁾ Specifically, during a mock ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ and dispensing of an ⁽ᵇ⁾⁽⁴⁾ intermediate surrogate conducted on August 9, 2018, the following was observed:

  a. After ⁽ᵇ⁾⁽⁴⁾ the surrogate was transferred first to a single use ⁽ᵇ⁾⁽⁴⁾ L bag (SUB) and then from the SUB to ⁽ᵇ⁾⁽⁴⁾ The SUB was removed from its container and assembled in the Biologic Safety Cabinet (BSC) used for ⁽ᵇ⁾⁽⁴⁾ and dispensing. Multiple open-process manipulations were conducted to prepare the SUB, including ⁽ᵇ⁾⁽⁴⁾

  b. During the SUB preparation process, the end of the ⁽ᵇ⁾⁽⁴⁾ downstream the ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ was observed to touch the operator's hands, the surfaces of the BSC, and the material placed inside the BSC.

  c. Prior to filling the ⁽ᵇ⁾⁽⁴⁾ analytical samples were collected into ⁽ᵇ⁾⁽⁴⁾ The ⁽ᵇ⁾⁽⁴⁾ of the ⁽ᵇ⁾⁽⁴⁾ used to fill the ⁽ᵇ⁾⁽⁴⁾ and the ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ are similar. In addition, the flow of the ⁽ᵇ⁾⁽⁴⁾ surrogate was not continuous and was difficult to control. As a result, the surrogate was spilled during the sampling process.

**Supporting Evidence and Relevance:**
(*This section was written by MD*)
The ⁽ᵇ⁾⁽⁴⁾ step, which includes ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ are governed by SOP-0644 for the operation of ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ and SOP-0059 for set up and use of the ⁽ᵇ⁾⁽⁴⁾ The ⁽ᵇ⁾⁽⁴⁾ ⁽ᵇ⁾⁽⁴⁾ step of the manufacturing is carried out in the BSC. Since the ⁽ᵇ⁾⁽⁴⁾ intermediate is stored at 2 to 8°C for up to ⁽ᵇ⁾⁽⁴⁾ , the contamination risk is high. For such high-risk drug substance intermediate, procedures to prevent contamination is inadequate. This open process is inefficient as it includes unnecessary steps such as ⁽ᵇ⁾⁽⁴⁾ In addition, the assembly of the SUB was

56

**Establishment Inspection Report**                    Immunomedics, Inc., 300 The American Road,
                                                        Morris Plains, NJ FEI # 1000526871
                                                        Inspection Dates: August 6th – August 14th, 2018
                                                        RC, MD, GB, RS

a challenge to the operator as it involves (b)(4) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
(b)(4) ▓▓▓▓▓▓▓▓ to the SUB (MD-2). These manipulations further increase the
contamination risk as we witnessed the end of the (b)(4) downstream the (b)(4) touching
the operator's hands, the surfaces of the BSC, and the material placed inside the BSC. The head
of downstream manufacturing, (b)(6) ▓▓▓▓▓ , head of downstream manufacturing who watched
process with me (MD) and RC agreed with us. Although he has been on the job for 2 months, he
stated that, this is the first time he has seen this process. This suggests that the lack of oversight
from the management.
.

**Management's Response:**
RC and I (MD) communicated to the management that this process is inefficient and includes
unnecessary steps. The management also agreed that the (b)(4) filling process is inefficient and
stated that they will make the process more efficient by eliminating unnecessary steps.


**XVI. General discussion with management**
The following verbal observations/discussion items were communicated verbally to the firm
during the inspection:

*Verbal observations Written by RC:*

RC-1: Deviations documentation is inadequate.
The deviation procedure SOP has a template to be filled when a deviation is documented.
However, the only section of the template that is consistently filled is the title and deviation
initiation. All information regarding description, product impact, and root cause investigation is
left blank and it may be reference to an attachment. The dates or authors of the attachment are
usually not traceable. Exhibits to support this deviation are included in the exhibits to 483-FDA
observation 10.

RC-2: Environmental monitoring sampling is inadequate
The Environmental Monitoring program of the firm allows them to sanitize the area and then
resample in case of an OOS. The resampling practice is inappropriate because it invalidates the
first above-action-limit sample; in addition, since the resample is taken immediately after
sanitization, the result would not be representative of the hygienic status of the area. This did not
result in an FDA-483 observation because the initial results are documented in the EM result
charts, the firm sanitizes the area after finding the initial excursion, lowering the risk to product
contamination, and the firm has initiated a change control to initiate a deviation after the initial
excursion.


*Verbal observations Written by MD:*

MD-1: Pest control system outsourced to (b)(4) ▓▓▓▓▓▓▓ and monitored by QA is
inadequate. Although large number of inspects were observed (more than the threshold), (b)(4) ▓▓
reported no activity in insect traps.

57

Establishment Inspection Report                    Immunomedics, Inc., 300 The American Road,
                                                   Morris Plains, NJ FEI # 1000526871
                                                   Inspection Dates: August 6th – August 14th, 2018
                                                   RC, MD, GB, RS

This observation is an oversight by (b)(4)    and QC. This did not result in an FDA-483
observation as there was no product impact. Thus, this observation was communicated as a
verbal recommendation. I communicated to the firm that if there is a failure in the current pest
control devices, the QC will not detect them. The firm agreed to monitor the pest control system
managed by (b)(4)    (See pest control section)

MD-2: Performing bioburden testing and growth promotion testing in the same BSC and,
incubating the plates from bioburden assay and growth promotion studies in the same incubator
increase the contamination risk of test samples.

Since, this observation does not impact the product quality, it was communicated as a verbal
recommendation. The increased contamination risk of test samples may give rise false positives
(See Microbiology Laboratory section).

## XVII. Attachments

| | |
|---|---|
| Attachment 1 | Notice of Inspection FDA 482 |
| Attachment 2 | Inspectional Observation Form FDA 483 |
| Attachment RC-1 | Letter to (b)(4) |
| Attachment RC-2 | Letter to (b)(4) |
| Attachment RC-3 | Process Validation Report MF-0119-PV-R |
| Attachment RC-4 | Health Hazard Evaluation, (b)(4) |

## XVIII. Exhibits

| | |
|---|---|
| Exhibit 1 | Individuals present at the opening of the inspection |
| Exhibit 2 | Individuals present at the closing of the inspection |
| Exhibit 3 | Organizational chart of Immunomedics |

| | |
|---|---|
| Exhibit RC-1 | Non-Conformance Report 18-009U |
| Exhibit RC-2 | Bioburden results of in-process samples |
| Exhibit RC-3 | SOP-0162 v4.0 Eff August 3, 2018 "Out of Specification Investigations" |
| Exhibit RC-4 | OOS Investigation Report 18-0001 |
| Exhibit RC-5 | (b)(4)    mL |
| Exhibit RC-6 | Change Control 13-521 |
| Exhibit RC-7 | Change Control 17-009P |
| Exhibit RC-8 | Material Specification Sheet for (b)(4)    Solution |
| Exhibit RC-9 | Deviation Report 18-081U |
| Exhibit RC-10 | Deviation Report 18-163U |
| Exhibit RC-11 | Positive samples recovered from contaminated bioreactors |
| Exhibit RC-12 | Differential Pressure Data from July 24, 2018 to August 1 2018 |
| Exhibit RC-13 | Form FRM-0267 v1.0 Eff August 4, 2018 " Differential Pressure Temperature and Relative Humidity Monitoring for Purification" |
| Exhibit RC-14 | (b)(4)    Quality Agreement, Final Draft for Execution |
| Exhibit RC-15 | (b)(4)    presentation, august 9, 2018 |

58

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

Exhibit RC-16   Purification Bioburden Data Evaluated during Investigation of 18-009
Exhibit RC-17   Non-Conformance Report 18-053U
Exhibit RC-18   Deviation Report 18-116U
Exhibit RC-19   Deviation Report 18-050U
Exhibit RC-20   Process (b)(4) Batches from vial thaw
Exhibit RC-21   Process (b)(4) Lot History, including disposition
Exhibit RC-22   SOP-0152 v3.0 Eff June 29, 2018 "Deviation Handling"
Exhibit RC-23   Deviation Report 18-079U
Exhibit RC-24   Excel Sheet for Immunomedics inventory

MD-1        (b)(4)  specifications for (b)(4)
MD-2        Pest control threshold

RS-1.       SOP-0141 Management of regulated documents v2.0 eff 6/13/2018. (20 pages)
RS-2.       (b)(4) log sheets for (b)(4) . (6 pages)
RS-3.       Deviation # 18-1854, Recording data in a logbook on an uncontrolled form. (8 pages)
RS-4.       SOP-Q626 Monitoring of the USP (b)(4) system v9 eff 4/1/2013.
            (19 pages)
RS-5.       List of equipment for the manufacturing of (b)(4) drug substance. (3 pages)
RS-6.       SOP-C399 Preventive maintenance program for cell culture process equipment. (14
            pages)
RS-7.       List of consumables for (b)(4) L Bioreactor. (2 pages)
RS-8.       List of consumables serviced during PM of the (b)(4) L bioreactor, equipment ID #
            E00060. (1 page)
RS-9.       List of testing equipment in QC analytical laboratories. (5 pages)

59

**Establishment Inspection Report**

Immunomedics, Inc., 300 The American Road,
Morris Plains, NJ FEI # 1000526871
Inspection Dates: August 6th – August 14th, 2018
RC, MD, GB, RS

## XIX. Signatures

Maria D.
Candauchacon -S

Digitally signed by Maria D. Candauchacon -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA,
ou=People, 0.9.2342.19200300.100.1.1=2000639745,
cn=Maria D. Candauchacon -S
Date: 2018.09.26 16:44:51 -04'00'

Reyes Candau-Chacon, Ph.D., Microbiologist
CDER/OPQ/OPF/DMA

Madushini N. Dharmasena -S

Digitally signed by Madushini N. Dharmasena -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA,
ou=People, 0.9.2342.19200300.100.1.1=0014260605,
cn=Madushini N. Dharmasena -S
Date: 2018.09.27 01:30:37 -04'00'

Madushini Dharmasena, Ph.D., Staff fellow
CDER/OPQ/OPF/DMA

Gunther H.
Boekhoudt -S

Digitally signed by Gunther H. Boekhoudt -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=FDA, ou=People,
0.9.2342.19200300.100.1.1=2000605472,
cn=Gunther H. Boekhoudt -S
Date: 2018.09.27 00:00:12 -04'00'

Gunther Boekhoudt, Ph.D., Staff fellow
CDER/OPQ/OBP

Rajiv R.
Srivastava -S

Digitally signed by Rajiv R. Srivastava -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA,
ou=People,
0.9.2342.19200300.100.1.1=2002112232, cn=Rajiv
R. Srivastava -S
Date: 2018.09.27 07:28:24 -04'00'

Rajiv Srivastava, Consumer Safety Officer
ORA